| DISTRICT COURT, LARIMER COUNTY, STATE OF COLORADO | |
|---|---|
| Court Address:    Larimer County Justice Center 201 LaPorte Avenue, Suite 100 Fort Collins, CO 80521 Telephone No.:    (970) 498-6100 | DATE FILED: November 8, 2017 6:13 PM FILING ID: C85E7852CA1C7 CASE NUMBER: 2017CV30940 |
| **Plaintiffs:** MCWHINNEY HOLDING COMPANY, LLLP, a Colorado Limited Liability Limited Partnership; MCWHINNEY CENTERRA LIFESTYLE CENTER, LLC, a Colorado Limited Liability Company v. **Defendants:** G. DAN POAG, an individual; JOSHUA D. POAG, an individual; TERRY W. McEWEN, an individual; POAG & McEWEN LIFESTYLE CENTERS - CENTERRA, LLC, a Delaware Limited Liability Company;  POAG & McEWEN LIFESTYLE CENTERS, LLC, a Delaware Limited Liability Company;  POAG LIFESTYLE CENTERS, LLC, a Delaware Limited Liability Company; POAG SHOPPING CENTERS, LLC, a Delaware Limited Liability Company; POAG & McEWEN LIFESTYLE SHOPPING CENTERS, LLC, a Delaware Limited Liability Company; POAG BROTHERS, LLC, a Tennessee Limited Liability Company; JOSHUA D. POAG, an individual acting as co-trustee of the Josh and Chloee Poag 2004-GST Exempt Trust; THOMAS M. SULLIVAN, an individual acting as co-trustee of the Josh and Chloee Poag 2004-GST Exempt Trust, JEREMY M. POAG, an individual acting as co-trustee of the Jeremy and Chloee Poag 2004-GST Exempt Trust; THOMAS M. SULLIVAN, an individual acting as co-trustee of the Jeremy and Chloee Poag 2004-GST Exempt Trust; D. MARK POAG, an individual acting as co-trustee of the Mark and Chloee Poag 2004-GST Exempt Trust; THOMAS M. SULLIVAN, an individual acting as co-trustee of the Mark and Chloee Poag 2004-GST Exempt Trust; JOSHUA D. POAG, an individual acting as co-trustee of the Josh and Dan Poag 2004-GST Exempt Trust; THOMAS M. SULLIVAN, an individual acting as co-trustee of the Josh and Dan Poag 2004-GST Exempt Trust; JEREMY M. POAG, an individual acting as co-trustee of the Jeremy and Dan | ▲COURT USE ONLY▲ Case Number: _____ Div.: _____ |

-1-

**EXHIBIT** tabbies® A1

Poag 2004-GST Exempt Trust; THOMAS M. SULLIVAN, an individual acting as co-trustee of the Jeremy and Dan Poag 2004-GST Exempt Trust; D. MARK POAG, an individual acting as co-trustee of the Mark and Dan Poag 2004-GST Exempt Trust; THOMAS M. SULLIVAN, an individual acting as co-trustee of the Mark and Dan Poag 2004-GST Exempt Trust; DOE INDIVIDUALS 1-10; DOE TRUSTS 11-30; and ROE CORPORATIONS 31-60.

*Attorneys for Plaintiffs*:
David A. Robinson, Esq. (CO#46877) (CA#107613)
ENTERPRISE COUNSEL GROUP, ALC
Three Park Plaza, Suite 1400
Irvine, CA  92614
Phone Number: (949)  833-8550
FAX Number:  (949)  833-8540
Email:    drobinson@enterprisecounsel.com

## COMPLAINT FOR:

**(1) FRAUDULENT CONCEALMENT,**

**(2) FRAUDULENT MISPRESENTATION,**

**(3) BREACH OF FIDUCIARY DUTY,**

**(4) CIVIL CONSPIRACY,**

**(5) FRAUDULENT TRANSFER pursuant to COLO. REV. STAT. § 38-8-108, and**

**(6) DECLARATORY RELIEF pursuant to COLO. REV. STAT. § 13-51-101 *et seq.* and COLO. R. CIV. PROC. 57**

Plaintiffs McWHINNEY HOLDING COMPANY, LLLP ("McWHINNEY") and

McWHINNEY CENTERRA LIFESTYLE CENTER, LLC ("MCLC") (collectively,

"PLAINTIFFS")[1] hereby bring this complaint against G. DAN POAG ("DAN"), an

---

[1]  PLAINTIFFS herein were also plaintiffs in the related, previously tried State court litigation—*i.e.*, "*McWHINNEY v. POAG*"—described at paragraph 28 *infra*.  Initially, there were other *McWHINNEY v. POAG* plaintiffs, but the others were dismissed before trial.

individual, JOSHUA D. POAG ("JOSH"), an individual, TERRY W. McEWEN ("TERRY"), an individual, POAG & McEWEN LIFESTYLE CENTERS – CENTERRA, LLC, a Delaware Limited Liability Company ("P&M CENTERRA"), POAG & McEWEN LIFESTYLE CENTERS, LLC, a Delaware Limited Liability Company ("PMLC"), POAG LIFESTYLE CENTERS, LLC, a Delaware Limited Liability Company ("PLC"),[2] POAG SHOPPING CENTERS, LLC, a Delaware Limited Liability Company ("PSC"), POAG & McEWEN LIFESTYLE SHOPPING CENTERS, LLC, a Delaware Limited Liability Company ("PMLSC"), POAG BROTHERS, LLC, a Tennessee Limited Liability Company ("POAG BROS"), JOSHUA D. POAG, an individual acting as co-trustee of the Josh and Chloee Poag 2004-GST Exempt Trust, THOMAS M. SULLIVAN, an individual acting as co-trustee of the Josh and Chloee Poag 2004-GST Exempt Trust, JEREMY M. POAG, an individual acting as co-trustee of the Jeremy and Chloee Poag 2004-GST Exempt Trust, THOMAS M. SULLIVAN, an individual acting as co-trustee of the Jeremy and Chloee Poag 2004-GST Exempt Trust, D. MARK POAG, an individual acting as co-trustee of the Mark and Chloee Poag 2004-GST Exempt Trust, THOMAS M. SULLIVAN, an individual acting as co-trustee of the Mark and Chloee Poag 2004-GST Exempt Trust, JOSHUA D. POAG, an individual acting as co-trustee of the Josh and Dan Poag 2004-GST Exempt Trust, THOMAS M. SULLIVAN, an individual acting as co-trustee of the Josh and Dan Poag 2004-GST Exempt Trust, JEREMY M. POAG, an individual acting as co-trustee of the Jeremy and Dan Poag 2004-GST Exempt Trust, THOMAS M. SULLIVAN, an individual acting as co-trustee of the Jeremy and Dan Poag 2004-GST Exempt Trust (collectively, the "TRUSTEE DEFENDANTS"), DOE

---

[2] P&M CENTERRA, PMLC and PLC were defendants in *McWHINNEY v. POAG*; the other named defendants herein were not.

INDIVIDUALS 1-10, DOE TRUSTS 11-30[3], ROE CORPORTAIONS 31-60 and each of them (collectively, "DEFENDANTS"), for fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, civil conspiracy, fraudulent transfer of assets and declaratory relief.

## JURISDICTION & VENUE

1.    This Court has jurisdiction in this matter as alleged in this complaint pursuant to Colorado Revised Statute section 13-1-124.

2.    Venue is proper in Larimer County, Colorado pursuant to Colorado Rules of Civil Procedure 98(a) and 98(c)(5) because all, or a majority, of the actions alleged in this complaint occurred, were accomplished, and/or had their purposeful effect in Larimer County, Colorado.

## PARTIES

3.    McWHINNEY is a limited liability limited partnership in good standing, organized and existing under and by virtue of the laws of the State of Colorado.  At all times herein mentioned, McWHINNEY has done business, and continues to do business, as a real estate owner and developer in the State of Colorado.  At the time of the events described herein, McWHINNEY's principal place of business was in Larimer County.  Presently, McWHINNEY maintains offices in both Larimer and Denver Counties.

4.    MCLC is a limited liability company in good standing, organized and existing under and by virtue of the laws of the State of Colorado.  At all times herein

---

[3]  By naming "DOE TRUSTS" in this complaint, PLAINTIFFS do not represent that they intend to add any trusts, to the extent discovered, as entity defendants in this matter, but rather, PLAINTIFFS will amend, if necessary, to add the respective *trustees* of the trusts in their capacities as said trustees.  The nomenclature "DOE TRUSTEES" is used simply to differentiate between the unknown defendants.

mentioned, MCLC did business in the State of Colorado with its principal place of business in Larimer County.

5.      PLAINTIFFS are informed and believe, and thereon allege, JOSH is, and at all relevant times was, a citizen and resident of the State of Tennessee.  PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned JOSH owned an interest in PMLC, P&M CENTERRA, PSC, PLC, POAG BROS, and other ROE CORPORATIONS 31-60 either individually or through his interest and/or control over various estate planning mechanisms or through his ownership of other ROE CORPORATIONS.

6.      PLAINTIFFS are informed and believe, and thereon allege, DAN is, and at all relevant times was, a citizen and resident of the State of Tennessee.  PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned DAN owned an interest in PMLC, P&M CENTERRA, PSC, PLC, and other ROE CORPORATIONS 31-60 either individually or through his interest and/or control over various estate planning mechanisms or through his ownership of other ROE CORPORATIONS.

7.      PLAINTIFFS are informed and believe, and thereon allege, TERRY is, and at all relevant times was, a citizen and resident of the State of Tennessee.  PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned TERRY either owned, or continues to own, an interest in PMLC, P&M CENTERRA, PSC, PLC, and other ROE CORPORATIONS 31-60 either individually or through his interest and/or control over various estate planning mechanisms or through his ownership of other ROE CORPORATIONS.

-5-

8.     PLAINTIFFS are informed and believe, and thereon allege, PMLC is a limited liability company organized and existing under and by virtue of the laws of the State of Delaware.  PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned PMLC was headquartered in the State of Tennessee with its principle place of business in Memphis, Tennessee.

9.     PLAINTIFFS are informed and believe, and thereon allege, P&M CENTERRA is a limited liability company organized and existing under and by virtue of the laws of the State of Delaware.  PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned P&M CENTERRA was headquartered in the State of Tennessee with its principle place of business in Memphis, Tennessee.

10.     PLAINTIFFS are informed and believe, and thereon allege, PLC is a limited liability company organized and existing under and by virtue of the laws of the State of Delaware.  PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned PLC was headquartered in the State of Tennessee with its principle place of business in Memphis, Tennessee.

11.     PLAINTIFFS are informed and believe, and thereon allege, PSC is a limited liability company organized and existing under and by virtue of the laws of the State of Delaware.  PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned PSC was headquartered in the State of Tennessee with its principle place of business in Memphis, Tennessee.

12.     PLAINTIFFS are informed and believe, and thereon allege, PMLSC is a limited liability company organized and existing under and by virtue of the laws of the State of Delaware.  PLAINTIFFS are further informed and believe, and thereon allege,

at all times herein mentioned PMLSC was headquartered in the State of Tennessee with its principle place of business in Memphis, Tennessee.

13.    PLAINTIFFS are informed and believe, and thereon allege, POAG BROS is a limited liability company organized and existing under and by virtue of the laws of the State of Delaware.  PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned POAG BROS was headquartered in the State of Tennessee with its principle place of business in Memphis, Tennessee.

14.    PLAINTIFFS are informed and believe, and thereon allege, JOSHUA D. POAG, as co-trustee of the Josh and Chloe Poag 2004-GST Exempt Trust is, and at all relevant times was, a citizen and resident of the State of Tennessee.  PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned the Josh and Chloe Poag 2004-GST Exempt Trust either owned, or continues to own, an interest in PMLC, P&M CENTERRA, PSC, PLC, and other ROE CORPORATIONS 31-60.

15.    PLAINTIFFS are informed and believe, and thereon allege, THOMAS M. SULLIVAN, as co-trustee of the Josh and Chloe Poag 2004-GST Exempt Trust is, and at all relevant times was, a citizen and resident of the State of Tennessee.  PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned the Josh and Chloe Poag 2004-GST Exempt Trust either owned, or continues to own, an interest in PMLC, P&M CENTERRA, PSC, PLC, and other ROE CORPORATIONS 31-60.

16.    PLAINTIFFS are informed and believe, and thereon allege, JEREMY M. POAG, as co-trustee of the Jeremy and Chloe Poag 2004-GST Exempt Trust is, and at all relevant times was, a citizen and resident of the State of Tennessee.  PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned the

Jeremy and Chloe Poag 2004-GST Exempt Trust either owned, or continues to own, an interest in PMLC, P&M CENTERRA, PSC, PLC, and other ROE CORPORATIONS 31-60.

17.    PLAINTIFFS are informed and believe, and thereon allege, THOMAS M. SULLIVAN, as co-trustee of the Jeremy and Chloe Poag 2004-GST Exempt Trust is, and at all relevant times was, a citizen and resident of the State of Tennessee. PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned the Jeremy and Chloe Poag 2004-GST Exempt Trust either owned, or continues to own, an interest in PMLC, P&M CENTERRA, PSC, PLC, and other ROE CORPORATIONS 31-60.

18.    PLAINTIFFS are informed and believe, and thereon allege, D. MARK POAG, as co-trustee of the Mark and Chloe Poag 2004-GST Exempt Trust is, and at all relevant times was, a citizen and resident of the State of Tennessee. PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned the Mark and Chloe Poag 2004-GST Exempt Trust either owned, or continues to own, an interest in PMLC, P&M CENTERRA, PSC, PLC, and other ROE CORPORATIONS 31-60.

19.    PLAINTIFFS are informed and believe, and thereon allege, THOMAS M. SULLIVAN, as co-trustee of the Mark and Chloe Poag 2004-GST Exempt Trust is, and at all relevant times was, a citizen and resident of the State of Tennessee. PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned the Mark and Chloe Poag 2004-GST Exempt Trust either owned, or continues to own, an interest in PMLC, P&M CENTERRA, PSC, PLC, and other ROE CORPORATIONS 31-60.

20.    PLAINTIFFS are informed and believe, and thereon allege, JOSHUA D. POAG, as co-trustee of the Josh and Dan Poag 2004-GST Exempt Trust is, and at all relevant times was, a citizen and resident of the State of Tennessee. PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned the Josh and Dan Poag 2004-GST Exempt Trust either owned, or continues to own, an interest in PMLC, P&M CENTERRA, PSC, PLC, and other ROE CORPORATIONS 31-60.

21.    PLAINTIFFS are informed and believe, and thereon allege, THOMAS M. SULLIVAN, as co-trustee of the Josh and Dan Poag 2004-GST Exempt Trust is, and at all relevant times was, a citizen and resident of the State of Tennessee. PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned the Josh and Dan Poag 2004-GST Exempt Trust either owned, or continues to own, an interest in PMLC, P&M CENTERRA, PSC and PLC.

22.    PLAINTIFFS are informed and believe, and thereon allege, JEREMY M. POAG, as co-trustee of the Jeremy and Dan Poag 2004-GST Exempt Trust is, and at all relevant times was, a citizen and resident of the State of Tennessee. PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned the Jeremy and Dan Poag 2004-GST Exempt Trust either owned, or continues to own, an interest in PMLC, P&M CENTERRA, PSC, PLC, and other ROE CORPORATIONS 31-60.

23.    PLAINTIFFS are informed and believe, and thereon allege, THOMAS M. SULLIVAN, as co-trustee of the Jeremy and Dan Poag 2004-GST Exempt Trust is, and at all relevant times was, a citizen and resident of the State of Tennessee. PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned the Jeremy and Dan Poag 2004-GST Exempt Trust either owned, or continues to own, an

interest in PMLC, P&M CENTERRA, PSC, PLC, and other ROE CORPORATIONS 31-60.

24.    PLAINTIFFS are informed and believe, and thereon allege, D. MARK POAG, as co-trustee of the Mark and Dan Poag 2004-GST Exempt Trust is, and at all relevant times was, a citizen and resident of the State of Tennessee.  PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned the Mark and Dan Poag 2004-GST Exempt Trust either owned, or continues to own, an interest in PMLC, P&M CENTERRA, PSC, PLC, and other ROE CORPORATIONS 31-60.

25.    PLAINTIFFS are informed and believe, and thereon allege, THOMAS M. SULLIVAN, as co-trustee of the Mark and Dan Poag 2004-GST Exempt Trust is, and at all relevant times was, a citizen and resident of the State of Tennessee.  PLAINTIFFS are further informed and believe, and thereon allege, at all times herein mentioned the Mark and Dan Poag 2004-GST Exempt Trust either owned, or continues to own, an interest in PMLC, P&M CENTERRA, PSC, PLC, and other ROE CORPORATIONS 31-60.

26.    PLAINTIFFS have reviewed limited records available to them in order to ascertain the true and full names and identities of all defendants in this action; however, PLAINTIFFS presently lack sufficient information and knowledge to identify all individuals and entities that may be liable to PLAINTIFFS for the claims stated herein. DOE INDIVIDUALS 1-10; DOE TRUSTS 11-30; and ROE CORPORATIONS 31-60 are sued herein under fictitious names for the reason their true names and identities are unknown to PLAINTIFFS except that they may be connected in some manner with DEFENDANTS and may be agents, attorneys, servants, employees, employers, representatives, co-venturers, co-conspirators, associates, or independent contractors

of DEFENDANTS and/or were in some manner responsible for the injuries and damages to PLAINTIFFS and their true names, identities, capacities, activities, and responsibilities are presently unknown to PLAINTIFFS or their attorneys. ROE CORPORATIONS is intended to be inclusive of all entity types, including but not limited to corporations, limited liability companies, partnerships, and not-for-profit entities.

27.     PLAINTIFFS are informed and believe, and thereon allege, at all relevant times DAN, JOSH and/or TERRY were either alter egos of, co-conspirators with, or acted in such a manner as to otherwise as a matter of law be directly or vicariously liable for the wrongful acts or omissions of P&M CENTERRA, PMLC, PLC, PSC, PMLSC, POAG BROS and TRUSTEE DEFENDANTS as described herein. In particular, PLAINTIFFS are informed and believe, and thereon allege, at all relevant times:

        a.  DAN, JOSH and TERRY, acting collectively or independently, so totally dominated and controlled the affairs of P&M CENTERRA, PMLC, PLC, PSC, PMLSC, POAG BROS and various trusts or estate planning mechanisms under the actual or putative control of TRUSTEE DEFENDANTS, either directly or through commonly reporting and controlled employees, agents and intermediaries, that they were able to, and did, use the funds, assets, credit facilities and/or opportunities of P&M CENTERRA, PMLC, PLC, PSC, PMLSC, POAG BROS and various trusts or estate planning mechanisms under the actual or putative control of TRUSTEE DEFENDANTS as their own without regard for the purported separateness of such defendant entities

and/or a fair exchange of consideration, all to the detriment of PLAINTIFFS.

b.  DAN, JOSH and TERRY, acting collectively or independently, so extensively comingled the funds, assets, credit facilities and/or opportunities of P&M CENTERRA, PMLC, PLC, PSC, PMLSC, POAG BROS and various trusts or estate planning mechanisms under the actual or putative control of TRUSTEE DEFENDANTS that it would promote injustice, and sanction a sham, to recognize P&M CENTERRA, PMLC, PLC, PSC, PMLSC, POAG BROS and various trusts or estate planning mechanisms under the actual or putative control of TRUSTEE DEFENDANTS as independent, adequately financed entities separate and apart from DAN, JOSH, TERRY and their respective individual estate plans.

c.  DAN, JOSH and TERRY, acting collectively or independently, exercised such total dominion and control over the affairs P&M CENTERRA, PMLC, PLC, PSC, PMLSC, POAG BROS and various trusts or estate planning mechanisms under the actual or putative control of TRUSTEE DEFENDANTS it would promote injustice, and sanction a sham, to recognize P&M CENTERRA, PMLC, PLC, PSC, PMLSC, POAG BROS and various trusts or estate planning mechanisms under the actual or putative control of TRUSTEE DEFENDANTS as independent functioning entities separate and apart from DAN, JOSH, TERRY and their respective individual estate plans. In particular:

-12-

    i.  DAN, JOSH and TERRY, acting collectively or independently, used their absolute, fiat control over PMLC, and in turn PMLC's absolute, fiat control over, *inter alia*, P&M CENTERRA, to cause P&M CENTERRA to:

      1.  Defraud PLAINTIFFS in the manner described hereinbelow;

      2.  Breach statutorily prescribed and contractually confirmed fiduciary duties owed to PLAINTIFFS in the manner described hereinbelow;

      3.  Breach other contractual duties owed to PLAINTIFFS in the manner described hereinbelow; and

      4.  Generally pursue their own individual interests, benefit, profit and/or unjust enrichment in the manner described hereinbelow without regard for the purported separate existence of P&M CENTERRA, PMLC, PLC, PSC, PMLSC, POAG BROS and various trusts or estate planning mechanisms under the actual or putative control of TRUSTEE DEFENDANTS, much less the interests of PLAINTIFFS or others including, but not limited to, other actual and/or purported PMLC co-owners.

    ii.  DAN, JOSH and TERRY, acting collectively or independently, likewise used their absolute, fiat control over P&M CENTERRA, PMLC, PLC, PSC, PMLSC, POAG BROS and various trusts or estate planning mechanisms under the actual or putative control of TRUSTEE DEFENDANTS to fraudulently transfer assets for the

purpose of escaping liability to PLAINTIFFS and/or other creditors in the manner described hereinbelow.

iii. Thus, DAN, JOSH and TERRY, acting collectively or independently, used P&M CENTERRA, PMLC, PLC, PSC, PMLSC, POAG BROS and various trusts or estate planning mechanisms under the actual or putative control of TRUSTEE DEFENDANTS as mere shells, instruments or conduits to commit some or all of the acts constituting fraud breach of fiduciary duties and fraudulent transfer of assets described herein.

## RELATED LITIGATION

28.    On May 27, 2011, PLAINTIFFS and others sued PMLC, P&M CENTERRA and PLC in the District Court of Larimer County, Colorado ("COLORADO TRIAL COURT") on different, but transactionally-related, claims in a case styled *McWhinney Holding Company, LLLP, et al. v. Poag & McEwen Lifestyle Centers – Centerra, LLC, et al.*, Case No. 2011 CV 1104 ("*McWHINNEY v. POAG*").[4]  PMLC, P&M CENTERRA and PLC countersued.  Various interim rulings, including the COLORADO TRIAL COURT's dismissal of some, but not all, of PLAINTIFFS' tort claims on the basis of the economic loss rule, ensued.  On June 5, 2017, the surviving claims on both sides

---

[4] Among other things, PLAINTIFFS' complaint in *McWHINNEY v. POAG* did not name DAN, JOSH and TERRY as defendants, as PLAINTIFFS at that point had not yet discovered—nor, through the exercise of reasonable diligence could PLAINTIFFS have then discovered—the facts herein alleged establishing the legal basis for their individual liability for the now adjudicated acts of fraud, fraudulent concealment and breaches of fiduciary duties committed by, on behalf or in the name of P&M CENTERRA.  Similarly, PLAINTIFFS did not discover—nor, through the exercise of reasonable diligence could PLAINTIFFS have discovered—the facts supporting the claims pled herein against PSC, PMLSC, POAG BROS and TRUSTEE DEFENDANTS until after the discovery stay described beginning at paragraph 29 *infra* was lifted.

went to trial. On August 15, 2017, the COLORADO TRIAL COURT issued its "Orders and Judgments Following Trial to the Court" in *McWHINNEY v. POAG* ("JUDGMENT"). A true and correct copy of that JUDGMENT is attached hereto as **Exhibit 1**. The JUDGMENT's contents are incorporated herein by reference as though set forth in full.

29.    The principal reason it took six years to get *McWHINNEY v. POAG* to trial was an interim appeal. During the course of that appeal, and for a considerable time thereafter, all discovery was stayed at PLMC, P&M CENTERRA and PLC's request. Before the formal discovery stay went into effect, PLMC, P&M CENTERRA and PLC filed multiple unsuccessful motions seeking to stop and/or severely limit PLAINTIFFS' discovery. They did so while withholding production of requested financial and business records (otherwise unobtainable by PLAINTIFFS) pertaining to DEFENDANTS' mismanagement of the jointly owned real estate investment described below beginning at paragraph 40 *infra*: *e.g.*, and by way of example only, DEFENDANTS' critically important communications among themselves and with bankers pertaining to DEFENDANTS' real intentions and activities regarding the refinancing of that real estate investment (documents DEFENDANTS consistently maintained were "confidential" and "proprietary"). Without access to these intentionally withheld records, PLAINTIFFS lacked the ability to discover DEFENDANTS' later adjudicated concealed misconduct and its causal relationship to PLAINTIFFS' injuries as described in the JUDGMENT and herein.

30.    Even though PLMC, P&M CENTERRA and PLC brought earlier stay and/or protective order motions that were serially denied, practically speaking these earlier motions served DEFENDANTS' intended tactical purpose: *i.e.*, from the inception of the *McWHINNEY v. POAG* action up through and after the lifting of the formal

discovery stay described below, they helped thwart PLAINTIFFS' ability to force DEFENDANTS' disclosure of the otherwise missing proof of DEFENDANTS' concealed misconduct described in the JUDGMENT and giving rise to the claims herein.

      31.    On July 12, 2013, at PLMC, P&M CENTERRA and PLC's request, the COLORADO TRIAL COURT finally did issue a formal discovery stay. It did so incident to its certification of its above-referenced order, *inter alia*, dismissing PLAINTIFFS' tort claims in *McWHINNEY v. POAG* for interim appeal. DEFENDANTS thereafter vigorously, and successfully, opposed multiple efforts by PLAINTIFFS to lift this stay and compel DEFENDANTS' long sought compliance with outstanding discovery. Although the stay was briefly lifted on September 20, 2015, almost immediately thereafter (*i.e.*, on October 9, 2015), PMLC, P&M CENTERRA and PLC filed a new motion seeking yet another protective order barring all PLAINTIFFS' outstanding (long-stymied) discovery, claiming it was "overly and unduly burdensome, overbroad and excessive." PLAINTIFFS countered by moving (a second time) for the COLORADO TRIAL COURT's appointment of a Special Master to oversee discovery. On November 23, 2015, PMLC, P&M CENTERRA and PLC's latter motion was denied and PLAINTIFFS' request for the appointment of a Special Master was granted. Thereafter, discovery recommenced. Even then, PLAINTIFFS had to spend the next several months, and significant expense, obtaining an order from the Special Master compelling PMLC, P&M CENTERRA and PLC's production of the critically important financial and business records, opposing PMLC, P&M CENTERRA and PLC's objections to the Special Master's recommendations before the COLORADO TRIAL COURT, and obtaining and enforcing an actual court order compelling DEFENDANTS' disclosure of such records. Further discovery, including the depositions of key third parties

(including, but not limited to, representatives of J.P. Morgan Chase Bank ("JP MORGAN")), ensued.

32.    In sum, notwithstanding PLAINTIFFS' ongoing exercise of reasonable (indeed, extraordinary) diligence, by these means up and until the summer of 2016, DEFENDANTS concealed proof of their wrongdoing dating back to 2003.  Specifically, DEFENDANTS intentionally and continuously concealed proof of the wrongdoing described in the attached JUDGMENT and this complaint until on and after July 18, 2016, when PLAINTIFFS finally, pursuant to the Special Master's recommendation and the COLORADO TRIAL COURT's confirmatory order, obtained DEFENDANTS' long concealed financial and business records.  As a result of PLAINTIFFS' receipt of these records, on and after August 16, 2016, PLAINTIFFS were finally able to meaningfully depose PMLC, P&M CENTERRA and PLC's agents and third party witnesses (including, again, representatives of JP MORGAN).  These newfound documents and associated deposition testimony revealed the material facts essential to proof of the elements of DEFENDANTS' fraud, fraudulent concealment and breach of fiduciary duties ultimately adjudicated in the JUDGMENT.

33.    Once in possession of such previously concealed/unobtainable information, PLAINTIFFS brought a motion before the COLORADO TRIAL COURT seeking leave to amend PLAINTIFFS' complaint in *McWHINNEY v. POAG* to add JOSH, DAN, TERRY and PSC as parties, and to add some of the additional claims pled herein.  On January 2, 2017, the COLORADO TRIAL COURT denied PLAINTIFFS' motion principally on the ground the proposed amended complaint would extend the case for an unreasonable period of time and would "further complicate an already complicated case."  However, the COLORADO TRIAL COURT did propose that

PLAINTIFFS' new claims might be plead "in a separate action as the claims are not precluded, and the statute of limitations did not begin to run until Plaintiffs became aware of the facts giving rise to the claims."

34.    On May 9, 2017, the COLORADO TRIAL COURT granted the parties' joint motion to bifurcate the trial in *McWHINNEY v. POAG* into two phases.  The first phase, since tried, addressed liability and damages on all legal claims.  The second phase, yet-to-be tried, will address PLAINTIFFS' allegations of alter ego against P&M CENTERRA, PMLC and PLC.

35.    The trial in the first phase resulted in the attached $42,006,032.50 JUDGMENT for PLAINTIFFS, plus prejudgment interest in an amount yet to be determined.  The COLORADO TRIAL COURT additionally found in favor of PLAINTIFFS on their claim for indemnity, damages to be awarded at a later date, and has deferred ruling on costs and fees until the conclusion of the second phase.

36.    Because PLAINTIFFS were unable to seek recourse against JOSH, DAN, TERRY and PSC in *McWHINNEY v. POAG*, pursuant to the COLORADO TRIAL COURT's instruction to PLAINTIFFS to seek redress for those claims in a separate action, PLAINTIFFS now bring this action for that purpose.  On information and belief, PLAINTIFFS further sue PSC, PMLSC, POAG BROS, DOE TRUSTS, DOE INDIVIDUALS and ROE CORPORATIONS and DAN, JOSH and TERRY's various trusts or estate planning mechanisms under the actual or putative control of TRUSTEE DEFENDANTS as recipients of fraudulently transferred funds, assets and opportunities.

37.    PLAINTIFFS are informed and believe, and thereon allege, P&M CENTERRA, PMLC and PLC will be unable and/or otherwise unwilling to satisfy the judgment of the COLORADO TRIAL COURT.  Wherefore, in addition to their individual

-18-

liability under the newly discovered claims alleged against JOSH, DAN, TERRY and PSC herein, PLAINTIFFS also seek declaratory judgment, pursuant to Colorado Revised Statute section 13-51-101 *et seq.*, declaring JOSH, DAN and TERRY to be alter egos of P&M CENTERRA, PMLC, PLC, PSC, PMLSC, POAG BROS and their various trusts or estate planning mechanisms under the actual or putative control of TRUSTEE DEFENDANTS, or otherwise directly or vicariously liable for the wrongdoing of those other defendants.

## FACTS

### TERRY's Courtship of McWHINNEY

38.    In 1994, brothers Chad McWhinney ("CHAD") and Troy McWhinney ("TROY") co-founded McWHINNEY, a holding company to house its other special purposes entities, and McWhinney Real Estate Services, Inc. ("MRES").  MCLC is one such special purpose entity in part owned by McWHINNEY.

39.    In the 1990s, McWHINNEY acquired approximately 3,000 acres of undeveloped land in Northern Colorado and planned to develop it into a first-class, master-planned community called Centerra.

40.    Centerra would include residential, commercial, industrial and mixed-use components.  One such commercial development was The Promenade Shops at Centerra ("SHOPS").

41.    McWHINNEY envisioned the SHOPS to be an upscale, open-air shopping center, commonly referred to as a "lifestyle center," to be the focal point of the Centerra master-planned community.  Because McWHINNEY recognized it did not have much experience in high-end fashion retail development, it sought a more learned partner to handle the development, leasing and management of the SHOPS.

42.     In 2001, CHAD, representing the interests of McWHINNEY, met with TERRY at an industry conference in Las Vegas, Nevada.  TERRY was, at the time, president of a consortium of closely held businesses with common majority stakeholders and under common control, colloquially referred to as "POAG & McEWEN" or "P&M."  Over time, these included, among others, PMLC, the POAG & McEWEN holding company for special purpose entities, and PMLSC, the POAG & McEWEN commercial real estate management company.  DAN and TERRY co-founded POAG & McEWEN in the 1980s.

43.     CHAD and TERRY immediately began discussing the prospect of a joint venture to develop the SHOPS with McWHINNEY's land and POAG & McEWEN's development expertise.

44.     POAG & McEWEN held itself out as the "inventor" of the lifestyle center concept.  Specifically, TERRY represented to CHAD that he had special relationships with many retail companies that enabled him, and consequently POAG & McEWEN, to all-but guarantee adequate leasing with the high-end tenants that McWHINNEY wanted for the SHOPS.  TERRY further assured CHAD he would be intimately involved in the development and leasing of the SHOPS and use his industry connections to benefit the SHOPS.  TERRY was a prominent figure in the shopping center industry and was the key component that made POAG & McEWEN the renowned lifestyle center developer it was known, or at least then claimed, to be.  CHAD was enticed by TERRY's expertise and promise of continued personal involvement with the SHOPS.

45.     As a result of TERRY's efforts to court CHAD with such representations of his industry connections, leasing abilities and his promised intimate and continued

-20-

involvement, a letter of intent was signed on December 5, 2002 between McWHINNEY and PMLC for the construction, development and management of the SHOPS.

46.    Thereafter, on behalf of McWHINNEY, then-chief-operating-officer Douglas L. Hill ("DOUG"), and on behalf of PMLC, then-vice president of financing JOSH, began negotiating the operating agreement for CENTERRA LIFESTYLE CENTER, LLC ("CLC") – the special purpose entity that would own the SHOPS.  Each of McWHINNEY and PMLC were equal, 50% owners of CLC through their respective special purpose entities, MCLC and P&M CENTERRA.

47.    The CLC Operating Agreement ("OPERATING AGREEMENT") was signed on September 29, 2004, making P&M CENTERRA CLC's then sole managing member.  MCLC was mostly a passive member but retained consent rights over key business decisions enumerated in the OPERATING AGREEMENT.  P&M CENTERRA concurrently caused CLC to enter into a property management agreement for the SHOPS with PMLSC, a wholly owned subsidiary of PMLC, for an above-market fee of 5% of monthly gross income.  This effectively solidified JOSH, DAN, TERRY and POAG & McEWEN's ultimate and exclusive control over the governance, finances and physical property of CLC and the SHOPS.

48.    Unbeknownst to McWHINNEY, and despite TERRY's repeated assurances of his individual expertise, industry connections and promised continuing personal involvement in the development and leasing of the SHOPS, during the negotiations between McWHINNEY and PMLC, TERRY and DAN had already begun planning their retirement and subsequent buyout from POAG & McEWEN, passing the reigns to JOSH.

49.    McWHINNEY would never have agreed to enter into the joint venture with POAG & McEWEN/PMLC had it known DAN and especially TERRY would soon be retiring and JOSH, an inexperienced leasing agent with no prior development or real estate background, would soon be taking over POAG & McEWEN.  McWHINNEY had caused language to be inserted into the OPERATING AGREEMENT permitting the termination of P&M CENTERRA's status as managing member if JOSH, DAN and TERRY were no longer majority stakeholders in P&M CENTERRA.  McWHINNEY did not become aware of DAN and TERRY's retirements and buyouts until 2015.  DAN and TERRY continued to hold their titles as President, CEO and Chairman of the Board in an "honorary" capacity to prevent the public, and McWHINNEY, from discovering the true circumstances of their planned retirements and buyouts.

***Construction, Development, and Leasing of the SHOPS.***

50.    After the OPERATING AGREEMENT was signed and CLC was formed, MCLC contributed approximately 86 acres of land, valued at $16.78 million, and other funds for necessary offsite improvements for the benefit of the SHOPS.  P&M CENTERRA advanced approximately $2.38 million in pre-construction development costs.

51.    Pursuant to one of its obligations under the OPERATING AGREEMENT as CLC's managing member, P&M CENTERRA caused CLC to obtain a $116 million construction loan ("CONSTRUCTION LOAN") from a syndicate of banks ("BANK GROUP") to fund the construction of the SHOPS.  The CONSTRUCTION LOAN had a high interest rate with a two year term and two additional one-year extensions available, contingent on certain conditions being met.

52.     With the help of a public-private partnership with, among others, the City of Loveland, construction broke ground for the SHOPS in 2004. The SHOPS opened in October of 2005. Unbeknownst to McWHINNEY, POAG & McEWEN had overbuilt the SHOPS and was struggling to lease the SHOPS to "stabilization" as defined in the industry. These struggles were principally concealed from McWHINNEY.

53.     Under the OPERATING AGREEMENT, P&M CENTERRA as managing member was responsible for procuring offers for a permanent loan to replace the CONSTRUCTION LOAN prior to the scheduled maturity date of the CONSTRUCTION LOAN. The ability of the SHOPS to qualify for re-financing was dependent on several factors including, but not limited to, leasing, occupancy, and net operating income.

54.     By mid-2006, JOSH became POAG & McEWEN's dominant principal, holding the title of Chief Financial Officer. Although JOSH was aided by his Vice President of Finance, David Selberg ("SELBERG"), JOSH exercised near-complete dominion over all financing decisions made with respect to the SHOPS and acted as the ultimate arbiter and sole decision-maker dictating if, when and in what amount a permanent loan would be placed.

55.     McWHINNEY had a general company policy to limit risk on their investments and replace construction loans with permanent loans as soon as possible because of the high cost of keeping a construction loan and the risks associated in attempting to refinance a construction loan near its maturity date. This preference was expressly communicated by McWHINNEY to JOSH, DAN and TERRY during the negotiation period and again continuously and frequently during the first two years of the joint venture.

-23-

56.     In response, JOSH and SELBERG repeatedly assured McWHINNEY that efforts to obtain permanent financing were underway and forecasted closing a permanent loan in 2007.

**DAN, TERRY and JOSH's Deception and Concealment of Material Information from McWHINNEY**

57.     At approximately the same time TERRY was promoting POAG & McEWEN to McWHINNEY as a prospective partner to develop the SHOPS in 2002, TERRY was negotiating several other deals for and on behalf of POAG & McEWEN around the country.  The negotiation of several projects to be developed nearly simultaneously constituted a significant departure from POAG & McEWEN's prior business model.  Prior to the opening of the SHOPS in 2005, JOSH, DAN and TERRY prepared a press release highlighting POAG & McEWEN's upcoming $1 billion worth of lifestyle center developments.

58.     In 2003, DAN and TERRY began discussing their retirement and redemption plans from POAG & McEWEN.  In 2004, when Dean Shauger was being interviewed for the position of POAG & McEWEN's Vice President of Management and Marketing, TERRY informed him that he and DAN were planning on retiring and JOSH would be assuming full control of POAG & McEWEN.  All this was concealed from McWHINNEY until September 30, 2015 when Mr. Shauger was deposed.

59.     Thus, at the same time as POAG & McEWEN was publicly announcing and putting a plan into effect to dramatically grow its organization and assets, JOSH, DAN and TERRY were privately negotiating a change of control and payout of nearly all POAG & McEWEN's equity among themselves, leaving the most senior management

positions in the hands of individuals no longer actively fulfilling the duties of those positions.

60.    JOSH, DAN and TERRY failed to adequately staff their newly minted projects, including the SHOPS, thus stretching POAG & McEWEN's financial and human resources thin.  Without adequate leasing and management staff, the SHOPS opened with, and for years continued to have, insufficient leasing and thus insufficient income to cover expenses.  At the property management level, several of the property improvements were in a state of disrepair, amenities were not consistent with those that would be expected at a first class lifestyle center, and large numbers of tenants began to complain about POAG & McEWEN's mismanagement of the project.

61.    Notwithstanding, in early 2006 TERRY informed DAN and JOSH he wanted to accelerate the buyout of his POAG & McEWEN equity, seeking a single lump sum payment of $40,000,000.  At the time of these secret buyout negotiations, the majority of POAG & McEWEN's new development projects were not far enough along, nor sufficiently leased, to generate stabilized revenue values.  Nonetheless, accessing the merits of TERRY's offer, DAN and JOSH concluded $40,000,000 was less than TERRY's projected interest in the future value of POAG & McEWEN's assets at or near projected stabilized value.  Accordingly, to deprive TERRY of his full share of the anticipated increase in portfolio value, DAN and JOSH accepted TERRY's proposal and agreed to accelerate his buyout for $40,000,000.

62.    Thus, JOSH and DAN agreed to pay TERRY an amount exceeding the then-existing actual value of POAG & McEWEN's assets.

63.    As the COLORADO TRIAL COURT previously found, JOSH and DAN never seriously considered using their own money to purchase TERRY's interest, even

-25-

though they would personally obtain, and personally benefit from, the vast majority of that acquired interest. Instead, JOSH and DAN caused a series of inter-company transfers to occur whereby, as more particularly described below, POAG & McEWEN borrowed this $40,000,000 in exchange for the pledge of certain ownership and financial interests held by P&M CENTERRA, PMLSC and another POAG & McEWEN special purpose entity, Poag & McEwen Lifestyle Centers – Corona, LLC ("P&M CORONA"), holding POAG & McEWEN's 50% joint venture interest in Dos Lagos Lifestyle Center, LLC ("DOS LAGOS") in Corona, California. As further described below, JOSH, DAN and TERRY collectively concealed material details of these transactions from, among others, PLAINTIFFS for the purpose of deceiving, among others, PLAINTIFFS. They succeeded.

64.    More specifically, because DAN and JOSH privately acknowledged among themselves POAG & McEWEN lacked the necessary cash flow to service or repay a $40,000,000 loan, DAN and JOSH, with the help of JP MORGAN, represented to various financial institutions that such a $40,000,000 loan could be repaid by leveraging permanent loans that would soon thereafter have to be put in place for the SHOPS and DOS LAGOS. Thus, in exchange for a two-year interest only "mezzanine" loan in the amount of $40,000,000 ("MEZZANINE LOAN" or "$40 million MEZZANINE LOAN"), JOSH, DAN and TERRY, with JP MORGAN's contracted help, secretly obligated P&M CENTERRA, and by extension CLC, to acquire a substantially larger permanent loan mortgage on the SHOPS or face default on their loan obligations.

65.    Because POAG & McEWEN, through PMLC, only owned 50% of SHOPS and DOS LAGOS, to effectuate this plan DAN and JOSH needed to increase the amount of available permanent financing on the SHOPS and DOS LAGOS by

approximately $40 million per property, or $80 million collectively. The amount of available permanent financing, in turn, was largely dependent on the market value of both properties, which market value was largely dependent on the amount of fixed revenue derived therefrom: *e.g.* the amount of contractual rent, maintenance, insurance and taxes tenants were legally obligated to pay. In light of this, JOSH recognized, and secretly so informed DAN, their plan to buyout TERRY by placing the equivalent of a second mortgage on the SHOPS and DOS LAGOS amounted to a gamble dependent on the future success and value of both properties. More particularly, JOSH secretly informed DAN the plan required good capitalization rates, high leverage and good leasing.

66.    At the time they agreed to the accelerated buyout, TERRY, DAN and JOSH realized the SHOPS had insufficient leasing to qualify for a permanent loan sufficient to repay the CONSTRUCTION LOAN and net $40 million in excess proceeds. On the other hand, as the COLORADO COURT previously found, CLC had multiple opportunities in 2005, 2006 and 2007 to obtain permanent financing to refinance the CONSTRUCTION LOAN. JOSH and SELBERG "did not enter into any serious discussions with any of these lenders" because these loans "would have netted [POAG & McEWEN] between $7.5 million and $27.5 million—below the $40 million that [POAG & McEWEN] wanted to get from the loans." Further, JOSH concealed the existence of more than a half dozen lending offers from McWHINNEY.

67.    Further, per the COLORADO TRIAL COURT, once JOSH and DAN "ultimately determined that they were going to pull the $40 million out of the permanent loan from the S[HOPS] and D[OS] L[AGOS]," JOSH and SELBERG "went to JP[ MORGAN], the lead agent for the C[ONSTRUCTION] L[OAN] to purchase a $155

million forward rate swap [("$155 MM SWAP")] … P&M entered this swap in order to convince private investors into believing that P&M was close to getting a $155 million permanent loan … [T]he purchase of this forward swap essentially locked CLC into a specific value that it would need for the permanent loan. After this forward swap was entered into, P&M was never interested in a loan under $155 million—even though they only needed $116 million to refinance the C[ONSTRUCTION] L[OAN]." Moreover, "when P&M [CENTERRA] purchased this swap, P&M [CENTERRA] had never received any indication from a bank that they could enter a permanent loan of that magnitude, and P&M [CENTERRA] simply gambled that the [SHOPS] would reach the point where a bank would be willing to loan $155 million in the near future."

68.   As the COLORADO TRIAL COURT further found, "[e]ven Josh Poag, the person who obtained the forward swap, described swaps as 'aggressive' and 'unnecessarily risky.'" Thus, the "purchase of the $155 million forward swap was also a breach of P&M's duty of loyalty" because "the benefit of the forward swap purchase was for the individual benefit of P&M [CENTERRA], D[AN] and J[OSH], as well as for PMLC."

69.   McWHINNEY "was only informed one week prior that P[OAG] & McE[WEN] would 'possibly' put a swap in place, and McW[HINNEY] was never informed of the $155 million amount until after it was already purchased." Accordingly, P&M CENTERRA "breached its duty of candor because it failed to disclose a forward swap whose essential benefit was not for the benefit of the S[HOPS] or CLC." Per the COLORADO COURT, this is because "the purpose of this swap was in large part for the personal benefit of the Poags and P&M—not CLC or the S[HOPS]."

70.     With the swap in place, JOSH and SELBERG, with JP MORGAN's contracted assistance, began negotiating terms for the $40 million MEZZANINE LOAN. To qualify for the $40 million MEZZANINE LOAN, JOSH, DAN and TERRY, with help from JP MORGAN, had to convince the parties or entities ultimately agreeing to lend these funds the SHOPS would reach stabilization consistent with the initial proforma (*i.e.* =/>95% occupancy, all tenants paying full, contractual rent and costs) quickly enough to qualify and close a $155 million permanent loan. To accomplish this, JOSH and SELBERG, with JP MORGAN's assistance, provided financial information to multiple lenders that was substantially overstated or "scrubbed".

71.     At the time these matters were occurring, JOSH and DAN determined it would harm POAG & McEWEN's business and image as the pioneer in lifestyle center development if the news of TERRY's buyout became public. This is because, again, it was TERRY who had all of the retail connections and TERRY who was well-respected in the industry. PLAINTIFFS are informed and believe, and thereon allege, DAN had little to no meaningful industry connections. PLAINTIFFS are further informed and believe, and thereon allege, JOSH studied in the field of chemistry and never had any real estate experience, or developed any real estate projects, before joining his father's company as a leasing agent. Thus, the ability of CLC to lease the SHOPS to stabilization was largely dependent on TERRY's reputation.

72.     PLAINTIFFS are informed and believe, and thereon allege, the buyout agreement between TERRY, JOSH and DAN was reached in late 2005 and consummated in or about April 2006. To ensure the information concerning TERRY's buyout was concealed from the public and McWHINNEY, JOSH and DAN required JP MORGAN to execute a non-disclosure agreement whereby JP MORGAN promised to

keep the amount and the use of the $40 million MEZZANINE LOAN a secret. To maintain the *appearance* of TERRY's continued involvement in POAG & McEWEN, JOSH and DAN had TERRY sign a seven-year non-compete agreement and new "employment" agreement keeping him on the PMLC payroll but *without* requiring any particular hours or duties in exchange for the $40 million.

73.     PLAINTIFFS are informed and believe, and thereon allege, at the time of his buyout TERRY, together with DAN and JOSH, held ownership interests in several POAG & McEWEN single purpose entities, each held (actually or on paper) by different sets of owners. PLAINTIFFS are further informed and believe, and thereon allege, TERRY, DAN and JOSH, either directly or through their respective estate planning mechanisms, were the primary owners or stakeholders in those entities before the buyout. To effectuate the buyout, PLAINTIFFS are informed and believe, and thereon allege, JOSH, DAN and TERRY caused PMLC to acquire, redeem or "roll up" 100% of the interests of each such affected single purpose entity. PLAINTIFFS are further informed and believe, and thereon allege, to obtain the necessary consent for this roll-up, DAN falsely represented to other owners of these entities that the purpose of the roll-up was to close permanent financing on certain entities, including the SHOPS. PLAINTIFFS are informed and believe, and thereon allege, this was all done to further the individual interests of TERRY, JOSH and DAN at the expense of the affected entities and their other owners.

74.     As part of this roll-up, PLAINTIFFS are informed and believe, and thereon allege, TRUSTEE DEFENDANTS knowingly consented to rolling up the interests of the Josh and Chloee Poag 2004-GST Exempt Trust, Jeremy and Chloee Poag 2004-GST Exempt Trust, Mark and Chloee Poag 2004-GST Exempt Trust, Josh and Dan Poag

2004-GST Exempt Trust, Jeremy and Dan Poag 2004-GST Exempt Trust, and Mark and Dan 2004-GST Exempt Trust in P&M CENTERRA into PMLC in order to effectuate TERRY's buyout.

75.    The $40 million MEZZANINE LOAN closed on April 23, 2004. Shortly before that loan funded, PLAINTIFFS are informed and believe, and thereon allege, JOSH and DAN formed an entirely separate entity within POAG & McEWEN to house PMLC's indirect 50% ownership interest in the SHOPS and DOS LAGOS. Mechanically speaking, PLAINTIFFS are informed and believe, and thereon allege, JOSH and DAN accomplished this by causing P&M CENTERRA to transfer 100% of its 50% interest in CLC and DOS LAGOS to this new entity—Centerra & Dos Lagos Venture, LLC ("C&DL"), a Delaware limited liability company—for absolutely no consideration. PLAINTIFFS are further informed and believe, and thereon allege, C&DL thereafter pledged both newly acquired interests to I&G Promenade Shops Lenders, LLC ("I&G"), a special purpose entity established and managed by J.P. Morgan Investment Management ("JPMIM")—a JP MORGAN operating division—to fund the $40 million MEZZANINE LOAN and hold title to C&DL's pledged (or mortgaged) interest in the SHOPS and DOS LAGOS as security therefor.

76.    PLAINTIFFS are informed and believe, and thereon allege, after receiving the $40 million, C&DL upstreamed the funds to PMLC, at which point DAN and JOSH arranged for PMLC to pay all, or substantially all, of the $40 million to TERRY to redeem all but one percent of his ownership in POAG & McEWEN. As alleged above, JOSH, DAN and TERRY did so in secret so that JOSH and DAN might procure the bulk of TERRY's interest without risking any of their own money. At the time of its creation PLAINTIFFS are informed and believe, and thereon allege, C&DL had no legitimate

business purpose and was created solely as a vehicle to effectuate TERRY's secret buyout.

77.    By the foregoing means DAN, JOSH and TERRY, for their own purposes, effectively made I&G, established and managed by JPMIM, a *de facto* 50% CLC owner within the SHOPS', as the COLORADO COURT previously coined, "capital stack" without McWHINNEY's knowledge or consent.  Indeed, rather than disclose all material facts to POAG & McEWEN's joint venture partner as required by law, JOSH and DAN intentionally and consistently concealed and misrepresented the nature of the transaction—opaquely describing it to McWHINNEY as just some internal POAG & McEWEN "corporate financing."

78.    More particularly, as the COLORADO COURT previously found, when JP MORGAN, through JPMIM, asked JOSH and those POAG & McEWEN attorneys and representatives working with him to procure McWHINNEY's written consent to the $40 million MEZZANINE LOAN, JOSH refused.  JOSH told JP MORGAN that asking for McWHINNEY's consent would lead to McWHINNEY "asking questions."  Hence, instead of seeking McWHINNEY's informed consent, JOSH, DAN and those working with them to consummate the $40 million MEZZANINE LOAN—including, but not limited to JP MORGAN through JPMIM—devised a plan to "sell" McWHINNEY on a first amendment to the OPERATING AGREEMENT ("FIRST AMENDMENT").   The idea behind the FIRST AMENDMENT was to secure McWHINNEY's implicit written consent to the transaction, for the benefit of both POAG & McEWEN and JP MORGAN, without revealing the material terms of the transaction:  *e.g.*, without disclosing that, as the COLORADO COURT previously found, POAG & McEWEN was in fact putting the

functional equivalent of a "second mortgage" on the SHOPS to raise $40 million for DAN and JOSH to prematurely buyout TERRY's interest.

79.     PLAINTIFFS are informed and believe, and thereon allege, at all relevant times TERRY was informed of, consented to and actively participated in this intentional concealment and misrepresentation.  Among other things, TERRY privately urged JOSH and DAN to secure McWHINNEY's written approval of the FIRST AMENDMENT before disclosing DEFENDANTS' true intentions with regard to their planned rejection of a proposed expansion of the parties' relationship.

80.     PLAINTIFFS are informed and believe, and thereon allege, DAN, JOSH and TERRY could have not closed the $40 million MEZZANINE LOAN without the FIRST AMENDMENT.  DAN, JOSH and TERRY most definitely could not have secured McWHINNEY's approval of the FIRST AMENDMENT without such concealment and fraud, as McWHINNEY would have never approved of the $40 million MEZZANINE LOAN had the material terms of that transaction been disclosed to McWHINNEY in advance.

81.     To this end, per the COLORADO TRIAL COURT, McWHINNEY "was never informed of the amount, purpose, or effect of the $40 million MEZZANINE LOAN. McWhinney was never informed that [TERRY] was being bought out, never informed that P[OAG[ & McE[WEN] were planning on leveraging the S[HOPS] to pay back a $40 million loan, and never informed that—as part of the M[EZZANINE] L[OAN] transactions—JPMIM would own specific rights regarding CLC, including the right to approve any refinancing of the C[ONSTRUCTION] L[OAN].  P[OAG] & McE[WEN] hid all of these from [McWHINNEY]."  Similarly, per the COLORADO TRIAL COURT, the POAG & McEWEN organization "did not disclose significant details surrounding the

reason for the [FIRST AMENDMENT] and made misrepresentations to McW[HINNEY] in order to induce them to sign the amendment … At no point did [JOSH] or any P&M representative make the requisite 'full disclosure of all material facts'": *i.e.,* P&M admittedly sought and obtained McW[HINNEY]'s consent to amend the OPERATING AGREEMENT without disclosing:

    a. JP[ MORGAN] had originally asked [POAG & McEWEN] to obtain McWHINNEY'S consent to the actual $40,000,000 Mezzanine Loan *[ ]*;

    b. Josh Poag refused to seek McWHINNEY'S consent for fear of McWhinney asking "more questions and then their hands out," *[ ]*;

    c. afterwards, JP[MORGAN] convinced [its operating division, JP MORGAN Investment Management, or "JPMIM"] to accept McWHINNEY'S consent to the amendment as an alternative, *[ ]*;

    d. the size, structure and intended use of the Mezzanine Loan;

    e. the fact that, per Dan Poag, a mezzanine loan amounted to a "second mortgage" on the Shops;

    f. the fact that, per KeyBank, the Mezzanine Loan put JPMIM within the Shops' "capital stack" or "ownership structure";

    g. the fact that, to get the $40,000,000, [POAG & McEWEN] had to sign and/or approve agreements giving JPMIM control over various aspects of the joint venture's operations and veto power over the future refinancing of the [CLC] Construction Loan;

    h. the fact that [POAG & McEWEN] transferred its ownership in the joint venture to a newly formed entity without consideration, *[ ]*;

    i.   the fact that [TERRY]'s (never produced) buyout agreement did not require him to do anything to receive his salary after he got his $40,000,000; and

    j.   the fact that [POAG & McEWEN]'s secret plan prevented them from pursuing or accepting multiple permanent loan "bids" because none would have netted Josh and Dan Poag the $40,000,000 needed to pay [TERRY].

(References to trial exhibits omitted from quotes.)

82.    As the COLORADO TRIAL COURT additionally found, "[b]y intentionally hiding and making false representations about the details of the [MEZZANINE LOAN] from McWhinney, [POAG & McEWEN] committed fraud and willful misconduct and breached their duties of fair dealing and candor."

83.    Based on the foregoing misrepresentations and concealment of critical information, McWHINNEY signed the FIRST AMENDMENT.

84.    By signing the MEZZANINE LOAN agreement, JOSH, DAN and TERRY gave I&G's agent, JPMIM, veto power over any future refinancing of CLC's CONSTRUCTION LOAN, including obtaining a permanent loan, if JPMIM did not feel I&G's 50% pledged interest was secure.

85.    To effectuate this veto power, thus further secure the $40 million MEZZANINE LOAN, JP MORGAN, on behalf of the BANK GROUP, and JPMIM, its affiliate, executed an Intercreditor Agreement ("INTERCREDITOR AGREEMENT"). While neither JOSH, DAN, CLC, nor any POAG & McEWEN affiliate was a party to the INTERCREDITOR AGREEMENT, PMLC and P&M CENTERRA, as CLC's managing member, were given an opportunity to review the agreement because it substantially

affected CLC's rights. While PMLC's attorneys reviewed the INTERCREDITOR AGREEMENT for POAG & McEWEN's benefit, JOSH decided not to hire independent counsel on behalf of CLC to do the same, instead insisting the agreement be signed quickly to consummate the MEZZANINE LOAN.

86.     Through the INTERCREDITOR AGREEMENT, JOSH, DAN and TERRY willingly ceded rights belonging to CLC. JOSH, DAN and TERRY concealed the existence of the MEZZANINE LOAN agreement and the INTERCREDITOR AGREEMENT from McWHINNEY in violation of the OPERATING AGREEMENT; intentionally causing P&M CENTERRA to breach the fiduciary duties owed to McWHINNEY. As the COLORADO TRIAL COURT more broadly found, P&M CENTERRA's "entry into, and concealment of, the [MEZZANINE LOAN] constituted material breaches of their fiduciary duties to MCLC and CLC."

87.     As stated above, at the time JOSH, DAN and TERRY procured the MEZZANINE LOAN for their personal financial gain, JOSH, DAN and TERRY knew, or through the exercise of reasonable care and diligence should have known, POAG & McEWEN lacked sufficient funds to make interest payments on all of the outstanding debt the POAG & McEWEN organization had accumulated. Shortly after the MEZZANINE LOAN funded, POAG & McEWEN began defaulting on multiple loan obligations owed to various lenders. PLAINTIFFS are informed and believe, and thereon allege, certain of these loans had cross-default provisions that could effect, or were affected by the status of, the SHOPS' existing CONSTRUCTION LOAN.

88.     Throughout 2008, JOSH directly, and DAN and TERRY indirectly, caused, suffered or permitted P&M CENTERRA, as CLC's managing member, to make numerous monthly distributions in order for POAG & McEWEN to satisfy MEZZANINE

-36-

LOAN covenants including, but not limited to, the making of monthly interest payments. Legal counsel for POAG & McEWEN noted these types of distributions were "unlawful, imprudent and unbusinesslike" to the extent they left insufficient funds in CLC's accounts to pay all of the SHOPS' vendors and property taxes. The distributions left CLC with insufficient funds to timely pay its vendors. JOSH directed POAG & McEWEN's staff to ignore McWHINNEY's repeated requests for P&M CENTERRA to establish a reserve to pay scheduled property taxes, as the SHOPS did not generate sufficient funds to both pay taxes and make the distributions. JOSH in essence thus "robbed Peter to pay Paul" by directing PMLSC and/or P&M CENTERRA to make the improper distributions to protect his and his family interests.  In the latter regard, PLAINTIFFS are informed and believe, and thereon allege, JOSH made or authorized the improper distributions, and DAN and TERRY knowingly suffered or permitted JOSH to breach P&M CENTERRA's overlapping contractual and fiduciary duties to CLC in this manner, to avoid liability to themselves or their families associated with personal guarantees each previously signed potentially triggered by a default on the MEZZANINE LOAN.

89.     McWHINNEY repeatedly objected to these distributions, although McWHINNEY at the time was unaware of POAG & McEWEN's dire financial circumstances.  JOSH ignored all such pleas.

90.     As the COLORADO TRIAL COURT previously found, "CLC simply did not have enough capital to make all of these distributions, but P&M made them anyway to pay their individual debts. These improper distributions constituted a breach of P&M's duties and amounted to willful misconduct."

91.    JOSH, DAN and TERRY knew at the time they concealed this information that PMLSC's property management agreement for the SHOPS was a lucrative asset POAG & McEWEN could not afford to lose.

92.    Under Section 6.5 of the OPERATING AGREEMENT, MCLC could remove P&M as managing member of CLC if either of two conditions were met:

      a.  If JOSH, DAN, and TERRY do not, together, own at least 50% of P&M CENTERRA; or

      b.  If P&M CENTERRA committed willful malfeasance, gross negligence, fraud, embezzlement, or engaged in materially damaging conduct.

93.    At the time, because PLAINTIFFS were entirely kept in the dark on the financial status of the SHOPS, the real reasons delaying the obtainment of permanent financing and TERRY's buyout, PLAINTIFFS did not believe they had sufficient grounds to remove P&M CENTERRA as CLC's managing member.

94.    Had PLAINTIFFS known all the above information constituting, as the COLORADO TRIAL COURT found in *McWHINNEY v. POAG*, fraud, willful malfeasance, gross negligence and actions materially damaging CLC, the SHOPS and PLAINTIFFS, PLAINTIFFS would have exercised their right under section 6.5(a) of the OPERATING AGREEMENT to remove P&M CENTERRA as CLC's managing member. Had PLAINTIFFS known about TERRY's buyout, and known as a result thereof and PMLC's above-described roll-up (see, paragraphs 73-74 *supra*) JOSH, DAN and TERRY no longer together would own at least 50% of P&M CENTERRA, PLAINTIFFS would have exercised their right under section 6.5(b).  Either way, PLAINTIFFS would have thus rid JOSH, DAN and TERRY of ultimate and unfettered dominion and control over the finances and management of CLC and the SHOPS.  PLAINTIFFS would have

further terminated the management contract with PMLSC and found a new, competent manager to properly manage the SHOPS.

95.    Upon exercise of MCLC's rights under section 6.5, PLAINTIFFS would have become CLC's new managing member under the terms of the OPERATING AGREEMENT and would have immediately obtained permanent financing to replace the high-cost, short-term CONSTRUCTION LOAN, thus avoiding a foreclosure and the ultimate loss of PLAINTIFFS' equity in CLC and the SHOPS.

**Buy-Sell Negotiations**

96.    As the COLORADO TRIAL COURT previously found, after obtaining the $40 million MEZZANINE LOAN, JOSH "instructed [SELBERG] to inform JPM that P&M was no longer seeking a permanent loan." Per the COLORADO TRIAL COURT, this conduct was "a breach of P&M's duties of good faith and loyalty as it was in CLC's best interest to close on any of these proposed permanent loans. But, it was in P[OAG] & McE[WEN]'s interest to put on a permanent loan of at least $155 million."

97.    As the COLORADO TRIAL COURT previously found, in May 2007 "P[OAG] & McE[WEN] changed its strategy on how to pay off the $40 million M[EZZANINE] L[OAN]. Instead of trying to get the capital to pay off the M[EZZANINE] L[OAN] from permanent loan proceeds, they decided that they would pay the loan off with proceeds from the sale of their interest in CLC to McW[HINNEY]. P[OAG] & McE[WEN] informed JPMIM that this was their 'exit strategy.'"

98.    P&M CENTERRA and MCLC hired Eastdil Securities ("EASTDIL") to appraise the SHOPS. EASTDIL's first appraisal in August 2007 returned a value between $197 and $202 million. JOSH was dissatisfied with that amount despite knowing that the SHOPS were still insufficiently leased and were having severe income

problems. However, neither EASTDIL nor McWHINNEY knew of these problems because JOSH insisted on "scrubbing the numbers" to make the SHOPS appear profitable before sending anything out.

99.    JOSH wanted a valuation of $250 million for the SHOPS. He berated EASTDIL for allegedly making several errors in the numbers and assumptions and sent EASTDIL the numbers he thought should be used. Using JOSH's numbers, EASTDIL returned a final valuation in September 2007 of between $206 and $212 million.

100.    Per the COLORADO TRIAL COURT, "P[OAG] & Mc[EWEN] intentionally withheld important financial information from McW[HINNEY] to use as a 'tool in their negotiations.' [JOSH] described this as a 'scrub' of the documents before they were provided to McW[HINNEY] … P&M's deliberate concealment and withholding of relevant financial information and other conduct directly breached their duties of candor and fair dealing."

101.    PLAINTIFFS are informed and believe, and thereon allege JOSH, DAN and TERRY further devised a plan whereby they would threaten to sue McWHINNEY as a pretextual means to force McWHINNEY to pay an above-market price for the SHOPS.

102.    McWHINNEY offered to purchase P&M CENTERRA's interest in CLC for $47.125 million. McWHINNEY sought a 45-day due diligence period to obtain detailed (and accurate) financial information on the SHOPS, information that JOSH concealed from McWHINNEY.

103.    Knowing that allowing due diligence into CLC's finances would reveal all of JOSH, DAN and TERRY's accounting fictions and the actual (dire) financial status of the SHOPS, JOSH responded to McWHINNEY's offer in an email, requesting McWHINNEY forgo due diligence or face consequences.

104.    As the COLORADO TRIAL COURT previously found, "P&M also used the Loveland City Council meeting as another tool in their negotiations by threatening McW[HINNEY] if they did not waive their right to conduct due diligence and sign the letter of intent immediately.  When McW[HINNEY] refused to do so, P[OAG] & Mc[EWEN] made a public statement at the city council meeting that the S[HOPS] were overbuilt and in a precarious financial state. These statements were made even though P[OAG] & Mc[EWEN] had continued to inform McW[HINNEY]—and third-party financial institutions—that the S[HOPS] had been doing well financially (in order to maximize the value of their interest)."

105.    This was the first time McWHINNEY was ever informed of the true condition of the SHOPS.

106.    The COLORADO TRIAL COURT found these tactics constituted bad faith and concluded "the change in P[OAG] & Mc[EWEN]'s story about the S[HOPS]' performance demonstrates P[OAG] & Mc[EWEN]'s interest in tailoring facts to advance their own personal interests."

***CONSTRUCTION LOAN Default and Workout Negotiations***

107.    When the buy-sell negotiations began, JOSH and SELBERG stopped looking for permanent loans without ever informing McWHINNEY.  After the buy-sell negotiations broke down, the Great Recession had begun and it became difficult to source a loan in the excessive amount desired by JOSH and DAN.

108.    Consequently, P&M CENTERRA, under JOSH's control, let the CONSTRUCTION LOAN go into default.

109.    At approximately the same time the CONSTRUCTION LOAN went into default, the BANK GROUP sent a proposal for a post-default extension.  The proposal

contained a provision requiring the mezzanine lender's, i.e. JPMIM's, consent. This was the first time McWHINNEY ever saw the word "mezzanine lender," had any idea about the POAG & McEWEN's MEZZANINE LOAN, or any idea about its *de facto* joint venture partner for the last three years – *i.e.* JPMIM. At that point, McWHINNEY asked POAG & McEWEN for all documents associated with that loan to assess its effect on the refinancing of the CONSTRUCTION LOAN. JOSH responded with only the INTERCREDITOR AGREEMENT, stating the rest was "proprietary." Again, the COLORADO TRIAL COURT found these actions constituted a breach of P&M CENTERRA's fiduciary duties to MCLC and CLC.

110.    Thereafter, P&M CENTERRA under JOSH and DAN's control sent McWHINNEY and MCLC two purported "Permanent Loan Notices". The COLORADO TRIAL COURT rejected POAG & McEWEN's claim that these notices were proper "Permanent Loan Notices" under the OPERATING AGREEMENT, finding the resulting foreclosure and loss of the property to be the result of P&M CENTERRA's material breaches of the OPERATING AGREEMENT.

111.    During the post-default workout negotiations with the BANK GROUP, JOSH, for the benefit of himself and his father DAN, played both sides of the table – *i.e.* purporting to negotiate with McWHINNEY for the benefit of their joint venture while also seeking out equity investors to purchase the CONSTRUCTION LOAN, even if that meant diluting McWHINNEY, or pushing McWHINNEY out altogether.

112.    JOSH and DAN knew McWHINNEY had the capital to purchase the defaulted CONSTRUCTION LOAN note and/or pay down a large portion of the note and obtain a better deal from the BANK GROUP. However, POAG & McEWEN was on the brink of bankruptcy and had no liquid capital of its own to invest. If McWHINNEY

injected capital into CLC and POAG & McEWEN did not, under the terms of the OPERATING AGREEMENT, P&M CENTERRA's 50% interest would be proportionately diluted, making McWHINNEY the controlling member of CLC. As controlling member, McWHINNEY could have terminated PMLSC's lucrative management contract and would have immediately discovered all of POAG & McEWEN's improper conduct. JOSH and DAN refused to allow that to happen, and in doing so, caused the property to be lost in foreclosure.

### TERRY's Loan, JOSH and DAN's Decision to Not Put CLC into Bankruptcy and TERRY's New Deal

113.    At approximately this same time, TERRY made a $250,000 "loan" to P&M CENTERRA to hire bankruptcy counsel to prevent the foreclosure of the SHOPS. PLAINTIFFS are informed and believe, and thereon allege, despite being advised CLC was a "prime bankruptcy candidate," JOSH and DAN refused consent for CLC to seek bankruptcy protection after discovering it would trigger "bad boy" carve-outs in other loans held by POAG & McEWEN and/or personally guaranteed by JOSH and DAN. Thus, to maintain their personal and POAG & McEWEN's creditworthiness, JOSH and DAN, without consulting McWHINNEY, decided not to put CLC into bankruptcy.

114.    PLAINTIFFS are informed and believe, and thereon allege, TERRY, upset, among other reasons, his "loan" was not used to commence bankruptcy proceedings, negotiated with JOSH and DAN to have this and other "loans" converted into a reinstatement of his equity interest in PMLC.

### Fraudulent Transfer of Assets

115.    PLAINTIFFS are informed and believe, and thereon allege, between 2010 and 2015, JOSH, DAN, TERRY, TRUSTEE DEFENDANTS and/or DOE INDIVIDUALS,

acting collectively or independently, used P&M CENTERRA, PMLC, PLC, PSC, PMLSC, POAG BROS and/or various trusts or estate planning mechanisms under their control, or under the actual or putative control of TRUSTEE DEFENDANTS, to cause, suffer or permit a significant number of assets, funds and/or business opportunities to be shifted out of existing POAG & McEWEN entities to avoid then known or anticipated claims.

116.    By way of example only, PLAINTIFFS are informed and believe, and thereon allege, during or before 2010 JOSH and DAN created PLC for the purpose of housing a management contract for the SHOPS pursuant to a post-foreclosure acquisition by a private equity firm.  PLC had no employees and relied entirely upon the employees, assets, facilities and equipment of PMLSC to operate.  PLAINTIFFS are informed and believe, and thereon allege, JOSH and DAN did not renew this contract using PMLSC, the entity that had been managing the SHOPS pre-foreclosure, in an effort to shield the revenue stream of the management contract from McWHINNEY's claims.  At the time, there was an arbitration pending between PLAINTIFFS, on the one hand, and PMLC and P&M CENTERRA, on the other, initiated by McWHINNEY.

117.    In 2012, after McWHINNEY and MCLC filed *McWHINNEY v. POAG* against PMLC, P&M CENTERRA, and PLC before the COLORADO TRIAL COURT, JOSH and DAN again formed a new single purpose entity within the POAG & McEWEN organization – PSC.

118.    PLAINTIFFS are informed and believe, and thereon allege, in January 2014 JOSH, DAN, TRUSTEE DEFENDANTS and DOE INDIVIDUALS transferred the majority of PMLC and PMLSC's assets into PSC (or other ROE CORPORATIONS or DOE TRUSTS).  All of PMLSC's employees then became PSC employees.  PSC was

housed at the same address using the same people, computers, officers and supplies as PMLC and PMLSC before it. PLAINTIFFS are informed and believe, and thereon allege, that there was no or insufficient consideration given to PMLC and PMLSC for this transfer of assets.

119. PLAINTIFFS are informed and believe, and thereon allege, the assets transferred to PSC (or other ROE CORPORATIONS or DOE TRUSTS) include, among other things, the right to perform management services for the SHOPS, the Promenade Shops at Evergreen Walk (South Windsor, Connecticut), the Promenade Shops at Saucon Valley (Center Valley, Pennsylvania), Carriage Crossing (Memphis, Tennessee), the Promenade Shops at Briargate (Colorado Springs, Colorado), the Shops at Perry Crossing (Plainfield, Indiana), and the Promenade Shops at Orchard Valley (Manteca, California).

120. PLAINTIFFS are informed and believe, and thereon allege, JOSH, DAN, TERRY, TRUSTEE DEFENDANTS and/or DOE INDIVIDUALS caused these assets to be transferred to PSC (or other ROE CORPORATIONS or DOE TRUSTS) to fraudulently put them outside of the execution power of the COLORADO TRIAL COURT in response to McWHINNEY's likely eventual judgment.

121. PLAINTIFFS are informed and believe, and thereon allege, JOSH, DAN, TERRY, TRUSTEE DEFENDANTS and/or DOE INDIVIDUALS created additional entities or asset receptacles, which now serve the function previously served by PMLC. The identity of these entities or receptacles is not presently known to PLAINTIFFS.

122. PLAINTIFFS are informed and believe, and thereon allege PMLC, P&M CENTERRA and PLC are now, and for many years have been, defunct entities with no significant assets or income stream (to the extent they were actually ever anything more

than alter egos of DAN, JOSH and/or TERRY.)  PLAINTIFFS are further informed and

believe, and thereon allege JOSH, DAN, TERRY, TRUSTEE DEFENDANTS and/or

DOE INDIVIDUALS intentionally transferred all, or substantially all, assets, funds and

opportunities including, but not limited to, the ownership of other lifestyle centers and

lucrative management contracts, first to PLC and then to PSC (or other ROE

CORPORATIONS or DOE TRUSTS), and possibly other entities or receptacles, to

avoid a judgment reaching those assets, funds or opportunities.  PLAINTIFFS are

informed and believe, and thereon allege, there was no or insufficient consideration

given in response for these transfers.

123.    In sum, PLAINTIFFS are informed and believe, and thereon allege,

JOSH, DAN, TERRY, TRUSTEE DEFENDANTS and/or DOE INDIVIDUALS have

engaged in such intentional conduct to avoid liability for PMLC and P&M Centerra's

wrongdoing; wrongdoing that occurred by the hand of, or at the express direction of

TERRY, DAN, and JOSH, and often for the direct personal financial gain of TERRY,

DAN, and JOSH.

### FIRST CLAIM FOR RELIF

### FRAUDULENT CONCEALMENT against JOSH, DAN, and TERRY

124.    PLAINTIFFS fully incorporate herein by reference paragraphs 1 through

123 above.

125.    DAN, JOSH and TERRY, acting collectively or independently, so

dominated and controlled the affairs of P&M CENTERRA, PMLC, PLC and PSC, they,

or through their control of employees, agents and intermediaries, intentionally

concealed material information from PLAINTIFFS, including but not limited to.

a. In 2003, DAN and TERRY's put into place a succession plan by which they would both retire from POAG & McEWEN and would cash-out their controlling interests therein;

b. The plan of succession for JOSH to take over operations; and

c. PMLC's drastically changing business model during the parties' negotiations prior to executing the OPERATING AGREEMENT.

126.    During the negotiations over the OPERATING AGREEMENT, JOSH, DAN, and TERRY knew TERRY's involvement in the joint venture was a foundational, material point for McWHINNEY.  JOSH, DAN, and TERRY further knew TERRY's departure from POAG & McEWEN and JOSH's planned and subsequent accession to power would jeopardize negotiations with McWHINNEY because of the significance of TERRY's involvement to McWHINNEY and the complete of any real estate experience by JOSH.

127.    JOSH, DAN, and TERRY further intentionally concealed from McWHINNEY and MCLC:

a. TERRY's buyout in 2006;

b. That JOSH, DAN, and TERRY no longer owned more than a 50% interest in P&M CENTERRA;

c. JOSH, DAN, and TERRY's true purpose for purchasing the $155 MM SWAP;

d. JOSH, DAN, and TERRY's true purpose for delaying the obtainment of permanent financing to replace the CONSTRUCTION LOAN;

e. JOSH, DAN, and TERRY's true purpose for obtaining the $40 million MEZZANINE LOAN; and

      f.   The actual financial status of CLC after the execution of the OPERATING AGREEMENT.

128.   JOSH, DAN, and TERRY knew McWHINNEY and MCLC operated on a conservative business model of lowering risk exposure by obtaining permanent financing at the earliest possible point.  McWHINNEY communicated this desire to JOSH, DAN, and TERRY during the negotiations for the OPERATING AGREEMENT and indeed, terms were included in the OPERATING AGREEMENT reflecting McWHINNEY's preference for lower risk.  Nonetheless, JOSH, DAN, and TERRY concealed their risky financial plan for the joint venture from McWHINNEY and MCLC, concealed the true financial wellbeing of the SHOPS from McWHINNEY and MCLC, and concurrently misrepresented to McWHINNEY and MCLC that they were actively searching for permanent financing throughout the life of the partnership.

129.   The facts in paragraphs 125(a)-(c) and 127(a)-(f) were material because a reasonable person under the circumstances of PLAINTIFFS would regard such facts as important in deciding how to proceed with its joint venture with POAG & McEWEN.

130.   Specifically, the facts in paragraphs 125(a)-(c) and 127(a)-(f) were material because they constituted a breach of fiduciary duty by JOSH, DAN, and TERRY.

131.   JOSH, DAN, and TERRY intentionally concealed such facts from PLAINTIFFS in order to create a false impression in PLAINTIFFS' minds.

132.   JOSH, DAN, and TERRY intentionally concealed the foregoing from PLAINTIFFS with the intent that PLAINTIFFS:

    a. Believe TERRY would be involved in the development, management, and leasing of the SHOPS and therefore agree to joint venture the SHOPS with PMLC;

    b. Not take action under the OPERATING AGREEMENT to remove P&M CENTERRA as managing member of CLC;

    c. Not take action to terminate PMLSC as the SHOPS' contracted property manager;

    d. Believe the SHOPS had greater value than they actually did to justify demanding a higher sale price from MCLC during the buy-sell negotiations; and

    e. Do not inject additional capital into CLC or purchase the CONSTRUCTION LOAN note from the BANK GROUP and thereby gain control over CLC and the SHOPS and push out P&M CENTERRA and ultimately JOSH, DAN, and TERRY.

133.　As evidenced by the ensuing events leading up to and including the *McWHINNEY v. POAG* lawsuit, PLAINTIFFS believed:

    a. TERRY would be intimately involved in the development, management, and leasing of the SHOPS and as a result, agreed to joint venture the SHOPS with POAG & McEWEN;

    b. They did not have sufficient grounds under Section 6.5 of the OPERATING AGREEMENT to remove P&M CENTERRA as managing member of CLC;

    c.  The value of the SHOPS was or exceeded $200 million as evidenced by the $45 and $47.125 million offers PLAINTIFFS made to purchase P&M CENTERRA's interest in the SHOPS; and

    d.  JOSH and DAN's threat of litigation if they attempted to purchase the CONSTRUCTION LOAN note or inject additional capital into CLC.

134.  PLAINTIFFS reliance on JOSH, DAN, and TERRY's concealments was justified by virtue of the partnership between McWHINNEY and POAG & McEWEN, PLAINTIFFS' trust in JOSH, DAN, and TERRY, PLAINTIFFS' belief JOSH, DAN, and TERRY would cause P&M CENTERRA to act in accordance with its duties under the OPERATING AGREEMENT, and PLAINTIFFS' belief JOSH, DAN, and TERRY would act in the best interest of the SHOPS and CLC because it benefited both PLAINTIFFS *and* POAG & McEWEN.

135.  PLAINTIFFS' reliance on JOSH, DAN, and TERRY's concealment resulted in the loss of PLAINTIFFS' equity in the SHOPS through foreclosure, lost profits during the partnership as a result of PMLSC and P&M CENTERRA's mismanagement of CLC's finances under the power and control of JOSH, DAN, and TERRY, and lost future profits from the SHOPS.

## SECOND CLAIM FOR RELIEF

### FRAUDULENT MISREPRESENTATION against JOSH, DAN, and TERRY

136.  PLAINTIFFS fully incorporate herein by reference paragraphs 1 through 135 above.

137.  JOSH, DAN, and TERRY falsely represented to PLAINTIFFS that:

    a.  TERRY would remain with POAG & McEWEN and be intimately involved in the development, leasing, and management of the SHOPS;

b. DAN would remain with POAG & McEWEN;

c. The $155 MM SWAP would benefit the SHOPS by locking in a then-current interest rate, even though JOSH and DAN had not obtained any commitments for a permanent loan;

d. The $40 million MEZZANINE LOAN was a simple "corporate financing" transaction that would benefit the SHOPS;

e. The SHOPS were in a positive cash-flow situation and could support $500,000 monthly distributions, even though there was not enough money in CLC's accounts to cover all of its debts and property taxes;

f. The SHOPS were adequately leased at the time of opening and throughout 2006 and 2007, even though the SHOPS never reached a point of stabilization;

g. The SHOPS were worth in excess of $200 million;

h. PLAINTIFFS' attempts to purchase the CONSTRUCTION LOAN note from the BANK GROUP would constitute a breach of the OPERATING AGREEMENT; and

i. PLAINTIFFS' ultimately abandoned adjacent, mixed-use development would constitute a breach of the OPERATING AGREEMENT and disadvantage the SHOPS.

138. JOSH, DAN, and TERRY misrepresented the foregoing information because they knew McWHINNEY and MCLC would be able to trigger the removal of P&M CENTERRA as managing member of CLC under Section 6.5 of the OPERATING AGREEMENT and could therefore remove PMLSC, the contracted property manager for the SHOPS, from its position. The 5% property management fee charged by

PMLSC was a significant source of income for POAG & McEWEN which JOSH, DAN, and TERRY could not afford to lose.

139.    The facts in paragraphs 137(a)-(i) were material because a reasonable person under the circumstances of PLAINTIFFS would regard such facts as important in deciding how to proceed with its joint venture with POAG & McEWEN.

140.    Specifically, the facts in paragraphs 137(a)-(i) were material because they constituted a breach of fiduciary duty by JOSH, DAN, and TERRY.

141.    At the time JOSH, DAN, and TERRY made these representations to PLAINTIFFS, they knew them to be false.

142.    JOSH, DAN, and TERRY made these false representations to PLAINTIFFS with the intent that PLAINTIFFS rely on such representations.

143.    PLAINTIFFS in fact relied on such representations  because PLAINTIFFS believed:

> a.  TERRY would be intimately involved in the development, management, and leasing of the SHOPS and as a result, agreed to joint venture the SHOPS with POAG & McEWEN;
>
> b.  They did not have sufficient grounds under Section 6.5 of the OPERATING AGREEMENT to remove P&M CENTERRA as managing member of CLC;
>
> c.  The value of the SHOPS was or exceeded $200 million as evidenced by the $45 and $47.125 million offers PLAINTIFFS made to purchase P&M CENTERRA's interest in the SHOPS; and
>
> d.  JOSH and DAN's threat of litigation if they attempted to purchase the CONSTRUCTION LOAN note or inject additional capital into CLC.

144.    PLAINTIFFS reliance on JOSH, DAN, and TERRY's false representations was justified by virtue of the partnership between McWHINNEY and POAG & McEWEN, PLAINTIFFS' trust in JOSH, DAN, and TERRY, PLAINTIFFS' belief JOSH, DAN, and TERRY would cause P&M CENTERRA to act in accordance with its duties under the OPERATING AGREEMENT, and PLAINTIFFS' belief JOSH, DAN, and TERRY would act in the best interest of the SHOPS and CLC because it benefited both PLAINTIFFS *and* POAG & McEWEN.

145.    PLAINTIFFS' reliance on JOSH, DAN, and TERRY's false representations resulted in the loss of PLAINTIFFS' equity in the SHOPS through foreclosure, lost profits during the partnership as a result of PMLSC and P&M CENTERRA's mismanagement of CLC's finances under the power and control of JOSH, DAN, and TERRY, and lost future profits from the SHOPS.

### THIRD CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY against JOSH, DAN, and TERRY

146.    PLAINTIFFS fully incorporate herein by reference paragraphs 1 through 145 above.

147.    JOSH, DAN, and TERRY were acting as fiduciaries to PLAINTIFF with respect to:

   a. The negotiations between the joint venture parties for of the letter of intent;

   b. The negotiations between the joint venture parties for the OPERATING AGREEMENT;

   c. Being principles, executives, and owners of PMLC, which was a signatory to the OPERATING AGREEMENT;

    d.  Being principles, executives, and owners of PMLSC, which was the

       contracted property manager for the SHOPS; and

    e.  Being principles, executives, and owners of P&M CENTERRA, which

       was the contracted managing member of CLC.

148.  JOSH, DAN, and TERRY breached their fiduciary duties to PLAINTIFFS by, among other things:

    a.  Misrepresenting TERRY's involvement in the development, leasing,

       and management of SHOPS and concealing TERRY's impending

       retirement from POAG & McEWEN;

    b.  Misrepresenting DAN's involvement in the development, management,

       and financing of the SHOPS and concealing DAN's impending

       retirement from POAG & McEWEN;

    c.  Misrepresenting POAG & McEWEN's conservative business model

       and concealing the new and risky business model instituted under

       JOSH's leadership;

    d.  MISREPRESNTING the true purpose for obtaining the $155 MM

       SWAP;

    e.  MISPRESENTING the true purpose for obtaining PLAINTIFFS'

       consent to the First Amendment to the OPERATING AGREEMENT;

    f.  Concealing the nature, amount, purpose and effect of the $40 million

       MEZZANINE LOAN;

    g.  Misrepresenting the effect of the $40 million MEZZANINE LOAN as

       being beneficial to CLC and PLAINTIFFS;

h. Intentionally delaying the obtaining of permanent financing to replace the CONSTRUCTION LOAN for the sole benefit of JOSH, DAN, and TERRY;

i. Causing P&M CENTERRA to relay materially inaccurate and false financial information to PLAINTIFFS in order to create the appearance of value, profitability, and positive cash flow;

j. Concealing material financial information from PLAINTIFFS to use in buy/sell negotiations with PLAINTIFFS;

k. Secretly causing P&M CENTERRA to cease searching for permanent financing to replace the CONSTRUCTION LOAN during the buy/sell negotiations with PLAINTIFFS; and

l. Causing P&M CENTERRA to make several monthly distributions of $500,000 from CLC when CLC did not have enough cash in its accounts to cover all of its invoices or year-end property taxes.

149.   JOSH, DAN, and TERRY's breaches of fiduciary duties were the cause of PLAINTIFFS loss of equity in the SHOPS through foreclosure, lost profits during the partnership as a result of PMLSC and P&M CENTERRA's mismanagement of CLC's finances under the power and control of JOSH, DAN, and TERRY's, and lost future profits from the SHOPS.

### FOURTH CLAIM FOR RELIEF

### CIVIL CONSPIRACY against JOSH, DAN, and TERRY

150.   PLAINTIFFS fully incorporate herein by reference paragraphs 1 through 149 above.

151.   JOSH, DAN, and TERRY agreed, by words and conduct, to accomplish a goal through unlawful means, including, but not limited to, concealing from and misrepresenting to PLAINTIFFS material information during the negotiation process preceding the parties' joint venture and during the life of the joint venture, as described in paragraphs 1 through 149 above.

152.   JOSH, DAN, and TERRY further agreed, by words and conduct, to accomplish a goal through unlawful means, including but not limited to, breaching their fiduciary duties of care and loyalty owed to PLAINTIFFS as described in paragraphs 1 through 149 above.

153.   JOSH, DAN, and TERRY performed the foregoing unlawful acts to accomplish the goal of:

    a.  Convincing PLAINTIFFS to enter into a joint venture with POAG & McEWEN;

    b.  Obtaining $40 million to buy out TERRY's interest from POAG & McEWEN;

    c.  Artificially inflating the value of the SHOPS to solicit a larger offer price from PLAINTIFFS during the buy/sell negotiations; and

    d.  Purchasing the CONSTRUCTION LOAN note out of foreclosure or directly from the BANK GROUP to push out PLAINTIFFS and maintain POAG & McEWEN's lucrative management contract.

154.   JOSH, DAN, and TERRY's conspiracy was the cause of PLAINTIFFS loss of equity in the SHOPS through foreclosure, lost profits during the partnership as a result of PMLSC and P&M CENTERRA's mismanagement of CLC's finances under the

power and control of JOSH, DAN, and TERRY's, and lost future profits from the

SHOPS.

155.    PLAINTIFFS' injuries were caused by the unlawful acts performed by

JOSH, DAN, and TERRY to accomplish the goals set forth in paragraphs 1 through 149

above.

## FIFTH CLAIM FOR RELIEF

### FRAUDULENT TRANSFER pursuant to Colo. Rev. Stat. § 38-8-108 against all DEFENDANTS

156.    PLAINTIFFS fully incorporate herein by reference paragraphs 1 through

155 above

157.    PLAINTIFFS are informed and believe, and thereon allege, between 2010

and 2015, JOSH, DAN and/or TERRY, acting collectively or independently, used P&M

CENTERRA, PMLC, PLC, PSC, PMLSC, POAG BROS and/or various trusts or estate

planning mechanisms under their control, or under the actual or putative control of

TRUSTEE DEFENDANTS, to cause, suffer or permit a significant number of assets,

funds and/or business opportunities to be shifted out of existing POAG & McEWEN

entities to avoid then known or anticipated claims by present and/or future creditors.

158.    PLAINTIFFS are creditors of P&M CENTERRA resulting from a judgment

entered in *McWHINNEY v. POAG* in the amount of $42,006,032.50 for MCLC, plus

prejudgment interest in an amount yet to be determined.  At the time of transfer,

PLAINTIFFS were potential creditors of PMLC and PLC because P&M CENTERRA,

PMLC and PLC were defendants in *McWHINNEY v. POAG*.

159.    JOSH, DAN, and TERRY acting collectively or independently, used P&M

CENTERRA, PMLC, PLC, PSC, PMLSC, POAG BROS and/or various trusts or estate

planning mechanisms under their control, or under the actual or putative control of TRUSTEE DEFENDANTS to cause, suffer or permitt a significant number of assets, funds and/or business opportunities to be shifted out of existing POAG & McEWEN entities with actual intent to hinder, delay, and defraud PLAINTIFFS from executing on a judgment obtained in *McWHINNEY v. POAG* against PMLC, PLC, and/or P&M CENTERRA.

160.    JOSH, DAN, and TERRY acting collectively or independently, used P&M CENTERRA, PMLC, PLC, PSC, PMLSC, POAG BROS and/or various trusts or estate planning mechanisms under their control, or under the actual or putative control of TRUSTEE DEFENDANTS to cause, suffer or permitt a significant number of assets, funds and/or business opportunities to be shifted out of existing POAG & McEWEN entities without receiving a reasonably equivalent value in exchange for the transfer and believed or reasonably should have believed that PMLC, PLC, and/or P&M CENTERRA would incur debts beyond their ability to pay as they became due.

161.    JOSH, DAN, TERRY, and/or TRUSTEE DEFENDANTS retained control of the assets, funds and/or business opportunities shifted out of existing POAG & McEWEN entities.

162.    JOSH, DAN, TERRY, and/or TRUSTEE DEFENDANTS concealed the transfer of all or substantially all assets, funds and/or business opportunities shifted out of existing POAG & McEWEN entities.

163.    Before the transfer was made, PMLC, PLC, and P&M CENTERRA, of which JOSH, DAN, and TERRY were principles, owners, and executives, were sued by PLAINTIFFS in *McWHINNEY v. POAG*.

164.  JOSH, DAN, and TERRY concealed assets of PMLC, PLC, and P&M CENTERRA.

165.  PMLC, PLC, and P&M CENTERRA became insolvent as a result of JOSH, DAN, TERRY, and TRUSTEE DEFENDANTS transferring all or substantially all assets, funds and/or business opportunities shifted out of existing POAG & McEWEN entities because the sum of all of PMLC, PLC, and P&M CENTERRA's debts is greater than all of their assets at fair valuation.

## SIXTH CLAIM FOR RELIEF

**DECLARATORY RELIEF pursuant to Colo. Rev. Stat. § 13-51-101 *et seq.* and Colo. R. Civ. Proc. 57 against all DEFENDANTS**

166.  PLAINTIFFS fully incorporate herein by reference paragraphs 1 through 165 above

167.  JOSH, DAN, and/or TERRY are alter egos of PMLC, PLC, P&M CENTERRA, and PSC.

168.  PMLC, PLC, and P&M CENTERRA are all alter egos of one another.

169.  PMLC, PLC, and P&M CENTERRA are alter egos of PSC.

170.  JOSH, DAN, and/or TERRY had exclusive dominion and control of PMLC, PLC, and P&M CENTERRA.

171.  JOSH and DAN have exclusive dominion and control over PSC.

172.  PMLC had exclusive dominion and control over P&M CENTERRA.

173.  JOSH, DAN, and/or TERRY formed PSC (or other ROE CORPORATIONS or DOE TRUSTS) as a fraud to avoid a potential judgment against PMLC, PLC, and/or P&M CENTERRA and transferred all or substantially all of PMLC,

PLC, and P&M CENTERRA's assets to PSC (or other ROE CORPORATIONS or DOE TRUSTS).

174.    JOSH, DAN, and TERRY disregarded the corporate form of PMLC, PLC, and P&M CENTERRA by cross-collateralizing among the three entities and C&DL in order to obtain the $40 million MEZZANINE LOAN to buy out TERRY's interest in POAG & McEWEN without having to personally contribute any money.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS pray for judgment against DEFENDANTS and each of them as follows:

A.    General damages in the amount of $92,200,000 against JOSH, DAN, TERRY, DOE INDIVIDUALS and DEFENDANT TRUSTEES;

B.    Avoidance of the transfer of assets from PMLC, PLC, and/or P&M CENTERRA to PSC, ROE CORPORATIONS, and/or DOE TRUSTS pursuant to Colorado Revised Statute section 38-8-108(a);

C.    An attachment of assets transferred from PMLC, PLC, and/or P&M CENTERRA to PSC (or other ROE CORPORATIONS or DOE TRUSTS) pursuant to Colorado Revised Statute section 38-8-108(b);

D.    Damages in the amount of one and one-half times the value of the assets transferred from PMLC, PLC, and/or P&M CENTERRA to PSC (or other ROE CORPORATIONS or DOE TRUSTS) or one and one-half times the amount necessary to satisfy PLAINTIFFS' creditor claim, whichever is less, pursuant to Colorado Revised Statute section 38-8-108(c);

E.    Declaratory relief pursuant to Colorado Revised Statute section 13-51-101 *et seq.* and Colorado Rule of Civil Procedure 57 establishing:

      i.     JOSH, DAN, and TERRY as alter egos of PMLC, PLC, and/or P&M CENTERRA;

      ii.    PMLC, PLC, and/or P&M CENTERRA as alter egos of each of other;

      iii.   JOSH, DAN, and TERRY as alter egos of PSC; and

      iv.   PMLC, PLC, and/or P&M CENTERRA as alter egos of PSC;

F.     Temporary, preliminary and permanent injunctive relief enjoining JOSH, DAN, and/or TERRY from transferring, or causing the transfer of, any assets from PSC, PMLC, PLC, or P&M CENTERRA to a different individual(s) or entity(ies) except for fair market value;

G.     Exemplary damages in an amount to be determined at trial;

H.     Attorneys' fees and costs of suit; and

I.     Such other relief as the Court deems proper.

Dated November 7, 2017.         ENTERPRISE COUNSEL GROUP, ALC

                                           David A. Robinson, (CO#46877 (CA#107613)
                                         *Attorney for the Plaintiffs*