IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 17-cv-02853-RBJ

MCWHINNEY HOLDING COMPANY, LLLP, a Colorado Limited Liability Partnership,
MCWHINNEY CENTERRA LIFESTYLE CENTER, LLC, a Colorado Limited Liability Company, and
CENTERRA LIFESTYLE CENTER, LLC, a Delaware Limited Liability Company,

    Plaintiffs,

v.

G. DAN POAG, an individual;
JOSHUA D. POAG, an individual; an individual acting as co-trustee of the Josh and Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Jeremy and Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Mark and Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Josh and Dan Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Jeremy and Dan Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Mark and Dan Poag 2004-GST Exempt Trust;
TERRY W. McEWEN, an individual;
POAG & McEWEN LIFESTYLE CENTERS - CENTERRA, LLC, a Delaware Limited Liability Company;
POAG & McEWEN LIFESTYLE CENTERS, LLC, a Delaware Limited Liability Company;
POAG LIFESTYLE CENTERS, LLC, a Delaware Limited Liability Company;
POAG SHOPPING CENTERS, LLC, a Delaware Limited Liability Company;
PM LIFESTYLE SHOPPING CENTERS, LLC, a Delaware Limited Liability Company;
POAG BROTHERS, LLC, a Tennessee Limited Liability Company;
JEREMY M. POAG, an individual acting as co-trustee of the Josh and Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Jeremy and Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Mark and Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Josh and Dan Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Jeremy and Dan Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Mark and Dan Poag 2004-GST Exempt Trust;
D. MARK POAG, an individual acting as co-trustee of the Josh and Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Jeremy and Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Mark and Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Josh and Dan Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Jeremy and Dan Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Mark and Dan Poag 2004-GST Exempt Trust;

DOE INDIVIDUALS 1-10;
DOE TRUSTS 11-30; and
ROE CORPORATIONS 31-60;

    Defendants.

---

## ORDER on MOTION TO REMAND

---

Plaintiffs move to remand this case to state court, arguing that there is no federal subject matter jurisdiction. The Court denies the motion.

## BACKGROUND

**I. The Lifestyle Center Project.**

This lawsuit is the latest chapter in litigation that began in 2011. It all dates back, however, to the mid-1990's when two brothers, Chad and Troy McWhinney, decided to develop a mixed use community on approximately 3,000 acres of undeveloped land they owned in Larimer County. A centerpiece of the contemplated development would be an upscale fashion shopping center. However, they lacked experience with such a development. Their search for someone who had such expertise eventually led them to Dan Poag, who purportedly invented the concept of a "lifestyle center." In December 2002 the McWhinneys decided to enter into a joint venture with and Poag and his partner, Terry McEwen, to develop a lifestyle center on the McWhinneys' property.

To this end, in 2004 the parties created a new entity called Centerra Lifestyle Center, LLC ("CLC"). CLC's mission was to build, own, and operate the "Promenade Shops at Centerra." The facts are somewhat complicated by the penchant of both sides to do their business through holding companies under which sprouted a veritable garden of subsidiaries and

affiliates. For present purposes, however, the key McWhinney entity is McWhinney Centerra Lifestyle Center, LLC ("MCLC"), and the key Poag and McEwen entity is Poag & McEwen Lifestyle Center-Centerra, LLC ("P&M"). On September 29, 2004 MCLC and P&M signed a contract entitled "Limited Liability Company Agreement of Centerra Lifestyle Center, LLC," sometimes referred to simply as the "Operating Agreement." Under the Operating Agreement MCLC and P&M each are 50% members and owners of CLC. MCLC contributed land and capital. P&M contributed expertise in building and leasing lifestyle centers and was designated the manager of CLC.

The Shops were built, but leasing was less successful than had been anticipated. For various reasons a permanent loan was never obtained to pay off the construction loan. Eventually the center was foreclosed by the lenders and sold in foreclosure to a third party. Neither the McWhinneys nor Poag & McEwen retain any ownership interest in the Shops today, although the new owner hired a Poag entity called Poag Lifestyle Centers, LLC ("PLC") to be the manager of the Shops.

**II. State Court Litigation.**

I need not, at least for present purposes, describe in detail what happened to the project because those facts have been extensively discussed in a state court lawsuit that was filed on May 27, 2011. The plaintiffs originally named in that case were McWhinney Holding Company, LLLP and MCLC, "derivatively on behalf of [CLC], a nominal defendant," and three other entities related to the McWhinneys (Centerra Properties West, LLC, SMP4 Investments, Inc. and Centerra Retail Sales Fee Corporation). Complaint, Larimer County District Court, ECF No. 74-1. The defendants named were P&M, Poag & McEwen Lifestyle Centers, LLC, PLC and

3

several "Does." Following a 13-day bench trial, the district court, Hon. Thomas R. French, issued a 79-page order and judgment on August 15, 2017. ECF No. 22-1. The order discusses the history of the project and the parties' falling out in great detail. The court discusses and resolves each of the plaintiffs' claims and the defendants' counterclaims in turn as follows:

**A. Plaintiffs' First Claim: Breach of Contract**.

The court found that P&M had breached contractual duties of good faith, loyalty, care, fair dealing and candor owed to MCLC and to CLC under the express terms of the Operating Agreement (which essentially imposed the same duties as would in any event be owed as fiduciary duties under governing Delaware law). Specifically, P&M breached the Operating Agreement in seven different ways:

1. <u>Purchase of a $155 Million Forward Swap</u>. In connection with its obligation to obtain a permanent loan to pay off the construction loan for the Shops, P&M purchased an uncovered or "naked" swap with CRC funds without MCLC's informed knowledge or approval. This was a risky gamble on future interest rates. The state court held that it constituted an exercise of bad judgment; a breach of the duties of good faith and loyalty by favoring the interest of P&M, Dan Poag, his son Josh Poag, and PMLC over the interests of CLC and the Shops; and a breach of the duty of candor. The swap caused CRC to lose $7.5 million. Although the court found that the breach was not sufficiently material to excuse MCLC from performing its duties under the Operating Agreement, it was sufficient to render P&M liable to MCLC for damages under § 6.6(a) of the Operating Agreement because it was accompanied by gross negligence and willful misconduct. ECF No. 22-1 at 39-42 (pp. 38-41 of the court's order).

2. <u>A $40 Million Loan to Pay Off Terry McEwen</u>.  A major contributor to the project's financial demise arose after Mr. McEwen informed Dan Poag that he wanted to retire and wished to be paid $40 million for his interest in Poag and McEwen and related entities.  Instead of using the Poags' money for this purpose, the decision was made to obtain a $40 million loan and, without MCLC's knowledge or approval, ultimately to repay the loan with CRC's anticipated permanent loan proceeds.  P&M surreptitiously increased the size of CRC's permanent loan application by $40 million to provide for funds to repay this loan.  A permanent loan in that increased amount was never obtained, resulting in the foreclosure proceedings.  The court found that P&M's entry into and concealment of the $40 million loan was, for several reasons, a material breach of fiduciary duties owed to MCLC and CLC as embedded in the Operating Agreement.  *Id.* at 44-51 (pp. 43-50 of the court order).

3. <u>Sales Negotiations</u>.  This breach concerns P&M's intentional withholding of material financial information during a time when P&M was attempting to sell its interest in CLC to MCLC.  *See id.* at 51-53 (pp. 50-52 of court order).

4. <u>Tax Appeals</u>.  P&M breached § 6.2(m) of the Operating Agreement by contesting a valuation of the lifestyle center below $190 per square foot without MCLC's consent.  *Id.* at 53-55 (pp. 52-54 of court order).

5. <u>Distributions from CLC</u>.  P&M breached its duty of loyalty under the Operating Agreement by taking cash distributions from CLC in order to make interest payments on the $40 million loan when CLC could not afford to do.  *Id.* at 55-56 (pp. 54-55 of court order).

6. <u>Permanent Loan Notice</u>. P&M did not provide a permanent loan notice before the maturing date of the construction loan as required by § 7.3(a) of the Operating Agreement. *Id.* at 56-61 (pp. 55-60 or court order.

7. <u>Permanent Loan Impasse Notice</u>. P&M failed to send MCLC a permanent loan impasse notice as required by § 7.3(a) of the Operating Agreement. *Id.* at 61-62 (pp. 60-61 of court order).

**B. Damages for Breach of Contract.**

The court held that MCLC had sustained damages caused by P&M's breach of the Operating Agreement in three categories: (1) the tax appeals had cost CLC $12,065; as a 50% owner of CLC, MCLC was awarded 50% of that cost, i.e. $6,032.50; (2) the $155 million swap cost CLC $7.5 million; MCLC was awarded 50% of that loss, i.e. $3.75 million; and (3) MCLC lost its equity in the Shops, which the court valued at $38.25 million. Accordingly, the court found P&M to be liable to MCLC for a total of $42,006,032.50. *Id.* at 62-71 (pp. 61-70 of court order).

**C. Plaintiffs' Other Claims.**

The court held that plaintiffs' second claim for indemnification was premature because, under Delaware law, it cannot be pursued until its final judgment withstands appellate review. The court resolved plaintiffs' third claim (fraudulent concealment of intent to breach the contract's requirement for tax appeals) and fourth claim (civil conspiracy) in favor of the defendants. *Id.* at 71-76 (pp. 70-75 of court order). The Court reserved plaintiffs' claim that the Poag and McEwen entities are alter egos of each other for a second part of the trial, which had

not yet been scheduled as of the Scheduling Conference in the present case held on January 10, 2018.

   **D. Defendants' Counterclaims.**

Defendants' counterclaims were all resolved in favor of the plaintiffs.  *Id.* at 76-79 (pp. 75-78 of court order).

   **E. Judgment.**

The court entered judgment in favor of MCLC and against P&M in the amount of $42,006,032.50 plus interest to be determined at a later date.  *Id.* at 79 (p. 78 of court order).  The Court did not enter judgment on plaintiffs' second claim but entered judgment in favor of defendants on plaintiffs' remaining claims and in favor of MCLC on the counterclaims.  *Id.* at 80 (p. 79 of court order).

   **III. The Present Case.**

   **A. Plaintiffs' Original Complaint.**

McWhinney Holding Company, LLLP and MCLC filed the present case in the Larimer County District Court on November 8, 2017.  The long list of defendants named in the original complaint can, for simplicity, be divided into three groups: (1) Dan Poag, Josh Poag and Terry McEwen individually; (2) six Poag or Poag and McEwen entities (including P&M); and (3) the trustees of three Poag family trusts.  *See* Complaint, ECF No. 17.  Plaintiffs allege that the defendants in the state court concealed material information and obstructed plaintiffs' discovery efforts literally for years.  After plaintiffs eventually were able, with the assistance of a Special Master and the court, to obtain necessary documents and depositions, they sought leave to amend their complaint to add the Poags and Mr. McEwen individually as defendants and to assert

7

additional claims. The state court denied their motion, principally – according to plaintiffs – because it would further complicate and extend an already complicated and old case. Instead, the trial court suggested that the new claims could be pled in a separate action. *Id.* at 17. Plaintiffs' inability to pursue claims against the Poags and Mr. McEwen individually and other affiliated entities in that case – and their concern that they will not be able to satisfy their judgment against P&M – are the reasons for the present case. *Id.* at 18-19.

Plaintiffs' recitation of the facts in the present case largely repeats the facts they asserted, and in large part the court sustained, in the state case, albeit focused more specifically at the individual defendants. *See id.* at 19-46. They assert claims of (1) fraudulent concealment against the three individual defendants; (2) fraudulent misrepresentation against the three individual defendants; (3) breach of fiduciary duty against the three individual defendants; (4) civil conspiracy against the three individual defendants; (5) fraudulent transfer against all defendants; and (6) a declaratory judgment that three individual defendants and the numerous other entities named as defendants are all alter egos of each other. *Id.* at 46-60.

In their prayer for relief they request $92,200,000 in "general damages" (a number that is not explained and that appears to violate Rule 8(a) of the Colorado Rules of Civil Procedure which prohibits the inclusion of dollar amounts in the prayer for relief) and various other categories of compensatory, punitive and equitable relief. *Id.* at 60-61). However, in their proposed Scheduling Order, plaintiffs make clear that they seek "[g]eneral economic damages in the amount of $42,006,032.50" plus interest, i.e., the amount awarded by the state court. Plaintiffs assert some alternative damages theories, but the essence of this case appears to be plaintiffs' effort to recover the $42 million from whomever within the Poag and McEwen group

additional claims. The state court denied their motion, principally – according to plaintiffs – because it would further complicate and extend an already complicated and old case. Instead, the trial court suggested that the new claims could be pled in a separate action. *Id.* at 17. Plaintiffs' inability to pursue claims against the Poags and Mr. McEwen individually and other affiliated entities in that case – and their concern that they will not be able to satisfy their judgment against P&M – are the reasons for the present case. *Id.* at 18-19.

Plaintiffs' recitation of the facts in the present case largely repeats the facts they asserted, and in large part the court sustained, in the state case, albeit focused more specifically at the individual defendants. *See id.* at 19-46. They assert claims of (1) fraudulent concealment against the three individual defendants; (2) fraudulent misrepresentation against the three individual defendants; (3) breach of fiduciary duty against the three individual defendants; (4) civil conspiracy against the three individual defendants; (5) fraudulent transfer against all defendants; and (6) a declaratory judgment that three individual defendants and the numerous other entities named as defendants are all alter egos of each other. *Id.* at 46-60.

In their prayer for relief they request $92,200,000 in "general damages" (a number that is not explained and that appears to violate Rule 8(a) of the Colorado Rules of Civil Procedure which prohibits the inclusion of dollar amounts in the prayer for relief) and various other categories of compensatory, punitive and equitable relief. *Id.* at 60-61). However, in their proposed Scheduling Order, plaintiffs make clear that they seek "[g]eneral economic damages in the amount of $42,006,032.50" plus interest, i.e., the amount awarded by the state court. Plaintiffs assert some alternative damages theories, but the essence of this case appears to be plaintiffs' effort to recover the $42 million from whomever within the Poag and McEwen group

of individuals and entities is solvent and capable of satisfying a large judgment. ECF No. 47 at 29-32.

B. **Removal of the Case to Federal Court.**

Defendant Poag Shopping Centers, LLC, with the consent of the other defendants, defendants promptly removed the case to this Court on grounds of diversity of citizenship under 28 U.S.C. § 1332. ECF No. 1. It is undisputed that the requirements for diversity of citizenship jurisdiction were met, and that the case was properly removed to this Court.

C. **Plaintiff's Amended Complaint.**

Plaintiffs' then filed their First Amended Complaint. ECF No. 22 (red-lined version at ECF No. 24-1). For present purposes the primary difference is that CLC was added as a third named plaintiff in the amended version. It is undisputed that if CLC was properly added as other than a nominal plaintiff, then diversity jurisdiction is destroyed. A limited liability company such as CLC assumes the citizenship of its members. CLC and defendants share citizenship in Tennessee, Texas, Washington, Ohio and Utah.

D. **Plaintiff's Motion to Remand.**

Plaintiffs then moved to remand the case to state court based on lack of diversity jurisdiction. Defendants oppose the motion, arguing that CLC is neither a necessary nor an indispensable party, and that the addition of CLC in the amended complaint was a sham done solely to defeat federal jurisdiction.[1] The issues have been fully briefed, and I turn to them next.

---

[1] Defendants also argue that MCLC had no right to initiate litigation on CLC's behalf. However, as plaintiffs point out in reply, MCLC had the right under the Operating Agreement to designate a replacement manager for CLC if P&M committed willful malfeasance, gross negligence, or materially damaging conduct. ECF No. 77 at 2. The state court's order of August 22, 2017 established that P&M

**ANALYSIS**

In their motion plaintiffs begin by reminding the Court that the state court found that P&M owed contractual duties of care, loyalty, good faith and fair dealing to both MCLC and CLC. The court found that CLC lost $7.5 million due to P&M's purchase of the ill-fated swap and $12,085 on P&A's tax appeals. I agree. But that is not the way the state case was resolved.

The state court declined to treat their claims as derivative. *See* ECF No. 70 at 7. When the defendants sought to strike plaintiffs damages disclosure on grounds that the damages were sustained by CLC, the court denied the motion. The court held that "any losses suffered by CLC are to be allocated equally to each of the members because they were 50/50 owners." ECF No. 70 at 8 (citing the state court's order of May 26, 2017, ECF No. 70-5, at 4). The court awarded damages to MCLC, not CLC. MCLC was awarded 50% of the $7.5 million and $12,065 losses sustained by CLC, plus other damages. CLC was awarded nothing.

Consistently with the state court order and judgment, plaintiffs' original complaint in the present case did not name CLC as a party. It was only after defendants removed the case that plaintiffs added CLC. In their motion to remand plaintiffs suggest that they did this because they were concerned that a federal court might find CLC to be a necessary party and conclude that the absence of CLC as a party defeats plaintiffs' right of recovery. ECF No. 70 at 8. In response, having unsuccessfully argued in the state court that the damages belonged to CLC, defendants now vigorously support the position that the state court adopted, namely, that the proper plaintiff is MCLC, not CLC. *See* Response to Motion to Remand, ECF No. 74, at 2-3. That would preserve diversity and this Court's jurisdiction.

---

committed breaches of contract by acts including fraud, gross negligence, and willful misconduct, thus permitting MCLC to designate a replacement manager.

I find plaintiffs' fear of having their hoped-for victory taken away by a decision that CLC is a necessary or indispensable party to be unfounded. In the first place, defendants have now staked out an unequivocal position that CLC is not a necessary or indispensable party. They have waived any position to the contrary and won't be heard to argue otherwise in this case. Moreover, I agree with the defendants that CLC is not a necessary or indispensable party under the applicable rules.

Whether CLC is a "necessary" party turns on whether its joinder is "required" by Rule 19(a) of the Federal Rules of Civil Procedure. Joinder is "required" if the court cannot accord complete relief among existing parties in a party's absence; or the absent party has an interest in the subject matter that might be impaired in its absence; or its absence might leave an existing party subject to multiple recoveries. Such a party must be joined if feasible, i.e., if joinder would not deprive the federal court of subject-matter jurisdiction. Here, even if CLC were viewed as a necessary party (which I find later that it is not), joinder of CLC is not feasible because it would deprive this Court of subject-matter jurisdiction.

Rule 19(b) provides that when the joinder of an otherwise necessary party is not feasible, the court must determine "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed," often phrased in the case law as whether the party is "indispensable." Whether an LLC is an indispensable party in litigation between the members of the LLC depends on the facts of the particular case. *See Meyer Natural Foods v. C.R. Freeman,* No. CIV-12-1329-D, 2013 WL 5460823, at **2-4 (W.D. Okla. Sept. 30, 2013) (the absent LLC was not deemed indispensable); *R&R Capital , LLC v. Merritt,* No. 07-2869,

2007 WL 3102961, at **7-9 (E.D. Pa. Oct. 23, 2007) (LLC was a necessary but not indispensable party).

Rule 19(b) lists four factors for courts to consider in determining whether a party is indispensable, which are somewhat similar to the determination of whether a party is necessary:

> 1. the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> 2. the extent to which any prejudice could be lessened or avoided by:
>    (A) protective provisions in the judgment;
>    (B) shaping the relief; or
>    (C) other measures;
> 3. whether a judgment rendered in the person's absence would be adequate; and
> 4. whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Rule 19(b).

I find that a judgment entered in CLC's absence would not prejudice CLC. Defendant describes CLC as defunct, noting that as a result of the lenders' foreclosure, a receiver was appointed to take possession of CLC's property (the Shops), and to pay such claims as were asserted against the receivership estate. Ultimately the receivership was terminated after the public trustee sold the property at the foreclosure sale. *See* ECF No. 74 at 6-7. CLC has no remaining creditors and no assets other than the potential recovery in this case. But, as in the state court case, half of any damages that might technically have been sustained by CLC will be passed through to MCLC.[2] The litigation will not benefit CLC, and CLC has no interest that might be impaired in its absence.

The absence of CLC would not prejudice the plaintiffs. Having their damages pass through CLC in these circumstances adds nothing of value to the plaintiffs. Ironically, their

---

[2] At this time it is unclear to me why McWhinney Holding Company, LLLP was named as a party or whether it has any viable claim to damages separate and apart from MCLC.

12

suggestion that CLC is a necessary or indispensable party potentially undercuts the very state court judgment that they hope to collect. Rules 19(a) and (b) of the Colorado Rules of Civil Procedure are substantially the same as the federal rules.

In any event, on the facts of this case I regrettably find that CLC is neither a necessary nor an indispensable party. I say "regrettably" only because Judge French (and others) spent years mastering the complex facts and the law applicable to these parties' disputes. I have studied his 79-page order and find it to have been an extraordinary piece of work. It makes a great deal of sense for this case to be litigated in the same forum, ideally before the same judge. But a federal court's obligation is to resolve cases where jurisdiction exists. I am satisfied that federal jurisdiction does exist in this case, and as mentioned, the defendants are in no position to suggest otherwise, now or in the future.

Defendants alternatively argue that plaintiffs' additional of CLC in the amended complaint was a fraudulent joinder. ECF No. 74 at 11. During the Scheduling Conference I mentioned a recent decision of the Tenth Circuit: *Brazell v. Waite,* 525 F. App'x 878 (10th Cir. 2013) (unpublished). The court stated,

> Fraudulent joinder need not involve actual fraud in the technical sense. Instead, it can occur when the plaintiff joins a 'resident defendant against whom no cause of action is stated' in order to prevent removal under a federal court's diversity jurisdiction. When this occurs, the district court disregards the fraudulently joined non-diverse party for removal purposes.

*Id.* at 881 (internal citation omitted.)

The facts here are a little different. Plaintiffs joined a non-diverse plaintiff and deny that they did so to destroy diversity and support a remand to state court. The chronology, however, calls this into question. Plaintiffs obtained a favorable decision in the state court. They filed the

13

present suit without including CLC as a plaintiff. Only after the case was removed to state court did they amend and add CLC, followed by their motion to remand. They are taking a position regarding CLC's right to pursue an independent damages claim that goes against what the state court held in resolving the case in plaintiffs' favor. The plaintiffs knew, of course, that CLC would take on the citizenship of its members, and that this would eliminate diversity of citizenship jurisdiction.

I have no basis to dispute that plaintiffs had some concern that a future court might determine that there was no federal jurisdiction and undo the results obtained in months or years of litigation. However, I find the addition of CLC in the amended complaint was probably also motivated, at least in part, by a desire to trump the removal and return the case to the state court. On the facts as discussed in this order, the principle behind the Tenth Circuit's discussion of fraudulent joinder applies and is additional support for the result I reach today.

Plaintiffs state that they do not oppose CLC's designation as a nominal party, citing *Hann v. City of Clinton, Oklahoma,* 131 F. 2d 978, 981 (10th Cir. 1942) and *Dodson Aviation, Inc. v. HLMP Aviation Corp.,* No. 08-4102-EFM, 2009 WL 1036123 at *3 (D. Kan. Feb. 12, 2009) for the proposition that "the presence of a nominal party with no real interest in the controversy" will be disregarded for purposes of diversity jurisdiction. Because on the present facts I find that CLC has no real interest in the controversy between its two members, and neither party objects to its remaining in the case as a nominal party only, the Court concludes that CLC can remain as a nominal party, but its citizenship does not impact this Court's subject matter jurisdiction

14

## ORDER

For the reasons set forth above, plaintiffs' motion to remand, ECF No. 70, is DENIED. CLC is deemed to be a nominal party only. Plaintiffs' motion to expedite, ECF No. 68, is denied as MOOT. The stay granted by the Court, ECF No. 73, is lifted. Plaintiffs may respond to pending motions ECF Nos. 53, 55, 56 and 57 as if they were filed on the date of this order.

DATED this 13th day of March, 2018.

BY THE COURT:

_____
R. Brooke Jackson