IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 17-cv-02853-RBJ

MCWHINNEY HOLDING COMPANY, LLLP, a Colorado Limited Liability Partnership,
MCWHINNEY CENTERRA LIFESTYLE CENTER, LLC, a Colorado Limited Liability
Company, and
CENTERRA LIFESTYLE CENTER, LLC, a Delaware Limited Liability Company,

  Plaintiffs,

v.

G. DAN POAG, an individual;
JOSHUA D. POAG, an individual; an individual acting as co-trustee of the Josh and
Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Jeremy
and Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the
Mark and Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of
the Josh and Dan Poag 2004-GST Exempt Trust; an individual acting as co-trustee of
the Jeremy and Dan Poag 2004-GST Exempt Trust; an individual acting as co-trustee of
the Mark and Dan Poag 2004-GST Exempt Trust;
TERRY W. McEWEN, an individual;
POAG & McEWEN LIFESTYLE CENTERS - CENTERRA, LLC, a Delaware Limited
Liability Company;
POAG & McEWEN LIFESTYLE CENTERS, LLC, a Delaware Limited Liability Company;
POAG LIFESTYLE CENTERS, LLC, a Delaware Limited Liability Company;
POAG SHOPPING CENTERS, LLC, a Delaware Limited Liability Company;
PM LIFESTYLE SHOPPING CENTERS, LLC, a Delaware Limited Liability Company;
POAG BROTHERS, LLC, a Tennessee Limited Liability Company;
JEREMY M. POAG, an individual acting as co-trustee of the Josh and Chloee Poag
2004-GST Exempt Trust; an individual acting as co-trustee of the Jeremy and Chloee
Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Mark and
Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Josh and
Dan Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Jeremy and
Dan Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Mark and
Dan Poag 2004-GST Exempt Trust;
D. MARK POAG, an individual acting as co-trustee of the Josh and Chloee Poag 2004-
GST Exempt Trust; an individual acting as co-trustee of the Jeremy and Chloee Poag
2004-GST Exempt Trust; an individual acting as co-trustee of the Mark and Chloee
Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Josh and Dan
Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Jeremy and Dan
Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Mark and Dan
Poag 2004-GST Exempt Trust;
DOE INDIVIDUALS 1-10;
DOE TRUSTS 11-30; and

ROE CORPORATIONS 31-60;

    Defendants.

---

## ORDER on MOTIONS TO DISMISS

---

Five motions to dismiss are before the Court. ECF Nos. 53, 55, 56, 57, 90. For the reasons stated below, my ruling on each motion is as follows: the first motion to dismiss is GRANTED; the second and third motions to dismiss are DENIED; and the fourth and fifth motions to dismiss are DENIED in part and GRANTED in part.

## I. BACKGROUND[1]

### A. **The Lifestyle Center Project**.

This lawsuit is the latest chapter in litigation that began in 2011. It all dates back, however, to the mid-1990s when two brothers, Chad and Troy McWhinney, decided to develop a mixed use community on approximately 3,000 acres of undeveloped land they owned in Larimer County. A centerpiece of the contemplated development would be an upscale fashion shopping center. However, they lacked experience with such a development. Their search for someone who had such expertise eventually led them to Dan Poag, who purportedly invented the concept of a "lifestyle center." In December 2002, the McWhinneys decided to enter into a joint venture with Poag and his partner, Terry McEwen, to develop a lifestyle center on the McWhinneys' property.

To this end, in 2004 the parties created a new entity called Centerra Lifestyle Center, LLC ("CLC"). CLC's mission was to build, own, and operate the "Promenade Shops at

---

[1] I repeat in large part my discussion of the background of the case in my order on plaintiffs' motion to remand, issued on March 13, 2018. ECF No. 78.

Centerra." The facts are somewhat complicated by the penchant of both sides to do their business through holding companies under which sprouted a veritable garden of subsidiaries and affiliates. For present purposes, however, the key McWhinney entity is McWhinney Centerra Lifestyle Center, LLC ("MCLC"), and the key Poag and McEwen entity is Poag & McEwen Lifestyle Center-Centerra, LLC ("P&M"). On September 29, 2004 MCLC and P&M signed a contract entitled "Limited Liability Company Agreement of Centerra Lifestyle Center, LLC," sometimes referred to simply as the "Operating Agreement." Under the Operating Agreement MCLC and P&M each were 50% members and owners of CLC. MCLC contributed land and capital. P&M contributed expertise in building and leasing lifestyle centers and was designated the manager of CLC.

The Shops were built, but leasing was less successful than had been anticipated. For various reasons a permanent loan was never obtained to pay off the construction loan. Eventually the center was foreclosed by the lenders and sold in foreclosure to a third party. Neither the McWhinneys nor Poag and McEwen retain any ownership interest in the Shops today, although the new owner hired a Poag entity called Poag Lifestyle Centers, LLC ("PLC") to be the manager of the Shops.

**B. State Court Litigation.**

I need not, at least for present purposes, describe in detail what happened to the project because those facts have been extensively discussed in a state court lawsuit that was filed on May 27, 2011. The plaintiffs originally named in that case were McWhinney Holding Company, LLLP and MCLC, "derivatively on behalf of [CLC], a nominal defendant," and three other entities related to the McWhinneys (Centerra Properties West, LLC, SMP4 Investments, Inc. and Centerra Retail Sales Fee Corporation). Complaint, Larimer County District Court, ECF No. 74-

1.  The defendants named were P&M, Poag & McEwen Lifestyle Centers, LLC, PLC and several "Does."  Following a 13-day bench trial, the district court, Hon. Thomas R. French, issued a 79-page order and judgment on August 15, 2017.  ECF No. 22-1.  The order discusses the history of the project and the parties' falling out in great detail.  The court discusses and resolves each of the plaintiffs' claims and the defendants' counterclaims in turn as follows:

**1. Plaintiffs' First Claim: Breach of Contract**.

The court found that P&M had breached contractual duties of good faith, loyalty, care, fair dealing and candor owed to MCLC and to CLC under the express terms of the Operating Agreement (which essentially imposed the same duties as would in any event be owed as fiduciary duties under governing Delaware law).  Specifically, P&M breached the Operating Agreement in seven different ways:

a.  <u>Purchase of a $155 Million Forward Swap</u>.  In connection with its obligation to obtain a permanent loan to pay off the construction loan for the Shops, P&M purchased an uncovered or "naked" swap with CLC funds without MCLC's informed knowledge or approval.  This was a risky gamble on future interest rates.  The state court held that it constituted an exercise of bad judgment; a breach of the duties of good faith and loyalty by favoring the interest of P&M, Dan Poag, his son Josh Poag, and PMLC over the interests of CLC and the Shops; and a breach of the duty of candor.  The swap caused CLC to lose $7.5 million.  Although the court found that the breach was not sufficiently material to excuse MCLC from performing its duties under the Operating Agreement, it was sufficient to render P&M liable to MCLC for damages under § 6.6(a) of the Operating Agreement because it was accompanied by gross negligence and willful misconduct.  ECF No. 22-1 at 39–42 (pp. 38–41 of the court's order).

b. <u>A $40 Million Loan to Pay Off Terry McEwen</u>.  A major contributor to the project's financial demise arose after Mr. McEwen informed Dan Poag that he wanted to retire and wished to be paid $40 million for his interest in Poag and McEwen and related entities.  Instead of using the Poags' money for this purpose, the decision was made to obtain a $40 million loan and, without MCLC's knowledge or approval, ultimately to repay the loan with CLC's anticipated permanent loan proceeds.  P&M surreptitiously increased the size of CLC's permanent loan application by $40 million to provide for funds to repay this loan.  A permanent loan in that increased amount was never obtained, resulting in the foreclosure proceedings.  The court found that P&M's entry into and concealment of the $40 million loan was, for several reasons, a material breach of fiduciary duties owed to MCLC and CLC as embedded in the Operating Agreement.  *Id.* at 44–51 (pp. 43–50 of the court order).

c. <u>Sales Negotiations</u>.  This breach concerns P&M's intentional withholding of material financial information during a time when P&M was attempting to sell its interest in CLC to MCLC.  *See id.* at 51–53 (pp. 50–52 of court order).

d. <u>Tax Appeals</u>.  P&M breached § 6.2(m) of the Operating Agreement by contesting a valuation of the lifestyle center below $190 per square foot without MCLC's consent.  *Id.* at 53–55 (pp. 52–54 of court order).

e. <u>Distributions from CLC</u>.  P&M breached its duty of loyalty under the Operating Agreement by taking cash distributions from CLC to make interest payments on the $40 million loan when CLC could not afford to do.  *Id.* at 55–56 (pp. 54–55 of court order).

f. <u>Permanent Loan Notice</u>.  P&M did not provide a permanent loan notice before the maturing date of the construction loan as required by § 7.3(a) of the Operating Agreement.  *Id.* at 56–61 (pp. 55–60 of court order).

g. <u>Permanent Loan Impasse Notice</u>.  P&M failed to send MCLC a permanent loan impasse notice as required by § 7.3(a) of the Operating Agreement.  *Id.* at 61–62 (pp. 60–61 of court order).

**2. Damages for Breach of Contract.**

The court held that MCLC had sustained damages caused by P&M's breach of the Operating Agreement in three categories: (1) the tax appeals had cost CLC $12,065; as a 50% owner of CLC, MCLC was awarded 50% of that cost, i.e. $6,032.50; (2) the $155 million swap cost CLC $7.5 million; MCLC was awarded 50% of that loss, i.e. $3.75 million; and (3) MCLC lost its equity in the Shops, which the court valued at $38.25 million.  Accordingly, the court found P&M to be liable to MCLC for a total of $42,006,032.50.  *Id.* at 62–71 (pp. 61–70 of court order).

**3. Plaintiffs' Other Claims.**

The court held that plaintiffs' second claim for indemnification was premature because, under Delaware law, it cannot be pursued until its final judgment withstands appellate review. The court resolved plaintiffs' third claim (fraudulent concealment of intent to breach the contract's requirement for tax appeals) and fourth claim (civil conspiracy) in favor of the defendants.  *Id.* at 71–76 (pp. 70–75 of court order).  The Court reserved plaintiffs' claim that the Poag and McEwen entities are alter egos of each other for a second part of the trial, which had not yet been scheduled as of the Scheduling Conference in the present case held on January 10, 2018.

**4. Defendants' Counterclaims.**

Defendants' counterclaims were all resolved in favor of the plaintiffs.  *Id.* at 76–79 (pp. 75–78 of court order).

**5. Judgment.**

The court entered judgment in favor of MCLC and against P&M in the amount of $42,006,032.50 plus interest to be determined at a later date. *Id.* at 79 (p. 78 of court order). The court did not enter judgment on plaintiffs' second claim but entered judgment in favor of defendants on plaintiffs' remaining claims and in favor of MCLC on the counterclaims. *Id.* at 80 (p. 79 of court order).

**C. The Present Case.**

**1. Plaintiffs' Original Complaint.**

McWhinney Holding Company, LLLP, and MCLC filed the present case in the Larimer County District Court on November 8, 2017. The long list of defendants named in the original complaint can, for simplicity, be divided into three groups: (1) Dan Poag, Josh Poag and Terry McEwen individually; (2) six Poag or Poag and McEwen entities (including P&M); and (3) the trustees of three Poag family trusts. *See* Complaint, ECF No. 17. Plaintiffs allege that the defendants in the state court concealed material information and obstructed plaintiffs' discovery efforts literally for years. After plaintiffs eventually were able, with the assistance of a special master and the court, to obtain necessary documents and depositions, they sought leave to amend their complaint to add the Poags and Mr. McEwen individually as defendants and to assert additional claims. The state court denied their motion, principally—according to plaintiffs—because it would further complicate and extend an already complicated and old case. Instead, the trial court suggested that the new claims could be pled in a separate action. *Id.* at 17.

Plaintiffs' inability to pursue claims against the Poags and Mr. McEwen individually and other affiliated entities in that case—and their concern that they will not be able to satisfy their judgment against P&M—are the reasons for the present case. *Id.* at 18–19.

Plaintiffs' recitation of the facts in the present case largely repeats the facts they asserted, and in large part the court sustained, in the state case, albeit focused more specifically at the individual defendants. *See id.* at 19–46. They assert claims of (1) fraudulent concealment against the three individual defendants; (2) fraudulent misrepresentation against the three individual defendants; (3) breach of fiduciary duty against the three individual defendants; (4) civil conspiracy against the three individual defendants; (5) fraudulent transfer against all defendants; and (6) a declaratory judgment that three individual defendants and the numerous other entities named as defendants are all alter egos of each other. *Id.* at 46–60.

In their prayer for relief they request $92,200,000 in "general damages" (a number that is not explained and that appears to violate Rule 8(a) of the Colorado Rules of Civil Procedure which prohibits the inclusion of dollar amounts in the prayer for relief) and various other categories of compensatory, punitive and equitable relief. *Id.* at 60–61. However, in their proposed Scheduling Order, plaintiffs make clear that they seek "[g]eneral economic damages in the amount of $42,006,032.50" plus interest, i.e., the amount awarded by the state court. Plaintiffs assert some alternative damages theories, but the essence of this case appears to be plaintiffs' effort to recover the $42 million from whomever within the Poag and McEwen group of individuals and entities is solvent and capable of satisfying a large judgment. ECF No. 47 at 29–32.

### 2. Removal of the Case to Federal Court.

Defendant Poag Shopping Centers, LLC, with the consent of the other defendants, promptly removed the case to this Court on grounds of diversity of citizenship under 28 U.S.C. § 1332. ECF No. 1. It is undisputed that the requirements for diversity of citizenship jurisdiction were met, and that the case was properly removed to this Court.

### 3. Plaintiff's Amended Complaint.

Plaintiffs' then filed their First Amended Complaint ("FAC"). ECF No. 22 (red-lined version at ECF No. 24-1). The primary difference is that CLC was added as a third named plaintiff in the amended version. It is undisputed that if CLC was properly added as other than a nominal plaintiff, then diversity jurisdiction is destroyed. A limited liability company such as CLC assumes the citizenship of its members. CLC and defendants share citizenship in Tennessee, Texas, Washington, Ohio and Utah.

### 4. Plaintiff's Motion to Remand.

Plaintiffs then moved to remand the case to state court based on lack of diversity jurisdiction. Defendants opposed the motion, arguing that CLC is neither a necessary nor an indispensable party, and that the addition of CLC in the amended complaint was a sham done solely to defeat federal jurisdiction. On March 13, 2018 I denied plaintiffs' motion to remand and deemed CLC as a nominal party only. ECF No. 78.

I now turn to the present motions to dismiss.

## II. STANDARD OF REVIEW

To survive a 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plausible claim is a claim that "allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court must accept the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff, *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002), conclusory allegations are not entitled to be presumed true. *Iqbal*, 556 U.S. at 681. However, so long as the plaintiff offers sufficient factual allegations such that the right to relief is raised above the speculative level, he has met the threshold pleading standard. *See, e.g.*, *Twombly*, 550 U.S. at 556; *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).

## III. ANALYSIS

### A. Motion to Dismiss I.

In the first of five motions to dismiss, Poag Shopping Center, LLC ("PSC"), seeks to dismiss plaintiffs' sixth claim for relief—which seeks an alter ego declaratory judgment—per Rule 12(b)(6). *See* ECF No. 53. PSC first argues that exceptional circumstances must be present before a court may disregard corporate form, and in this case, plaintiffs have failed to meet that high bar for alter ego claims. *Id.* at 4. Second, PSC argues that plaintiffs' Complaint is too conclusory to state a claim because plaintiffs fail to allege how PSC abused the corporate form. *Id.* at 8. Further, PSC believes that all of plaintiffs' harms occurred prior to PSC's formation in 2012, and therefore, the corporate form could not have been abused. *Id.* at 9–10. The only exception is the harm suffered from the fraudulent transfer claim, which PSC argues cannot be used to support the alter ego claim because the requisite element of fraud cannot come from the underlying claim. *Id.*

In response, plaintiffs argue that they have pled sufficient allegations to make out an alter ego claim. ECF No. 83 at 5. First, plaintiffs point to over three pages in its FAC that allege Dan Poag ("Dan"), Josh Poag ("Josh"), and Terry McEwen ("McEwen) were alter egos of PSC

because the three exercised total dominion and control of PSC and extensively comingled the funds and assets of PSC. ECF No. 22 at ¶20. Further, Plaintiffs allege that Dan, Josh, and McEwen not only formed PSC for the purpose of escaping potential liability against its predecessors in interest but also used PSC for this purpose. ECF No. 83 at 6–7.

1. **Choice of Law**.

This case is before the Court on diversity jurisdiction. A federal district court sitting in diversity must apply the choice of law rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Therefore, I will apply Colorado's choice of law principles in this case.

In 2016, Judge Martinez predicted that Colorado courts would adopt the Restatement (Second) of Conflict of Laws § 309 (1971) approach to veil-piercing/alter ego claims. *Jones v. Marquis Props., LLC*, 212 F. Supp. 3d 1010, 1021 (D. Colo. 2016); *see also Echostar Satellite Corp. v. Ultraview Satellite, Inc.*, No. 01–CV–00739–JLK, 2009 WL 1011204, at *7 (D. Colo. Apr. 15, 2009) ("The Colorado courts generally follow the choice of law principles set forth in the Restatement (Second) of Conflicts of Laws."). The Court has not located any Colorado cases that reject Judge Martinez's prediction.

Under the Restatement (Second) approach, the law of the state of incorporation applies to veil-piercing/alter ego claims. *Jones*, 212 F. Supp. 3d at 102; *Echostar*, 2009 WL 1011204, at *7. Thus, because PSC is a Delaware LLC, I will apply Delaware law for plaintiffs' veil-piercing claim.[2]

As a preliminary matter in an attempt to avoid any confusion going forward, I note that Delaware courts use the terms alter ego and piercing the corporate veil interchangeably. *Winner*

---

[2] Plaintiffs do not concede Delaware law applies. ECF No. 83 at 3. However, plaintiffs take the position that there is little substantive difference between Colorado's and Delaware's veil-piercing jurisdiction. *Id.* Therefore, plaintiffs' response motion argues its position under Delaware law. *Id.* at 5.

*Acceptance Corp. v. Return on Capital Corp.*, No. CIV.A. 3088-VP, 2008 WL 5352063, at *5

n.32 (Del. Ch. Dec. 23, 2008).  As such, I will do the same in this order.

## 2. __Alter Ego Claim__.

Members of LLCs, like the shareholders of a corporation, generally are not liable for the debts of the LLC. But in certain circumstances courts may pierce the veil of a corporate entity and require owners to answer for the debts of their companies. *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008). To do so, however, is a "difficult task." *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183–84 (Del. Ch. 1999). To succeed on an alter ego claim, plaintiffs must allege facts that demonstrate defendants exercised "complete domination and control" of the entity to the point that the entity no longer has independent significance of its own. *Id.* (citations omitted). These principles boil down to a two-prong test that Delaware courts apply when deciding to disregard a corporate entity: (1) whether those in control of the entity treated the entity as distinct; and (2) if they did not, whether the entity was used to perpetrate fraud or inequitable conduct. *Netjets*, 537 F.3d at 177 (citing *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 269 (D. Del. 1989)).

Delaware courts will consider a number of factors when deciding to disregard corporate form, including the following: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. CIV.A. 3184-VCP, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008) (citing *Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968)). "A decision to disregard the corporate entity generally results not from a single factor, but rather some combination of them, and an overall element of injustice or

unfairness must always be present, as well." *Id.* (citations omitted). Finally, plaintiffs need not prove that the entity was created to perpetrate the fraud. Rather, it is sufficient for plaintiffs to prove that the entity was so used. *Netjets*, 537 F.3d at 177 (citing *Martin v. D.B. Martin Co.*, 88 A. 612, 615 (Del. 1913)).

Delaware courts (or courts interpreting Delaware court opinions) have taken slightly different positions on the exact requirements to succeed on an alter ego claim. One court stated that the corporate structure must cause fraud or similar injustice, and the corporation "must be a sham and exist for no other purpose than as a vehicle for fraud." *Wallace*, 752 A.2d at 1184. In contrast, courts have declared that "plaintiff[s] need not allege or plead fraud under an alter ego theory." *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1085 (D. Del. 1990).

> [F]raud, strictly speaking, is not the only basis for finding an alter ego relationship and piercing the corporate veil. "Fraud is frequently cited as a basis on which to pierce the corporate veil, but it is not the only one: It may be done only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration[s] . . . are involved."

*Mobil Oil*, 718 F. Supp. at 268 (citing *Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, No. CIV.A. 8578, 1988 WL 5492, at *3 (Del. Ch. Jan. 27, 1988) (citations omitted)).

Finally, Delaware courts have endorsed the proposition that the "underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless . . . ." *Mobil Oil*, 718 F. Supp. at 268; *Outokumpu Eng'g Enters., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724, 729 (Del. Super. Ct. 1996).

With the alter ego legal framework in place, the next issue to analyze is whether the same framework for piercing the corporate veil applies to LLCs. In 2008, after surveying emerging case law, the Second Circuit determined that the veil-piercing framework should apply to a Delaware LLC as if it were a corporation. *NetJets*, 537 F.3d at 176; *see also Oliver v. Boston*

*Univ.*, No. 16570, 2000 WL 1091480, at *9, *12 (Del. Ch. Jul.18, 2000) (holding that a Massachusetts LLC could be the alter ego of its owner). Numerous state and federal courts have cited *Netjets* without any negative treatment concerning this holding. Because I have no reason to question *NetJets*'s reasoning, I conclude that piercing the limited liability veil is substantively similar to piecing the corporate veil.

The final step in the analysis is to decide whether plaintiffs' satisfied the pleading requirements per Rule 8(a) and 9(b). Rule 8(a) requires that plaintiffs provide a short and plain statement showing they are entitled to relief. Fed. R. Civ. P. 8(a)(1). Rule 9(b) requires more. Circumstances constituting fraud must be pled with particularity, although intent may be alleged generally. Fed. R. Civ. P. 9(b). The purpose of Rule 9(b)'s heightened pleading is "to afford defendant fair notice of plaintiff's claims and the factual ground upon which [they] are based . . . ." *U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1171–72 (10th Cir. 2010) (quoting *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (citations omitted)). Plaintiffs are not required to "provide a factual basis for every allegation. Nor must every allegation, taken in isolation, contain all the necessary information. Rather, to avoid dismissal under Rules 9(b) and 8(a), plaintiffs need only show that, taken as a whole, a complaint entitles them to relief." *Id.*

There is one small pleading "loophole" that plaintiffs in fraud cases frequently cite. The Tenth Circuit has held that "[a]llegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief." *Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992). Later, the Tenth Circuit walked back this statement by explaining that the "information and belief allegations in *Scheidt* concerned the intent or purpose of the defendants' actions,

elements which this court noted were allowed to be pleaded generally under Rule 9(b)." *Koch*, 203 F.3d at 1237.

In this case, plaintiffs name PSC as a defendant in two of its six claims—the fifth claim for fraudulent transfer and the sixth claim for declaratory relief. It is important to note that defendants formed PSC as a Delaware LLC in 2012 because the thrust of plaintiffs' claims is based on events that occurred between 2001 through 2010. So, in essence, plaintiffs seek to hold PSC liable for only one claim that occurred after PSC's formation: the fraudulent transfers. PSC does not seek to dismiss that claim, only the alter ego claim. I agree with PSC's argument that the fraudulent transfer claim cannot form the basis of the alter ego claim; the alleged injustice must consist of more than that claim. *See Netjets*, 537 F.3d at 183; *Mobil Oil*, 718 F. Supp. at 268. After PSC highlighted this issue in its motion to dismiss, plaintiffs responded in cursory fashion by stating that they had detailed allegations of PSC's "*post-formation* activity" because "[e]ach of the factual paragraphs preceding the sixth claim for relief in the [First Amended Complaint] is specifically and fully incorporated by reference therein." ECF No. 83 at 7.

Plaintiffs' response alleging incorporation of facts is not enough. The majority of the factual paragraphs preceding the sixth claim refer to events between 2001 through 2010. Because the only alleged fraud or injustice involving PSC is the fraudulent transfer claim, the Court must dismiss this alter ego claim against PSC. In so ruling, I note that the proposed discovery cut-off date is May 1, 2019. ECF No. 104. Plaintiffs should be allowed to develop the facts through discovery or investigation. Accordingly, I grant the motion but dismiss this claim against PSC without prejudice.[3] If, through discovery, plaintiffs develop grounds to properly

---

[3] Plaintiffs request the Court takes judicial notice of PSC's webpage. ECF No. 83 at 7 n.2. I have reviewed the webpage, but at this time, I decline to take judicial notice of the website.

claim fraud or injustice against PSC apart from the fraudulent transfers, they may amend their complaint.

**B. Motion to Dismiss II.**

In defendants' second motion to dismiss, Poag Brothers, LLC, and Josh, Jeremy, and Mark Poag, in their capacities as co-trustees of the named trusts, seek to dismiss for lack of personal jurisdiction. ECF No. 55 at 1. Defendants allege they have not purposely directed their activities at Colorado nor have they purposely availed themselves of the privilege of conducting business in Colorado. *Id.* Plaintiffs argue that defendants either currently hold or have previously held ownership interest in PMLC, P&M, and PLC. ECF No. 86 at 1. They then argue that moving defendants purposely directed their activities at Colorado by defrauding plaintiffs through fraudulent transfers. *Id.* at 2. Further, plaintiffs allege moving defendants were alter egos of PMLC, and because PMLC did business in Colorado, the minimum contact test is met. *Id.* Finally, plaintiffs believe the Court has jurisdiction over defendants' assets. *Id.*

**1. Personal Jurisdiction Standard.**

As a district court sitting in diversity, I must exercise personal jurisdiction according to both the forum state's long-arm statute and the Constitution. *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1357 (10th Cir. 1990). Specifically, I first must determine whether Colorado has an applicable statute which authorizes the service of process on defendants. *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). Second, I must examine whether application of the long-arm statute comports with due process. *Id.*

Colorado's long-arm statute confers the maximum jurisdiction permitted under the Due Process Clause of the Fourteen Amendment. *AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008). This "interpretation obviates the need for statutory analysis

separate from the due process inquiry required by *International Shoe Co. v. State of Washington,* 326 U.S. 310, 66 S. Ct. 154, 90 L.Ed. 95 (1945), and its progeny." *Id.* (quoting *Keefe v. Kirschenbaum & Kirschenbaum, P.C.*, 40 P.3d 1267, 1270 (Colo. 2002) (citations omitted)). Thus, my analysis will focus solely on the constitutional due process analysis.

To satisfy the due process, defendants must have "minimum contacts" with the forum state, and the exercise of jurisdiction must be reasonable. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291 (1979). The minimum contacts test may be satisfied through a showing of either general or specific jurisdiction. *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1090–91 (10th Cir. 1998). General jurisdiction exists when defendants have general business ties with the forum that exist independent of the events giving rise to the lawsuit. *Id.* at 1091. General jurisdiction typically requires defendants have "continuous and systematic" contacts in the state so as to render them "essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Asserting specific jurisdiction invokes a different but less stringent standard for the minimum contacts test. All plaintiffs must do is show that (1) defendants "purposely directed" their activities at the forum state and (2) the alleged injuries "arise out of or relate to" those activities. *OMI Holdings*, 149 F.3d at 1091.

To meet the test described in *OMI Holdings*, plaintiffs bear the burden of showing that personal jurisdiction exists, but plaintiffs' "burden is light" at this stage. *AST Sports Sci.*, 514 F.3d at 1056. In ruling on a Fed. R. Civ. P. 12(b)(2) motion without holding an evidentiary hearing, plaintiffs "need only make a prima facie showing of personal jurisdiction to defeat the motion." *OMI Holdings*, 149 F.3d at 1091. To do so, plaintiffs must plead sufficient facts to show that, if true, jurisdiction would be proper over defendants. *Id.* The burden then shifts to

the defendants to show that jurisdiction is not proper. *Id.* Any factual discrepancies must be resolved in plaintiffs' favor unless the allegations in the complaint are contradicted by affidavits. *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995). If the latter occurs, plaintiffs must submit a counter-affidavit or other written material to support jurisdiction. *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007).

In this case, it seems clear that defendants are not at home in Colorado. Poag Brothers, LLC, is registered in Tennessee. ECF No. 55-1 at 3. Its principal (and allegedly only) place of business is in Memphis, Tennessee. *Id.* None of the three brothers—who are the sole members of the LLC—resides in Colorado. Thus, I find general jurisdiction is lacking for Poag Brothers, LLC.

I come to the same conclusion for the trusts. None of the three trustees or co-trustees resides in Colorado, nor do the grantors of the trusts, Dan and Chloee Poag. *Id.* at 5. Although the corpus of each of the six trusts consists of membership interests in Poag-affiliated entities including PMLC, P&M, and PLC, this fails to meet the high burden of showing defendants were "at home" in the forum. ECF No. 55 at 7. I find general jurisdiction is lacking for the named trusts or individuals serving in the capacity as co-trustee.

The specific jurisdiction analysis is not so clear. One way to satisfy the "purposeful direction" requirement is for plaintiffs to show that the out-of-state defendants' "*intentional* conduct targets and has substantial harmful effects in the forum state." *Old Republic*, 877 F.3d at 907 (citing *Calder v. Jones*, 465 U.S. 783, 790–91 (1984)). The facts of *Calder* are simple: A California resident brought a libel action in a California court against a reporter—a Florida resident. *Calder*, 465 U.S. at 789. The Supreme Court held that personal jurisdiction in California over the Florida resident was proper because the Florida reporter intentionally caused

injury to the California plaintiff.  *Id.* at 791.  To meet *Calder*'s "effects test," the Tenth Circuit requires plaintiffs to satisfy three elements: "(a) an intentional action . . . , that was (b) expressly aimed at the forum state . . . , with (c) knowledge that the brunt of the injury would be felt in the forum state."  *Old Republic*, 877 F.3d at 907 (citations omitted).

The second step of the minimum contacts test for specific jurisdiction requires courts to determine whether plaintiffs' injuries "arise out of" defendants' contact with the forum state.  *Id.* at 908.  A court should look at the nexus between the forum and the underlying conduct, and then determine whether the activity or injury occurred in the forum state.  *Id.*

The final step in the jurisdictional journey is to analyze whether the exercise of jurisdiction is reasonable.  *Calder*, 465 U.S. at 788 (noting the fundamental principle that the exercise of personal jurisdiction must not offend "traditional notions of fair play and substantial justice").  Once plaintiffs establish minimum contacts with the forum, the burden shifts to defendants to present a compelling case that jurisdiction would be unreasonable.  *Old Republic*, 877 F.3d at 909.  The Tenth Circuit weighs five factors to determine whether jurisdiction is reasonable: "(1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies."  *Id.*

### 2.  Fraudulent Transfer Claim.

As described above, one way plaintiffs may satisfy the minimum contacts test is to show that defendants directed intentional tortious conduct at the forum state and that the alleged injury arose out of that conduct.  Plaintiffs argue that recipients of fraudulent transfers may be haled

into court in the forum state where the transfer originated by invoking the *Calder* effects test. ECF No. 86 at 10.  As applied to the facts of this case, I agree.

"Courts have held with near uniformity that they have personal jurisdiction to hear fraudulent transfer cases under the *Calder* analysis, even when the transfer is the only contact between the debtor and the foreign transferee."  *In re Akbari–Shahmirzadi*, No. 11-15351-T11, 2016 WL 6783245, at *3 (Bankr. D.N.M. Nov. 14, 2016) (summarizing case law).  However, none of the cases cited in *In re Akbari–Shahmirzadi* is binding on this Court.  Moreover, there are other cases in the Tenth Circuit that aren't quite so generous to plaintiffs alleging fraudulent transfer claims.  *See Racher v. Lusk*, No. CIV-13-665-M, 2013 WL 6037122, at *3 (W.D. Okla. Nov. 14, 2013) ("[A] non-resident defendant's receipt of assets transferred with an intent to hinder, delay, or defraud a creditor does not *ipso facto* establish personal jurisdiction in the state where a complaining creditor resides.").  My reading of the more persuasive case law is that more is needed than simply receiving a fraudulent transfer, but my conclusion remains unchanged under the facts of this case.

Plaintiffs allege in the FAC and in affidavits supporting their response to this motion that in 2004 Dan and Chloee Poag transferred interests in P&M to the trusts "for and in consideration of One Dollar ($1.00)," and that each trustee accepted the transfer.  ECF No. 86 at 6.  Then, in 2012, one year after plaintiffs filed a lawsuit against P&M, PMLC, and PLC, Dan and Chloee transferred their 20.5% membership interests in PLC to each of the trusts for and in consideration of love and affection.  *Id.* at 7; ECF No. 55-1 at 8.  Each trust, through its trustee, allegedly accepted these transfers.  ECF No. 86 at 7.  Each of these transfers, according to plaintiffs, was made in an effort to cause assets to be shifted out of Poag and McEwen entities to avoid Colorado creditors.  *Id.* at 14.

Plaintiffs further allege that Josh had control of PMLC with fifty-two percent of the shares. *Id.* at 13. However, his voting block required fourteen percent of shares from the trusts and eighteen percent from Poag Brothers, LLC. *Id.* Therefore, Josh needed both the trusts and Poag Brothers, LLC, to control PMLC, and PMLC defrauded plaintiffs. *Id.*

Lastly, I note the heavy involvement that Josh had in the business dealings with McWhinney. Although difficult to determine which hat he was wearing while doing business in Colorado, I cannot at this stage rule out that none of his business activities related to the trusts he manages or Poag Brothers, LLC.

**4. Trusts as Defendants.**

In a footnote, defendants highlight that Mark and Jeremy are named in this action solely in their capacity as trustees. Citing Judge Kane's opinion in *Colorado Springs Cablevision, Inc. v. Lively*, 579 F. Supp. 252 (D. Colo. 1984), defendants argue that a trust may not be sued directly in Colorado. ECF No. 55 at 17. However, in *Lively*, Judge Kane allowed Cablevision to sue Lively in his capacity as trustee and individually. Therefore, while it is true that Judge Kane ruled that a trust is not an entity which may be sued in Colorado, he allowed a suit against a trustee of a trust. Therefore, I see no issue with plaintiffs suing Mark and Jeremy in their capacity as trustee.

**5. Conclusion.**

At this stage in the pleadings, where the burden on the plaintiffs is light, I find that specific jurisdiction is proper over the named defendants in the second motion to dismiss. I am satisfied that plaintiffs have shown that defendants purposely directed their alleged tortious conduct at Colorado by accepting fraudulent transfers originating in Colorado, and that the injury was felt in Colorado. These actions meet the three elements of the *Calder* effects test: (1)

defendants' intentional action was (2) expressly aimed at Colorado with the (3) knowledge that the injury would primarily impact Colorado residents.

With that determination, I have no trouble finding that the exercise of jurisdiction does not offend the notions of fair play and substantial justice. Plaintiffs can satisfy at least the first four of the five reasonableness factors the Tenth Circuit has announced. First, the burden on Poag Brothers, LLC and each trust is minimal for Josh, as he is named as an individual and will be required to appear for the fraudulent transfer claim already. Because Mark and Jeremy are named solely in their capacity as co-trustees, the burden might be a little higher. Second, Colorado has an interest in resolving this dispute to protect its businesses and residents (McWhinney and MCLC are both Colorado LLCs, and Troy and Chad McWhinney are domiciled in and citizens of Colorado). Third, plaintiffs allege that they were harmed, and they have an interest in receiving convenient and effect relief in Colorado. Fourth, concerning the interstate judicial system's interest, there is a pending state court case in Colorado. It makes sense that the federal case remain in the District of Colorado.

On balance, and based on my consideration of the relevant legal principles, I find that jurisdiction in this Court is proper. Accordingly, I deny the second motion to dismiss based on Rule 12(b)(2).

### C. **Motion to Dismiss III.**

In the third motion to dismiss, Defendants Poag & McEwen Lifestyle Centers-Centerra, LLC ("P&M"), Poag & McEwen Lifestyle Centers, LLC ("PMLC"), PM Lifestyle Shopping Centers, LLC ("PMLSC"), and Poag Lifestyle Centers, LLC ("PLC"), seek to dismiss plaintiffs' sixth claim for relief—which seeks an alter ego declaratory judgment—per Rule 12(b)(6). *See*

ECF No. 56.  These four defendants make similar arguments as PSC in the first motion to dismiss but add an additional ground for relief.  *Id.* at 3.

Defendants make three main arguments.  First, defendants argue that alter ego claims are not available where there is an operating agreement between the two members of a two-member LLC.  ECF No. 56 at 4.  Second, defendants claim that the Operating Agreement does not allow for alter ego claims.  *Id.*  And third, if the contract grounds for dismissal fails, defendants argue plaintiffs did not sufficiently allege that the LLCs were set up as a vehicle to commit fraud.  *Id.*

Plaintiffs respond by arguing that defendants misinterpret the text of the Operating Agreement.  ECF No. 84 at 2.  They believe that the agreement does not exculpate defendants for committing fraud.  *Id.* at 3.  Finally, plaintiffs state that they pled sufficient facts that the moving defendants committed fraud, willful malfeasance, and gross negligence, and therefore their alter ego claim should survive.  *Id.* at 4.

**1. <u>Alter Ego Claim</u>.**

I have already ruled in the first motion to dismiss that the limited liability veil of an LLC may be pierced much like that of a corporation.  However, in this motion to dismiss, I must review the Operating Agreement to determine if the parties contracted away their common law rights.  If I find that the parties did not or that the Operating Agreement is ambiguous, I then must decide whether plaintiffs adequately pled an alter ego claim.

LLC operating agreements "are contracts to be construed like any other contract."  *Arbor Place, L.P. v. Encore Opportunity Fund, L.L.C.*, No. CIV.A. 18928, 2002 WL 205681, at *3 (Del. Ch. Jan. 29, 2002).  In this case, MCLC and P&M, wholly-owned subsidiaries of McWhinney and PMLC, signed the CLC Operating Agreement in 2004.  ECF No 22 at ¶40.

CLC is a special purpose entity that owned the Promenade Shops at Centerra. *Id.* at 39. CLC was owned fifty percent by MCLC and fifty percent by P&M. *Id.*

The parties vigorously dispute the meaning of the terms of the Operating Agreement. Defendants point out that PMLC joined the Operating Agreement "solely for the purposes of Section 7.4 and Section 8.3." ECF No. 56-1 at 47. Section 7.4 states that PMLC guaranteed the performance of its newly created subsidiaries under that provision only. *Id.* at 31. Section 8.3 defines when PMLC may sell, assign, or pledge its ownership interest in CLC. *Id.* at 41. Defendants argue that these are the only two provisions where PMLC may be liable. ECF No. 56 at 4. Finally, defendants argue that parties to the agreement may be liable only for actions involving actual fraud, gross negligence, or willful misconduct. ECF No. 56-1 at 31.

Plaintiffs argue that neither of the provisions exculpates PMLC for its wrongdoing in its own capacity or in its capacity as P&M's alter ego. ECF No. 84 at 5. Rather, plaintiffs assert that "[s]ection 7.1(i) binds PMLC to guarantee P&M's obligations pertaining to the parties' reciprocal purchase rights under section 7.4 generally." *Id.* Next, they assert that "[s]ection 8.3 restricts PMLC's ability to sell, assign, transfer, or otherwise dispose of its interest in P&M." *Id.* Moreover, plaintiffs argue that because PMLC joined the agreement "solely for the purposes" of the two stated provisions, PMLC cannot use the indemnification provision to escape liability. *Id.*

I find plaintiffs' argument more persuasive. At the least, the terms of the Operating Agreement are ambiguous as to when PMLC and other entities may be liable. Therefore, the next step is to analyze whether plaintiffs adequately pled a plausible claim under an alter ego theory of piercing the veil.

Plaintiffs make many bold allegations in their FAC. First, plaintiffs state, based on information and belief, that Dan Poag, Josh Poag, and Terry McEwen were alter egos of P&M,

PMLC, PMLSC, and PLC, among others. ECF No. 22 at ¶20. Further, plaintiffs allege that the three named defendants "so totally dominated and controlled the affairs" of P&M, PMLC, PMLSC, and PLC that such entities no longer had separate identities. *Id.* Specifically, plaintiffs allege (in addition to the fraudulent transfers) that PMLC used its interest in P&M to secure a $40 million mezzanine loan to buy out McEwen's interest in P&M, PMLC, and PMLSC. *Id.* at ¶¶65–66. According to plaintiffs, Dan and Josh had McEwen sign a new "employment" agreement keeping him on PMLC's payroll but which required no duties or obligations in exchange for the $40 million. *Id.* at ¶65. Plaintiffs suggest that intricacies of this loan were made for the fraudulent purpose of boosting Josh's and Dan's personal economic gain. *Id.* at ¶69. Finally, plaintiffs assert that defendants formed PLC, which occurred in 2010 after the Shops were sold in foreclosure, for the purpose of preserving the lucrative stream of income from management of the Shops for PMLC, Josh, Dan, and McEwen. *Id.* at ¶109. As support for this assertion, plaintiffs claim that PLC had no employees and relied entirely upon the employees, assets, facilities, and equipment of PMLSC to operate. *Id.*

Based on plaintiffs' FAC, plaintiffs have stated a plausible claim based on an alter ego theory. Plaintiffs have properly pled that Dan, Josh, and McEwen exercised complete domination and control over the four named entities in this motion to the point that the entities no longer had independent significance of their own. *See* ECF No. 22 at ¶20, ¶118. Specifically, to satisfy the first prong of the two-prong test, plaintiffs assert that on at least three occasions Dan, Josh, and McEwen failed to treat the four entities as distinct. *Id.* at ¶20(a)–(c). Plaintiffs allege that Dan, Josh, and McEwen controlled the funds, assets, and employees of the named entities, and that they extensively comingled the funds and assets of the named entities. *Id.* To satisfy the second prong, plaintiffs allege that defendants used the named entities to perpetrate

fraud and inequitable conduct—primarily by defrauding plaintiffs through the loan paid to McEwen, by breaching multiple contractual obligations, and through the fraudulent transfer of assets to escape liability to plaintiffs. *Id.* Therefore, I find that plaintiffs have satisfied the two-prong test.

Plaintiffs also have met their burden under the *EBG Holding* factors. Mainly, plaintiffs have pled multiple facts that suggest that the named entities functioned as a facade for the dominant shareholders. *Id.* at ¶20(a)–(c). And as stated above, there is enough to show an overall element of injustice or unfairness.

At this stage, I must accept the nonmoving parties' factual allegations as true. Plaintiffs have met the pleading standards by stating specific facts with particularity. Once a court finds that a party has properly alleged supportive facts, the ultimate trier of fact should determine the alter ego issue. *See Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 473 (D. Del. 2010) ("The nature and extent of the dominion and control exercised by [] defendants over the [] Subsidiaries is a question of fact, not subject to resolution on a motion to dismiss."); *Carte Blanche PTE., Ltd v. Diners Club Int'l, Inc.,* 758 F. Supp. 908, 914 (S.D.N.Y.1991) ("The Second Circuit has noted that the question of piercing the corporate veil is a fact-intensive issue that generally must be submitted to the jury."). And in this case, a reasonable factfinder could find that Dan, Josh, and McEwen operated the four named entities in this motion in their own self-interest, operated them as a single economic entity, and in a manner that suggests an "overall element of injustice." *NetJets*, 537 F.3d at 184. Therefore, I deny the third motion to dismiss.

Lastly, plaintiffs assert that the Court has jurisdiction over moving defendants' underlying property, which includes "the MEZANNINE LOAN proceeds secured by a loan on Colorado property and management contracts for the SHOPS and the Promenade Shops at

Briargate." ECF No. 86 at 17. Defendants allege they do not own or hold any interest in any real property within Colorado. ECF No. 94 at 5. Additionally, defendants add in affidavit form that the corpus of each of the six trusts consists of membership interests in Poag-affiliated entities including PMLC, P&M, and PLC. ECF No. 55-1 at 7. Each of these entities are Delaware LLCs, and defendants state that the trusts have never held membership interest in any Colorado entities or owned property in Colorado. *Id.* At this time, based on plaintiffs' weak pleading concerning its *in rem* argument, I decline to exercise jurisdiction over the named defendants based on *in rem* jurisdiction.

### D.  **Motion to Dismiss IV**.

In the fourth motion to dismiss, Defendants Dan Poag and Josh Poag, in their individual capacities, move to dismiss claims I-IV based on the economic loss rule. ECF No. 57 at 1. Further, Dan and Josh, individually, Josh, Mark, and Jeremy Poag as co-trustees, and Poag Brothers, LLC, move to dismiss claims I-IV and VI based on Delaware's strict veil-piercing jurisprudence. *Id.* at 2. Plaintiffs argue that the economic loss rule does not bar claims against Dan and Josh both on pre- and post-contractual conduct because the tort claims are independent of the Operating Agreement. ECF No. 85 at 4–10. Further, plaintiffs argue that they have properly pled their alter ego claims against moving defendants. *Id.* at 11.

#### 1.  **Economic Loss Rule**.

The Colorado Supreme Court first adopted the economic loss rule in 2000. *Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000). The rule states that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Id.* The economic loss rule applies to intentional torts the same as it does to negligence. *Hamon*

*Contractors, Inc. v. Carter & Burgess, Inc.,* 229 P.3d 282, 295 (Colo. App. 2009). The purpose

of the economic loss rule is to "maintain a distinction between contract and tort law." *Id.* at

1262. The main inquiry for any economic loss rule defense is whether the tort claims "stem from

a tort duty independent of the contract." *Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603, 605

(Colo. 2016). To prove independence, plaintiffs must satisfy two conditions: "[f]irst, the duty

must arise from a source other than the relevant contract; and [s]econd, the duty must not be a

duty also imposed by the contract." *Makoto USA, Inc. v. Russell*, 250 P.3d 625, 627 (Colo. App.

2009) (citations omitted).

The primary case plaintiffs rely on is *Van Rees*. In that 2016 Colorado Supreme Court

decision, Van Rees contracted with Unleaded to perform web-related services such as search-

engine optimization and website design. *Van Rees*, 373 P.3d at 605. Van Rees alleged that

Unleaded Software, Inc. induced it into entering into the contract at issue in the case by making

false promises regarding its capabilities to perform web-related services. *Id.* After Unleaded

missed multiple deadlines, Van Rees sued Unleaded for ten claims including breach of contract,

negligence, fraud, and fraudulent concealment. *Id.* at 606. The trial court dismissed each tort

claim based on the economic loss rule. *Id.* The court of appeals affirmed. *Id.*

On appeal, the Colorado Supreme Court reversed. The Court found that the court of

appeals erred by not finding a violation of an independent tort duty. *Id.* at 606. In so ruling, the

Court allowed Van Rees to bring breach of contract claims and separate tort claims based on

being wrongfully induced to enter into a contractual relationship with Unleaded when Unleaded

knew it lacked the capacity to perform. *Id.* at 607. Because the torts claims were based on

representations made *prior* to the contractual relationship, Unleaded violated an independent

duty in tort. *Id.*

The policy behind the court's ruling was that, while the purpose of the economic loss rule is to prevent tort law from swallowing contract law, courts must also be cautious of contract law swallowing tort law. *Id.* at 608. In the end, the Court found that Van Rees alleged sufficient facts that would amount to an independent violation of a tort duty. *Id.*

It's also important to note that the economic loss rule can extend to individuals and entities who were not parties to the underlying contract. The Colorado Court of Appeals has stated, "[w]hen the economic loss rule bars a claim against a corporate entity, it may also bar claims against that entity's officers and directors, even if the officers and directors were not parties to the contract at issue." *Former TCHR, LLC v. First Hand Mgmt. LLC*, 317 P.3d 1226, 1232 (Colo. App. 2012). Further, in *BRW, Inc. v. Dufficy & Sons, Inc*., the Colorado Supreme Court held that "the economic loss rule applies when the claimant seeks to remedy only an economic loss that arises from interrelated contracts." 99 P.3d 66, 72 (Colo. 2004). The "interrelated contracts" at issue in *BRW* concerned a subcontractor who tried to sue the project engineer and inspector based on negligence and negligent misrepresentation. *Id.* at 67. The subcontractor did not have a contract with the project engineer and inspector but did have a related contract with another subcontractor. *Id.* at 67–68. The Court ruled that the economic loss rule could apply to third parties in cases where the contractual duties stem from a "network of agreements" and where "all parties had notice." *Id.* at 73. The Court also found that each commercially sophisticated party in the case was able to negotiate and bargain for the allocation of risks and remedies. *Id.*

With the legal framework and relevant case law in place, I turn to the facts of the present case. Plaintiffs allege both pre- and post-contractual tort violations. I will consider each in turn.

a. <u>Pre-Contractual Conduct</u>.

In this case, Chad and Troy McWhinney wanted to develop a lifestyle center but lacked experience for such a development. ECF No. 22 at ¶¶31–34. Thus, in December 2002, the McWhinneys decided to enter into a joint venture with Dan Poag and McEwen to develop a lifestyle center. *Id.* at ¶38. Eventually, after nearly two years of negotiations, the two parties signed a comprehensive Operating Agreement in September 2004. *Id.* at ¶¶39–40.

The McWhinneys allege that they specifically contracted to do business with Dan and McEwen, and Dan's and McEwen's continued role in the joint venture was a "foundational, material point" for the McWhinney brothers. ECF No. 22 at ¶¶41, 118–19, 130. However, plaintiffs allege that Dan and McEwen knew in 2003 that they intended to transfer the contractual duties to Josh. *Id.* at ¶¶41, 118. Allegedly, Dan and McEwen had a succession plan in place in which they would both retire from P&M and cash-out their controlling interests therein. *Id.* According to the FAC, Dan, Josh, and McEwen intentionally concealed this "material information." *Id.* Therefore, plaintiffs allege they were induced to sign the Operating Agreement based on false promises made by Dan and McEwen, and they allege they never would have signed the agreement had they known Dan and McEwen's true intentions. *Id.* ¶¶41, 132–37.

Defendants argue that plaintiffs failed to allege the fraud with particularity. ECF No. 57 at 16–17. Further, they believe that Dan and Josh didn't owe any fiduciary duties prior to entering into the Operating Agreement. *Id.* at 17.

I am convinced that plaintiffs' pre-contractual misrepresentations are distinct from the duties owed under the Operating Agreement itself. Thus, plaintiffs have properly pled an independent tort claim. Plaintiffs contracted to work with Dan and McEwen, not Josh. Plaintiffs have sufficiently alleged that they relied on Dan and McEwen's representations in deciding

whether to sign the Operating Agreement.  In so ruling, I am not concluding that plaintiffs' tort

claims will be successful at trial.  In fact, I regard many of plaintiffs' tort claims against Dan and

Josh to be rather thin.  However, "to survive a motion to dismiss based on the economic loss

rule, [plaintiffs] merely ha[ve] to allege sufficient facts, taken in the light most favorable to

[them], that would amount to the violation of a tort duty that is independent of the contract."

*Van Rees*, 373 P.3d at 608.  Plaintiffs have met their burden here.

Further, plaintiffs argue in their response that defendants owed a fiduciary duty during

contractual negotiations.  ECF No. 85 at 5 (citing *Lucas v. Abbott*, 601 P.2d 1376, 1379 (Colo.

1979) ("[A fiduciary] relationship can attach during the negotiations which precede the formal

execution of a joint venture agreement.")).  Defendants fail to meaningfully dispute this assertion

in their reply.  Therefore, I find that defendants did owe fiduciary duties to plaintiffs during

negotiations.  Accordingly, the fourth motion to dismiss the tort claims against Dan and Josh is

denied regarding the pre-contractual conduct only.

   b. Post-Contractual Conduct.

I reach the opposite conclusion on defendants' post-contractual conduct.  To start, I note

my disagreement (and frustration) with plaintiffs' assertion that *Van Rees* overruled the earlier

cases.  *See* ECF No. 85 at 4 n.3 ("To the extent Colorado published case law preceding *Van Rees*

provided a differing formulation of the ELR under Colorado law, those cases were overruled by

the Colorado Supreme Court in *Van Rees* and should, therefore, not be relied upon.").  Plaintiffs

misstate the law.  Presumably plaintiffs are referring to the cases cited by defendants in this

motion.  In support of defendants' economic loss rule argument, defendants cite *Town of Alma*,

*Former TCHR, Hamon Contractors, Makoto, BRW*, *Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267

(Colo. 2000), *Top Rail Ranch Estates, LLC v. Walker*, 327 P.3d 321, 328 (Colo. App. 2014), and

*Engeman Enters., LLC v. Tolin Mech. Sys. Co.*, 320 P.3d 364, 370 (Colo. App. 2013), among others. *Van Rees* cites only one of these cases: *Town of Alma*.

If anything, *Van Rees* reaffirmed the holding in *Town of Alma* which was the seminal case where the Colorado Supreme Court first adopted the economic loss rule. *Van Rees*, 373 P.3d at 606. The *Town of Alma* opinion cited *Keller v. A.O. Smith Harvestore Products, Inc.*, 819 P.2d 69 (Colo. 1991), as an example of when the economic rule would not apply. *Id.* at 607. Both *Keller* and *Van Rees* involved pre-contractual misrepresentations whereas the conduct at issue in *Town of Alma* occurred after contract formation. *Id.* The respective cases held that the economic loss rule did not apply in the former cases but it did in the latter because in the latter case, the contract itself was the source of the duty of care. *Id.* at 607. *Van Rees* did not overrule *Town of Alma* or any previous precedent set by the Court.

Concerning the post-contractual conduct in this case, defendants argue that all of plaintiffs' allegations challenge actions taken in relation to the Shops, which is covered by the Operating Agreement. ECF No. 57 at 16. Further, defendants argue that the economic loss rule applies to any action Dan and Josh took while acting on behalf of P&M and PMLC because they were officers and directors of the two entities.[4] *Id.* And, defendants contend that plaintiffs have not alleged any violations of independent duties outside of the Operating Agreement. *Id.* Finally, defendants argue that the Operating Agreement permitted the $40 million mezzanine loan used to facilitate McEwen's buyout. ECF No. 93 at 4.

In response, plaintiffs argue the economic loss rule doesn't apply to Dan and Josh because they were acting in their own self-interest and not as agents of P&M or PMLC. ECF

---

[4] In 2004, Josh was the chief financial officer, executive vice president, and secretary of P&M. He was also a member and executive of PMLC. Finally, Josh was an executive of PMLSC—the property manager hired by CLC. ECF No. 57 at 5. In 2004, Dan was a member and chief executive officer of P&M. Further, he was an executive of PMLC and PMLSC. *Id.*

No. 85 at 7.  Moreover, plaintiffs argue that Dan and Josh's scheme to raise $40 million for

McEwen's buyout had nothing to do with CLC's or P&M's business.  *Id.* at 8.  Rather, the $40

million mezzanine loan was between Centerra & Dos Lagos Venture, LLC ("C&DL") (owned by

PMLC) and I&G Promenade Shops Lenders, LLC ("I&G") (owned by JP Morgan Investment

Management ("JPMIM")).  *Id.* at 9.  Because plaintiffs had no knowledge or notice of any of

these interrelated contracts, plaintiffs argue the economic loss rule should not apply.  *Id.* at 9–10.

Plaintiffs attempt to distinguish the facts of *Former TCHR*—where the Colorado Court of

Appeals held that the economic loss rule may bar claims against an entity's officers—because

that court found that the individual officers in *Former TCHR* were "acting as [] agents" to one of

the contractual parties.  *Former TCHR*, 317 P.3d at 1232.  Here, plaintiffs allege that Dan and

Josh were not acting as agents of P&M or PMLC when they made their misrepresentations; they

were acting to benefit their own personal interest and as agents of non-contractual parties such as

C&DL.  ECF No. 85 at 7.  At best, plaintiffs argue, whether Dan and Josh were acting as agents

of P&M is a factual dispute.  *Id.* at 8.

Plaintiffs also attempt to distinguish the facts of *BRW*, where the third-party

subcontractors had notice of the underlying contract thus making them subject to the economic

loss rule.  In this case, plaintiffs allege they didn't have notice of the mezzanine loan.  However,

Defendants argue that section 8.1 of the Operating Agreement expressly allows P&M to pledge

its membership interest as collateral for financing.  ECF No. 93 at 4.  And, notice wasn't

required under the Operating Agreement.  ECF No. 56-1, Ex. A ("Notwithstanding anything in

this Agreement to the contrary, each Member will have the right to pledge its Membership

Interest to a third party financial institution for any purpose . . . .").

Even if dealings are not interrelated like the contracts in *BRW*, plaintiffs have not shown an independent tort duty nor have they asserted anything other than an economic loss. Further, despite plaintiffs' allegations that they had no opportunity to bargain for their rights in these agreements or decline to enter the agreements because they had no knowledge of any these contracts, the mezzanine loan agreement was between C&DL and I&G. ECF No. 85 at 9–10. All plaintiffs allege is that defendants intentionally concealed and misrepresented the nature of the transaction. If plaintiffs still believe that defendants wronged them, they must bring a breach of contract claim. Plaintiffs have failed to show an independent tort duty for any conduct post-Operating Agreement.

Despite viewing the facts in the light most favorable to the plaintiffs, I agree with defendants that the post-contractual conduct is barred by the economic loss rule. Although there could be a factual issue as to whether defendants were serving as agents of the contracting parties or operating in their own self-interest, plaintiffs have not pled any plausible facts that would suggest Dan and Josh owed any duties independent of the Operating Agreement. The only fiduciary relationship Dan and Josh owed plaintiffs stemmed from the Operating Agreement. Therefore, any tortious conduct that harmed plaintiffs must be raised through a breach of contract claim.

In conclusion, I find that the economic loss rule bars the tort claims against defendants' post-contractual conduct. But as I did in the first motion to dismiss, I'm dismissing this portion of the claim against named defendants without prejudice. If, through discovery, plaintiffs develop grounds to properly plead an independent tort duty, plaintiffs may amend their complaint.

Lastly, Dan and Josh requested that I take notice of the Colorado Court of Appeals opinion from the parallel state court case. ECF No. 57 at 6. Because the Federal Rules of Evidence allow me to take judicial notice of public records, I see no reason to deny this request. Therefore, the Court takes judicial notice of that opinion.

## 2. **Alter Ego Claim.**

The statements of law covered in the first motion to dismiss apply with equal force in the fourth and fifth motions to dismiss. In this motion, I come to the same conclusion as I did in the third motion to dismiss where I allowed the claim to proceed against P&M, PMLC, PMLSC, and PLC. Essentially, defendants cite the same cases and argue the same facts as the four named defendants did in the third motion to dismiss. Accordingly, the fourth motion to dismiss is denied as to the alter ego claim.[5]

## E. **Motion to Dismiss V.**

In this fifth and final motion to dismiss, McEwen seeks to dismiss plaintiffs' first, second, third, fourth, and sixth claims for failure to state a claim per Rule 12(b)(6). ECF No. 90 at 1. McEwen argues the economic loss rule bars plaintiffs' four tort claims against him, and that Delaware's alter ego law and the terms of the Operating Agreement bar plaintiffs' first, second, third, fourth, and sixth claims. ECF No. 90 at 3.

In response, plaintiffs argue McEwen is not being sued in his capacity as president of P&M or member and executive of PMLC and thus the Operating Agreement does not apply. ECF No. 97 at 3–4. Specifically, plaintiffs claim that McEwen's pre-contractual conduct violated an independent tort duty because it occurred during the negotiating period. *Id.* at 4.

---

[5] I come to the same conclusion regarding plaintiffs' request for judicial notice of PLC's webpage. ECF No. 85 at 13 n.5. At this time, that request is denied. Plaintiffs may raise the issue as a motion in limine or at trial.

Plaintiffs then claim the post-contractual conduct is not barred by the economic loss rule because it concerns actions McEwen took on his own behalf and other Poag and McEwen entities, but not those entities which were parties to the Operating Agreement. *Id.* at 5–8. Finally, the one new argument plaintiffs raise in this motion is that McEwen allegedly retired in April 2007, and therefore, any alleged fraud or wrongful conduct that occurred after his retirement is not recoverable under the Operating Agreement. *Id.* at 6. Thus, the economic rule would not apply to his "continuing knowledge of the concealment and misrepresentation of his retirement, CLC's financial status, and the status of CLC's refinancing and his failure to disclose the truth or correct Plaintiffs' understanding of the aforementioned after his resignation from Poag & McEwen . . . ." *Id.*

1. **Economic Loss Rule.**

McEwen was the central figure in the pre-contractual misrepresentations. ECF No. 22 at ¶¶41, 118–19, 130. According to the FAC, McEwen, along with Dan and Josh, intentionally misrepresented information regarding his retirement intentions. *Id.* The McWhinneys allegedly relied on these material misrepresentations to their detriment. *Id.* I remain convinced that McEwen's pre-contractual misrepresentations are distinct from the Operating Agreement itself. Thus, in reviewing the FAC in light most favorable to plaintiffs, I find that plaintiffs have properly pled an independent tort claim against McEwen. Accordingly, the fifth motion to dismiss the tort claims against McEwen is denied regarding the pre-contractual conduct only.

Again, I reach the opposite conclusion on McEwen's post-contractual conduct for the exact same reasons as the fourth motion. Plaintiff alleged McEwen's fraudulent and wrongful conduct consisted of his continuing knowledge of the concealment and misrepresentation of his

retirement, nondisclosure of CLC's financial status, and the nondisclosure of CLC's refinancing. ECF No. 97 at 6.

The problem for plaintiffs is that each of the allegations concerning McEwen's tortious conduct is covered by the Operating Agreement, and plaintiffs have failed to meet their burden of showing why they cannot sue McEwen under a breach of contract theory. Prior to his retirement, McEwen was the president of P&M and a member and executive of PMLC. ECF No. 90 at 5. After retirement, McEwen remained with P&M as a salaried employee—even if only in a nominal sense. *Id.* They have a plausible contractual remedy against McEwen, and the Colorado Supreme Court was clear in *Town of Alma* that when a contract remedy is available for economic damages, the tort claim is prohibited. *Town of Alma*, 10 P.3d at 1261–62.

Plaintiffs have not pled any plausible facts that would suggest McEwen owed any duties independent of the Operating Agreement or why a breach of contract claim against McEwen is unavailable for his post-contractual conduct. I find that plaintiffs' relief lies in contract law, not tort law. However, this portion of the claim against McEwen is dismissed without prejudice. If, through discovery, plaintiffs develop grounds to properly plead an independent tort duty owed by McEwen, plaintiffs may amend their complaint.

## 2. **Alter Ego Claim.**

McEwen essentially makes the same arguments as the defendants did in the third and fourth motions to dismiss. Accordingly, the fifth motion to dismiss is denied as to the alter ego claim.

**ORDER**

For the reasons above, the first motion to dismiss [ECF No. 53] is GRANTED; the

second and third motions to dismiss [ECF Nos. 55 and 56] are DENIED; and the fourth and fifth

motions to dismiss [ECF Nos. 57 and 90] are DENIED in part and GRANTED in part.

DATED this 28th day of September, 2018.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge