IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 17-cv-02853-RBJ

MCWHINNEY HOLDING COMPANY, LLLP, a Colorado Limited Liability Partnership,
MCWHINNEY CENTERRA LIFESTYLE CENTER, LLC, a Colorado Limited Liability
Company, and
CENTERRA LIFESTYLE CENTER, LLC, a Delaware Limited Liability Company,

      Plaintiffs,

v.

G. DAN POAG, an individual;
JOSHUA D. POAG, an individual; an individual acting as co-trustee of the Josh and
Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Jeremy
and Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the
Mark and Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of
the Josh and Dan Poag 2004-GST Exempt Trust; an individual acting as co-trustee of
the Jeremy and Dan Poag 2004-GST Exempt Trust; an individual acting as co-trustee of
the Mark and Dan Poag 2004-GST Exempt Trust;
TERRY W. McEWEN, an individual;
POAG & McEWEN LIFESTYLE CENTERS - CENTERRA, LLC, a Delaware Limited
Liability Company;
POAG & McEWEN LIFESTYLE CENTERS, LLC, a Delaware Limited Liability Company;
POAG LIFESTYLE CENTERS, LLC, a Delaware Limited Liability Company;
POAG SHOPPING CENTERS, LLC, a Delaware Limited Liability Company;
PM LIFESTYLE SHOPPING CENTERS, LLC, a Delaware Limited Liability Company;
POAG BROTHERS, LLC, a Tennessee Limited Liability Company;
JEREMY M. POAG, an individual acting as co-trustee of the Josh and Chloee Poag
2004-GST Exempt Trust; an individual acting as co-trustee of the Jeremy and Chloee
Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Mark and
Chloee Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Josh and
Dan Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Jeremy and
Dan Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Mark and
Dan Poag 2004-GST Exempt Trust;
D. MARK POAG, an individual acting as co-trustee of the Josh and Chloee Poag 2004-
GST Exempt Trust; an individual acting as co-trustee of the Jeremy and Chloee Poag
2004-GST Exempt Trust; an individual acting as co-trustee of the Mark and Chloee
Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Josh and Dan
Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Jeremy and Dan
Poag 2004-GST Exempt Trust; an individual acting as co-trustee of the Mark and Dan
Poag 2004-GST Exempt Trust;
DOE INDIVIDUALS 1-10;
DOE TRUSTS 11-30; and

ROE CORPORATIONS 31-60;

      Defendants.

---

## ORDER on MOTIONS FOR SUMMARY JUDGMENT

---

      This order addresses three pending motions for summary judgment. They have been more than fully briefed, and oral argument was heard on October 27, 2020.

### I. BACKGROUND

**A. The Promenade Shops at Centerra.**

      The background facts leading to this lawsuit have been set forth in detail in a multitude of orders issued by this Court and by state court judges in related litigation. Briefly, for present purposes, two brothers, Chad and Troy McWhinney, owned undeveloped land in Larimer County, Colorado. In 2004 they entered into a contract ("the Operating Agreement") with Dan Poag and Terry McEwen, who were experts in developing upscale shopping centers, to build, own, and operate the Promenade Shops at Centerra (the "Shops") on the McWhinneys' land. The vehicle they created to do this was called Centerra Lifestyle Center, LLC ("CLC"). A McWhinney entity called McWhinney Centerra Lifestyle Center, LLC ("MCLC"), and a Poag and McEwen entity called Poag & McEwen Lifestyle Center-Centerra, LLC ("P&M") became equal owners of CLC pursuant to an operating agreement. P&M was also designated the manager of the project, and CRC contracted with another Poag and McEwen entity, PM Lifestyle Shopping Centers, LLC ("PMLSC"), to provide on-the-ground management services.

      The Shops were built, and they opened for business on October 29, 2005. But problems were brewing. Among other things P&M failed to secure a permanent loan to pay off the construction loan. Eventually the center was foreclosed by the lenders and sold in foreclosure to

a third party, G&I VI Promenade ("G&I").  Neither the McWhinneys nor Poag and McEwen retain any ownership interest in the Shops today.  However, G&I contracted with another Poag entity called Poag Lifestyle Centers, LLC ("PLC") to be the manager of the Shops under the new ownership, and PLC in turn hired PMLSC to provide day-to-day or what I will call the on-the-ground services.

### B.  <u>State Court Litigation: Phase I.</u>

McWhinney entities sued P&M, PLC, and a third entity, Poag & McEwen Lifestyle centers, LLC ("PMLC") in the Larimer County District Court on May 27, 2011.  Six years later, following a 13-day bench trial, the district court, Hon. Thomas R. French, issued a 79-page order and judgment on August 15, 2017 addressing five plaintiff claims and three defendant counterclaims.  ECF No. 22-1 (copy of state court decision).  The court found that P&M had breached contractual duties of good faith, loyalty, care, fair dealing and candor owed to MCLC and to CLC under the express terms of the Operating Agreement in multiple ways.  Without going into the details, suffice it to say that the court found P&M to be liable to MCLC for a total of $42,006,032.50 plus interest.[1]

The court determined that plaintiffs' indemnity claim against PLC and P&M was premature.  It resolved plaintiffs' fraud claim against all three defendants and their civil conspiracy claim against PLC in favor of the defendants.  In resolving the latter claim, the court rejected plaintiffs' argument that the management contract for the Shops was improperly shifted from PMLSC to PLC.  The court noted that once the Shops were acquired out of foreclosure, both the McWhinneys and the Poags could have sought to manage the property for the new owner.  The Poags did so.  They created a new entity, PLC, which was owned by eleven individuals including some Poags and others.  PLC was awarded the management contract.  The

---

[1] The judgment purportedly has grown to more than $100 million due to accumulated interest.

court found nothing improper in the Poags' setting up a new entity or in PLC's obtaining the management contract from G&I as a business opportunity.  The court also resolved all three counterclaims against the defendants.

### B.  State Court Litigation: Phase II.

Plaintiffs alleged that PMLC -- the original parent holding company for many of the Poag and McEwen entities -- was the alter ego of P&M and vice versa.  Due to the complexity of the issues that were to be presented in the June 2017 trial (and the possibility that they would all be resolved against the plaintiffs, thus mooting the alter ego issue), the court reserved that issue for a potential second phase of the trial.  Because of the judgment in favor of MCLC against P&M in the first phase, the court proceeded to the second phase which was tried to the court in November 2018.  On December 28, 2018, the court in a 29-page opinion determined that plaintiffs had not proven that P&M and PMLC were alter egos of each other.  ECF No. 132 (copy of order).  Thus, the court found that PMLC was not liable on an alter ego theory for the $42,006,032.50 judgment entered against P&M in Phase I.  *Id.* at 28.

### C.  The Present Case.

Plaintiffs had tried to amend the state case to add the Poags and Mr. McEwen individually as defendants and to assert additional claims.  However, the state court denied their motion and suggested that the new claims could be pled in a separate action.  Thus, McWhinney Holding Company, LLLP, and MCLC filed the present case in the Larimer County District Court on November 8, 2017.  They sued three groups of defendants (1) Dan Poag, Josh Poag and Terry McEwen individually; (2) six Poag or Poag and McEwen entities (including P&M); and (3) the trustees of three Poag family trusts.  *See* Complaint, ECF No. 17.

Plaintiffs' recitation of the facts in the present case largely repeated the facts they asserted, and in large part the court sustained, in the state case, albeit focused more specifically at the individual defendants. *See id.* at 19–46. They asserted claims of (1) fraudulent concealment against the three individual defendants; (2) fraudulent misrepresentation against the three individual defendants; (3) breach of fiduciary duty against the three individual defendants; (4) civil conspiracy against the three individual defendants; (5) fraudulent transfer against all defendants; and (6) a declaratory judgment that three individual defendants and the numerous other entities named as defendants are all alter egos of each other. *Id.* at 46–60. Although plaintiffs seek damages exceeding $100 million, the essence of this case appears to be plaintiffs' effort to recover the $42 million judgment they obtained against P&M in Phase I from whomever within the Poag and McEwen group of individuals and entities is solvent and capable of satisfying a large judgment.

Defendant Poag Shopping Centers, LLC ("PSC"), with the consent of the other defendants, removed the case to this Court on grounds of diversity of citizenship under 28 U.S.C. § 1332. ECF No. 1. Plaintiffs responded by filing their First Amended Complaint, in which they joined CLC, a non-diverse entity, as an additional plaintiff. This provoked a motion to remand, which I ultimately (and regretfully) denied on March 13, 2018 after deeming CLC to be a nominal party that did not destroy diversity jurisdiction.

As the file of the case reflects, this case has been through extensive pleading and motion practice. The case has been set for trial but then continued at the parties' request twice (March 11, 2019; January 6, 2020). It is presently set for a two week (nine day) jury trial beginning January 19, 2021, with a Trial Preparation Conference scheduled for December 15, 2020.

D. **State Court Appeal**.

Meanwhile, the parties had appealed the state court's decisions in both Phase I and Phase II.  In a status conference in the present case on February 18, 2020 the parties informed this Court that they anticipated that the appeal would be fully briefed by April 2020, and that they anticipated a decision from the Colorado Court of Appeals in approximately August 2020.  *See* ECF No. 266 at 8 (transcript).  However, as of the oral argument on the pending summary judgment motions on October 27, 2020, there was no appellate decision, although the parties by then were anticipating a decision sometime in November 2020.  As of the present date, however, no decision has been issued.

The result of the appeal is relevant to the upcoming trial in the present case due to potential issue preclusion.  In the Scheduling Conference in the present case, held on January 10, 2018, after noting Judge French's "extraordinary opinion" following the Phase I state court trial (Phase II had not been decided yet), I commented that we would not relitigate that case in this case.  ECF No. 71 at 3.  To go through all of that again in this Court would be so consumptive and wasteful of the parties' and the Court's resources as to be absurd.  Nevertheless, issue preclusion remains to be decided; and it is one of the issues addressed in the pending summary judgment briefing.

With that background, I turn to the three pending motions for summary judgment.

## II.  STANDARD OF REVIEW

A court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving party has the burden to show that there is an absence of evidence to support the

nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving

party must "designate specific facts showing that there is a genuine issue for trial."  *Id*. at 324.  A

fact is material "if under the substantive law it is essential to the proper disposition of the claim."

*Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty*

*Lobby, Inc*., 477 U.S. 242, 248 (1986)).  A material fact is genuine if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The Court will examine the factual record and make reasonable inferences in the light most

favorable to the party opposing summary judgment.  *Concrete Works of Colo., Inc. v. City & Cty.*

*of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## III.  ANALYSIS

### A.  Defendant Poag Shopping Centers LLC's Amended Motion for Summary Judgment on Plaintiff's Fraudulent Transfer Claim, ECF No. 274.

In my order of September 28, 2018 I granted PSC's Rule 12(b)(6) motion to dismiss

plaintiffs' Sixth Claim of their First Amended Complaint to the extent that it alleged that PSC

was the alter ego of PMLC, PLC, or Josh or Dan Poag.  PSC did not move to dismiss plaintiffs'

fraudulent transfer claim against PSC.  In the present motion PSC seeks summary judgment

dismissing that claim, which now is found in the Sixth Claim of plaintiffs' Third Amended

Complaint.

#### 1.  Uniform Fraudulent Transfer Act.

The Colorado Uniform Fraudulent Transfer Act ("CUFTA") provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor,
whether the creditor's claim arose before or after the transfer was made or the
obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (I) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (II) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay.

Colo. Rev. State. § 38-8-105(1).[2]

Allegations of actual intent must be proved by clear and convincing evidence.

*See Mountain Dudes v. Split Rock Holdings, Inc.,* 946 /f,3d 1122m 1127 (10th Cir. 2019);

*Epcon Co. v. Bar B Que Baron Int'l, Inc.,* 512 P.2d 646 (Colo. App. 1973).  *See also In*

*re Chin,* 492 B.R. 117, 130 (Bankr. E.D.N.Y. 2013) ("Actual intent under [the Act] mut

be demonstrated by clear and convincing evidence, and this standard applies on summary

judgment.").

## 2. <u>Plaintiffs' Allegations re Violation of CUFTA</u>.

In their Third Amended Complaint, under the subheading "Fraudulent Transfer of

Assets," plaintiffs allege:

120.  In 2012, after McWhinney and MCLC filed *McWhinney v. Poag* against PMLC, P&M, and PLC before the Colorado Trial Court, Josh and Dan again formed a new single purpose entity within the Poag & McEwen organization – **PSC**.  David [Selberg] was again given an ownership interest in **PSC**.

121.  Plaintiffs are *informed and believe*, and therefore allege, in January 2014 Josh, Dan, Trustee Defendants and Doe Individuals, with David's assistance, *transferred, whether directly or indirectly, the majority of PMLC and PMLSC's assets into PSC* (or other Roe Corporations or Doe Trusts) for no, or reasonably inadequate, consideration.  All of PMLSC's employees then became **PSC**

---

[2] In an order issued on September 28, 2018 the Court granted PSC's motion to dismiss the Sixth Claim of plaintiffs' First Amended Complaint to the extent that plaintiffs alleged that PSC was the alter-ego of the Poag individuals and other Poag entities. ECF No. 106.  In that order I determined that Delaware law applied.  *Id.* at 11.  In its motion for summary judgment on the fraudulent transfer claim, PSC suggests that Colorado law applies to the present motion, citing *In re Integra Realty Res., Inc.,* 198 B.R. 352, 364 (Bankr. D. Colo. 1996) (citing cases applying the forum's fraudulent transfer law despite Delaware or foreign states incorporation), *aff'd,* 354 F.3d 1246 (10th Cir. 2004).  There is no disputes about this, as both parties have briefed the issues under Colorado law.  I will rely on Colorado law, but I note that Delaware too has adopted the Uniform Fraudulent Transfer Act.  *See* Del. Code tit. 6, § 1304(1).

employees.  **PSC** was housed at the same address using the same people, computers, officers and supplies as PMLC and PMLSC before it.  Upon *information and belief, all management contracts held by PMLSC were cancelled and reinstated in the name of PSC, so that PMLC (the sole member of PMLSC) would not be entitled to the revenue generated by any of those management contracts.*

122.  Plaintiffs are *informed and believe*, and therefore allege, *the assets transferred to PSC … include, among other things, the right to perform management services* for the Shops, the Promenade Shops at Evergreen Walk (South Windsor, Connecticut), the Promenade Shops at Saucon Valley (Center Valley, Pennsylvania), Carriage Crossing (Memphis, Tennessee), the Promenade Shops at Briargate (Colorado Springs, Colorado), the Shops at Perry Crossing (Plainfield, Indiana), and the Promenade Shops at Orchard Valley (Manteca, California).

123.  Plaintiffs are *informed and believe*, and therefore allege, Josh, Dan, Terry, … caused these assets to be *transferred to PSC (or other Roe Corporations or Doe Trusts) to fraudulently put them outside of the execution power of the court should Plaintiffs obtain a judgment against PMLC.*

124.  Stated differently, Plaintiffs are *informed and believe* and thereon allege, that but for the creation of **PSC**, PMLC would presently hold all of the assets now held by PSC and would employ all of the staff now employed by PSC. Wherefore, Plaintiffs believe *PSC is nothing more than an extension, successor in interest, or alter ego of PMLC, created for the fraudulent purpose of shielding assets and depriving minority owners and creditors of the value of PMLC.*

Later in the Third Amended Complaint, after incorporating the previous factual

allegations, plaintiffs set forth their Sixth Claim for Relief (Fraudulent Transfer), essentially

tracking CUFTA:

163.  Plaintiffs are *informed and believe*, and thereon allege, *between 2010 and 2015, Josh, Dan and/or Terry*, acting collectively or independently, used P&M, PMLC, PLC, *PSC*, PMLSC, Poag Bros. and/or various trusts or estate planning mechanisms under their control, or under the actual or putative control of Trustee Defendants, *to cause, suffer or permit a significant number of assets, funds and/or business opportunities to be shifted out of existing Poag & McEwen entities to avoid then known or anticipated claims by present and/or future creditors.*

164.  Plaintiffs are creditors of P&M resulting from the Phase I Judgment entered in *McWhinney v. Poag* in the amount of $42,006,032.50 plus $60,589,271.20 in prejudgment interest and $1,650,000 in combined costs and fees for a total judgment that exceeds $104 million.  At the time of transfer, Plaintiffs were

potential creditors of PMLC and PLC because P&M, PMLC and PLC were defendants in *McWhinney v. Poag*.

165. *Josh, Dan, and Terry*, acting collectively or independently, *used* P&M, PMLC, PLC, **PSC**, PMLSC, Poag Bros. and/or various trusts or estate planning mechanisms under their control, or under the actual or putative control of Trustee Defendants, to cause, suffer or permit a significant number of assets, funds and/or business opportunities to be shifted out of existing Poag organization entities *with actual intent to hinder, delay, and defraud Plaintiffs from executing on a judgment* obtained in *McWhinney v. Poag* against PMLC, PLC and/or P&M. Josh, Dan and Terry further did so to hinder, delay and defraud Plaintiffs from executing on a potential judgment against themselves and their agents in this action.

166. <u>Josh, Dan, and Terry</u>, acting collectively or independently, *used* P&M, PMLC, PLC, **PSC**, PMLSC, Poag Bros. and/or various trusts or estate planning mechanisms under their control, or under the actual or putative control of Trustee Defendants to cause, suffer or permit a significant number of assets, funds and/or business opportunities to be shifted out of existing Poag & McEwen entities *without receiving a reasonably equivalent value in exchange for the transfer and believed or reasonably should have believed that PMLC, PLC, and/or P&M would incur debts beyond their ability to pay as they became due.*

ECF No. 248 (bolding and italics added except for "*McWhinney v. Poag*").

Thus, the key factual allegations pertinent to PSC are alleged "on information and belief." In summary, plaintiffs allege, on information and belief, that:

- in January 2014, the Poags transferred the majority of the assets of PMLC and PMLSC to PSC, including PMLSC's management contracts, so that PMLSC's parent PMLC would not receive the revenue generated by those contracts (¶121);

- the assets transferred to PSC include the right to perform management services for the Shops and for other shopping centers in Connecticut, Pennsylvania, Tennessee, Colorado Springs, Indiana, and California (¶122);

- defendants caused these assets to be transferred to PSC to fraudulently put them outside of the execution power of the court should Plaintiffs obtain a judgment against PMLC (¶123); and

- PSC is nothing more than an extension, successor in interest, or alter ego of PMLC, created for the fraudulent purpose of shielding assets and depriving minority owners and creditors of the value of PMLC (¶124).

During the oral argument plaintiffs' counsel summed it up this way: PSC is the one entity that still does business, so it would be the most likely source of money to collect on a judgment in this case.  ECF No. 311 at 52.

### 3.  **The Facts.**

The Court finds that there are no genuine disputes as to the following material facts:

a.  PSC was formed as a Delaware Limited Liability Company on April 23, 2012.  Dan and Josh Poag were the sole members of the Board of Managers.  The "subscribers" (owners) were Dan Poag and his wife Chloee; Josh Poag and his wife Amy; Jeremy Poag; Robert and Mary Rogers; Brian Smith; Alesia Kempe; and Tim Thompson.  Of the 100 units the Poags owned 63.[3]  The officers were Josh Poag, President and CEO; David Selberg, CFO and Secretary; Robert Rogers, COO and General Counsel; Alesia Kempe, Senior VP, Asset Management; and Brian Smith, Senior Vice President, Leasing.  PSC had no employees at the time of its formation.

b.  On May 8, 2012 PSC entered into a Property Management Agreement with a shopping center owner, G&I VII Retail Carriage, LLC, to provide property management services for the Carriage Crossing shopping center in Tennessee.  PSC entered into an Administrative Services Agreement with PMLSC whereunder PMLSC, for a fee, would provide operational and administrative services to PSC.  In essence, PSC contracted with PMLSC, which did have

---

[3] Both sides state that individuals not part of the Poag family owned 36% of the original membership interest in PSC.  I am not sure what the discrepancy is between what appears to be 63% owned by Poags and the stipulation that 36% was owned by non-Poags, but this discrepancy, if it is one, is immaterial. The non-Poag owners were apparently executives employed by Poag entities.

employees, to provide the actual on-the-ground management services at the Tennessee shopping center, similarly to how PMLSC had provided on-the-ground management services for P&M when P&M managed CLC and for PLC when PLC managed the Shops for G&I.

c.  PSC subsequently entered into several additional contracts to manage shopping centers, and in each case, it contracted with PMLSC to provide the on-the-ground services. These were:

(1) August 15, 2013, contract with IMI Colorado Springs, LLC to manage the Briargate shopping center in Colorado Springs.

(2) October 25, 2013, contract with Metropolis Lifestyle Center, LLC to manage the Metropolis shopping center in Indiana.

(3) December 3, 2013, contract with AmCap, Inc. to manage the Brinton Lakes shopping center in Glen Mills, Pennsylvania.

d.  No Poag-related or McEwen-related entity had previous management agreements with IMI, Metropolis, or AmCap.  PMLSC had managed Briargate for the owner prior to the sale to IMI.

e.  On December 31, 2013 the Prudential Company of America notified PMLSC of its termination of PMLSC's Property Management Agreements for the Evergreen Walk (Connecticut), Buckland Road (Connecticut), and Saucon Valley (Pennsylvania) shopping centers.

f.  On December 31, 2013 PMLSC sold certain equipment and office supplies to PSC for $29,810.  That was fair consideration for the assets purchased by PSC.

g.  Effective January 1, 2014 PMLSC's employees became employees of PSC.

h.  Effective January 1, 2014 Prudential contracted with PSC to manage the Connecticut and Pennsylvania shopping centers.

i.  Effective January 1, 2014 PSC entered into a contract with PLC to provide management services for the Shops (replacing PMLSC).

j.  Effective January 1, 2014 PSC contracted with PMLSC to provide management services at the Orchard Valley shopping center in Manteca, California.

k.  Plaintiffs had not up to that time asserted any claim against PMLSC and did not do so until the present case was filed on November 8, 2017.

l.  Notice and information concerning PSC's entry into these property management agreements was not concealed.  Rather, it was published online on a Poag-related website and on separate shopping center specific websites.

m.  The equipment and office supplies transferred by PMLSC to PSC on December 31, 2013 for $29,810 were the only assets transferred by PMLSC to PSC.  Neither PLC nor PMLC transferred any assets to PSC.

**4. Conclusions re Plaintiffs' Fraudulent Transfer Claim Against PSC.**

In my order of September 28, 2018, I noted that the Tenth Circuit permits plaintiffs to allege fraud, or at least the intent and purpose for the defendant's actions, on information and belief.  ECF No. 106 at 15.  The case is now well beyond the allegation stage, and PSC argues that the key allegations made on information and belief in the Third Amended Complaint have not been supported by evidence.

a.  The New Contracts.

PSC, a newly formed entity owned in part by non-Poag family individuals, obtained management contracts for the G&I VII shopping center in Tennessee in May 2012; the

Metropolis shopping center in Indiana in October 2013; and the AmCap shopping center in Pennsylvania in December 2013; as new business opportunities.  Neither PMLC, PMLSC, nor other Poag entities had been involved at those shopping centers previously.  Briargate in Colorado Springs had been managed by PMLSC for a prior owner, but PSC entered into a management contract for that center as a new business opportunity in August 2013 when the ownership changed to IMI.  These new business opportunities were not assets belonging to PMLSC, PMLC or P&M.  *See, e.g., Anderson Law LLC v. 3 Build Constr., LLC,* No. 1-18-1575, 2019 WL 4739190, at **4, 15-16 (Ill. App. Ct. 2019) ("[A]n action brought pursuant to the Fraudulent Transfer Act directly concerns the assets of the judgment debtor and imposes liability based on the value of the transferred assets…. Here, the alleged business opportunities diverted from the judgment debtors did not constitute an asset, that is, 'property of a debtor,' that could be owned by the judgment debtors or transferred to [the newly formed entity]".).

Plaintiffs questions the Poags' motive for creating PSC.  Josh Poag testified in his June 23, 2020 deposition that there were several reasons for this.  Terry McEwen, the "M" in PMLSC, was not longer involved.  Officers and executives of Poag enterprises were motivated by giving them ownership in ventures going forward; and to make a clean break from entities that had debt to facilitate future borrowing—was "self-serving."  ECF No. 286 at 15-16 (referring to deposition testimony, ECF No. 286-4 at 5-6).  Also according to Josh Poag's deposition, G&I VII wanted a new management entity to be the manager of the Carriage Crossing, Tennessee shopping center, which as I have indicated was the management contract into which PSC entered shortly after its formation.  ECF No. 299-1 at 4.  Plaintiffs label Josh Poag's explanation as "self-serving," ECF No. 286 at 15, but that too is argument, not evidence.  His testimony does not

support an inference that the "transfers" of the management contracts were made for a fraudulent purpose.

I analogize these contracts to the creation of PLC to pursue the management of the Shops for the new owner, G&I. Judge French found it to be appropriate in the circumstances to form a new entity to take advantage of the new business opportunity.

In any event, PSC argues that plaintiffs have not come forward with evidence, much less clear and convincing evidence, that defendants caused those new contracts to be placed with PSC in order to put them outside of the execution power of the court in case plaintiffs obtained a judgment against PMLC. I agree.

b. Existing PMLSC Contracts.

P&M and PMLC transferred nothing to PSC. PMLSC transferred equipment and office supplies of nominal value to PSC on December 31, 2013. PMLSC's employees moved over to PSC at that time, but that does not constitute a transfer of assets as such.

To be sure, those transfers took place in the context that PSC was replacing PMLSC across the board. Prudential switched the management contracts on its three shopping centers from PMLSC to PSC. PSC replaced PMLSC at the Shops. PSC entered into a contract with PMLSC, which still had a management contract for the shopping center in California, to provide the on-the-ground management, reversing the two entity's roles there. These changes were presumably orchestrated by the Poags, and they triggered plaintiffs' suspicions that they were made for a fraudulent purpose.

PSC argues that the PMLSC contracts were freely terminable, and as such, they were not assets subject to a potential fraudulent transfer. ECF No. 274 at 18 (citing Lazar & Allen, LESSORS BEWARE LEASE TERMINATION MIGHT GIVE RISE TO FRAUDULENT TRANSFER OR

PREFERENCE CLAIMS, 26-May Am. Bankr. Inst. J. 32, 33 (May 2017)).  In addition, a newly formed entity carrying on the business of even a debt-ridden predecessor is not liable for the predecessor's debts unless (1) there is an express or implied assumption of the debts; (2) the transaction results in a merger or consolidation of the two companies; (3) the purchaser is a continuation of the seller; or (4) the transfer is for the fraudulent purpose of escaping liability. *CMCB Enterprises Inc. v. Ferguson,* 114 P.3d 90, 93 (Colo. App. 2005).  The first three situations do not apply.  PSC argues that plaintiffs have come forward with no evidence, much less clear and convincing evidence, that these "transfers" were motivated by the fraudulent purpose of shielding the proceeds of the contracts in the event that plaintiffs obtain a judgment against PMLC.

As for the allegation that PSC is nothing more than an extension, successor in interest, or alter ego of PMLC, created for the fraudulent purpose of shielding assets and depriving minority owners and creditors of the value of PMLC, PSC points to my order of September 28, 2018 in which I dismissed plaintiffs' claim that PSC was the alter ego of PMLC, P&M, PLC, Josh Poag, or Dan Poag.

Plaintiffs begin their response brief by reasserting that Dan and Josh Poag craftily moved these management contracts to PSC over a period of years for the purpose of shifting them to an entity that would be safe from any judgment the McWhinneys might obtain against "the transferring entities" (PMLC, PMLSC, and PLC).  ECF No. 286 at 1.  That is argument, not evidence.

In terms of direct evidence the best plaintiffs can do after literally years of investigation and discovery is to cite the deposition of PSC's CFO, David Selberg, who testified that he thought that PSC was created to take these management contracts rather than using PLC for them

on advice of counsel, and that "it may have something to do with this lawsuit."  ECF no 286 at

14 (citing ECF No. 286-5 at 58-9).  That is not enough.

Intent is often determined based on circumstantial evidence, i.e., inferences that can

reasonably be drawn from the direct evidence.  However, having carefully studied the plaintiffs'

brief, its exhibits, and the transcript of the oral argument held on October 27, 2020, ECF No.

311, I find that plaintiffs have not come forward with admissible evidence from which a jury

could reasonably infer that assets were transferred to PSC for the purpose of shielding those

assets from plaintiffs' attempts to collect their state court judgment against P&M, much less that

a jury could so find by clear and convincing evidence.

Nor am I persuaded that plaintiffs have established three "badges of fraud" from which a

jury could reasonably infer nefarious intent.  *See id.* at 15-17.  The transfers to PSC were not

concealed; they were matters of public record and were disclosed on a Poag website and at least

some of the shopping centers' websites.  PMLSC had not been sued when these changes

occurred, and its parent, PMLC, had prevailed in the state court litigation.  It is true that

substantially all of PMLSC's assets had been transferred to PSC, but that by itself does not serve

as a badge of fraud.

Finally, plaintiffs suggest that they should at least have a trial on constructive fraud

because PSC has not shown that PMLSC it received fair value of the assets it transferred other

than the equipment and office supplies.  But, as I have noted, no other PMLSC asset was

transferred to PSC for which fair consideration would be required.

In sum, I appreciate plaintiffs' position that PSC is a potential source, possibly the best

source, of recovery.[4]  Indeed, during the oral argument I speculated that "the Poags and McEwen

---

[4] I note, however, that plaintiffs continue to pursue recovery of the judgment against Dan Poag, Josh
Poag, Terry McEwen, Poag Brothers, LLC, several family trusts, and other entities.

and their lawyers are going to do anything and everything they can to move assets wherever they have to move them to prevent [McWhinney] from getting them." ECF No. 311 at 52. However, I must be guided by the evidence or, in this instance, the lack of evidence. Therefore, PSC's motion for summary judgment dismissing the claims against it is granted.

Ideally, individuals with the background, credentials and successes of Dan Poag, Josh Poag and Terry McEwen would step up to the plate and take responsibility for the contractual liability their company P&M incurred, i.e., by negotiating a reasonable settlement of this overly extended litigation. Ideally, the McWhinneys would forget about collecting $100 million or even necessarily $42 million and instead would accept a reasonable compromise to put all this distraction behind them. But failing that, the parties will have to let a jury decide, in the first instance, and then slog on in the state and federal appellate courts, perhaps for years to come.

### B.  [Plaintiffs'] Motion for Partial Summary Judgment, ECF No. 276.

I have reviewed the principal briefs (ECF Nos. 276, 294, 297) but not all the other briefs filed by the parties relating to the issue preclusion issues. On the one hand, I agree with the Poags and Mr. McEwen that the issue is not yet ripe, since there has not yet been a decision by the Colorado Court of Appeals. On the other hand, I agree in substance that retrying the issues tried and decided in the state court litigation, both in Phase I and II, would be an unnecessary waste of time and resources. Although the individuals Dan and Josh Poag and Terry McEwen were not parties to the state case as such, their interests were fully and competently represented by themselves and their lawyers throughout that case, and I am inclined to find that the issues that were decided there (if upheld on appeal) will be binding on the parties to this case.

That said, although not yet in a league with Judge French, this Court has devoted a huge amount of time and resources to this case, as is evident not only by my decision on the PSC issue

set forth in this order but also by the previous hearings it has held and orders it has issued during the last three years. There is not a great deal of time between now and the scheduled trial, and the Court has many other cases demanding time, particularly because of the backup caused by the pandemic and the upcoming holiday season. In short, I do not have the hours available at this time that would be required to pull together all the facts, citations and authorities that have been presented in your briefs and their exhibits on the preclusion issues. Therefore, the Court requests that counsel prepare and submit proposed findings of fact and conclusions of law. Ideally, counsel could confer and agree as to form on a single submission. Failing that, however, all three interests may submit proposed findings and conclusions. The shorter your submissions are, the sooner after the Colorado Court of Appeals' decision on the pending appeals I will be able to review them. And, please, for the sake of continuity, refer to entities by the acronyms Judge French used, and that I have tried to use, e.g., "P&M," not "PMLC-Centerra."

### C. Poag Defendants' Motion for Partial Summary Judgment, ECF No. 279.

I have reviewed the motion, plaintiff's response, ECF No. 291, and the Poags' reply, ECF No. 300.

This motion reminds a little of the old Perry Mason series where the district attorney, Hamilton Burger, repeatedly objected to Perry's questions as "irrelevant, incompetent, and immaterial." Translated, he was saying, "I object on all possible grounds." The Poag interests, in this motion and joinders in the motion, are essentially objecting to the plaintiffs' Third Amended Complaint on all possible grounds, and in doing so some potentially valid points get lost in the shuffle. On the other hand, plaintiffs' cause is not strengthened by name-calling such as comparing Josh, Dan and Terry to Bernie Madoff and of having a "get-rich-quick" plan.

In the section on purportedly undisputed facts the motion makes some valid observations about provisions in the Operating Agreement.  But when it discusses the Agreement's provisions concerning third party financing and the pledging of members' interests, it ignores what took place in the state court, Phase I.  Judge French devoted significant parts of his 79-page order to findings and conclusions concerning the Mezzanine Loan and how it impacted the availability of permanent financing and ultimately the demise of the project.  *See* ECF No. 22-1 at 44-51, 63-69.  He found for five separate reasons that P&M's entry into, and concealment of, the Mezzanine Loan breached contractual and fiduciary duties owed to MCLC and CLC.  *Id.*  Indeed, he found that "Poag & McEwen's Mezzanine Loan – and their attempts to pay it off – resulted in the foreclosure of the Shops," *id.* at 63, and he concluded that $38.25 million of the total damages of $42,006,032.52 awarded was for breaches related to the Mezzanine Loan.  *Id.* at 70.  At a bare minimum there is a genuine dispute of fact concerning the extent to which each of the three principals – Dan, Josh and Terry – were involved in the conception and implementation of the Mezzanine Loan.  It is hard to imagine that they weren't fully aware and supporting of that ill-fated Loan.

The motion makes several points about Poag Brothers and the six trusts, essentially through the affidavit of Josh Poag, but when it comes to transfers in and out of those entities the motion asserts that nothing much happened starting in 2007 because of the economic downturn.  It has always been the Poag/McEwen position that the downturn was a cause, if not the cause, of the problems that befell this project.  But that assuredly is not undisputed.  By 2007 McEwen's retirement, his buyout, the Mezzanine Loan, and the problems obtaining permanent financing were all in play.  What transfers took place, when they took place, and what motivated them are disputed facts.  In their reply the Poags state, "McWhinney does not contest the entry of

summary judgment that there were no fraudulent transfers to Poag Brothers, LLC and the six defendant trusts. [*Id.* at 2 n.3]." ECF No. 300 at 1. I'm not sure that's what footnote 3 on page 2 of plaintiffs' response was meant to say, i.e., are plaintiffs conceding that Poag Brothers and the trusts did not receive or make fraudulent transfers, or only that Delaware law applies to the issue? Moreover, as indicated in plaintiffs' response brief, whether and the extent to which those entities played a role in securing the Mezzanine Loan (and thereby aided and abetted breaches of contractually imposed fiduciary duties) are also disputed facts.

The motion makes some potentially valid points about how the First and Second Claims in the Third Amended Complaint, masked as post operating agreement fraudulent concealment and misrepresentation claims, appear to be end-arounds the parties' earlier stipulation and this Court's order dismissing the fraudulent concealment and misrepresentation (fraudulent inducement) claims in the Second Amended Complaint. Plaintiffs respond that they want Chad McWhinney to be able to tell his story, and he will have that opportunity to a point. However, I think that plaintiffs have all but conceded that the First and Second Claims are on their way out, and therefore, I need not single out those issues for further discussion here. Plaintiffs should be prepared by the Trial Preparation Conference to clarify whether they are dismissing those claims. It is time to decide which claims are the meat of the case and which can at this point be discarded as distractions or clutter.

I'm not sure yet what the implications might be, but I found it to be interesting that the reason Josh, Dan and Terry can't be aiders and abettors of P&M's breaches of fiduciary duties is that they are themselves fiduciaries who owed fiduciary duties to P&M. If so, then the question occurred to me as to why they wouldn't owe the same fiduciary duties to CLC and MCLC as they owed to P&M, given that P&M was just the entity they formed to contract with MCLC and

form CLC.  In any event, plaintiffs point to *Gotham Partners, L.P v. Hallwood Realty Partners, L.P.,* 817 A.2d 160 (Del. 2002) as contrary authority.  I am inclined to agree, but at this point it is sufficient to note that the issue turns on disputes of fact.

I am confused about the parties' positions on the civil conspiracy claim.  Plaintiffs agree that Terry, Josh and Dan cannot be held liable for conspiring to induce McWhinney into signing the Operating Agreement.  Well, of course not, once the underlying fraudulent inducement claim was dismissed.  What then did the three individuals unlawfully conspire to do?  Might this be another claim that disappears by the Trial Preparation Conference?   I am not inclined to go through the motion and rule on each separate point on a piecemeal basis, particularly where I suspect that plaintiff will potentially abandon some of their claims.

On what is likely the ultimate issue remaining in the case – whether the Poags or McEwen or any of their entities made fraudulent transfers at any point (before or after the Phase I order) to insulate their assets from a potential or actual judgment against P&M, the motion just addresses this vital issue at the end and relies on conclusory statements in the Josh Poag affidavit for ammunition.  To make matters worse, in their reply the Poags say that plaintiffs have waived any opposition to the dismissal of the fraudulent transfer claim against the Poag defendants by not addressing the issue in the response.  Do you really believe that plaintiffs have waived perhaps the central issue in this case by not responding to a conclusory, almost throw-away argument?  I don't think so.

I find and conclude that the motion, taken as a whole, is replete with genuine fact disputes, and therefore the motion is denied.

## ORDER

1.  Defendant Poag Shopping Centers LLC's Amended Motion for Summary Judgment on Plaintiff's Fraudulent Transfer Claim, ECF No. 274, is GRANTED.  Plaintiffs' claims against PSC are dismissed with prejudice.

2.  [Plaintiffs'] Motion for Partial Summary Judgment, ECF No. 276, is not ruled on for the reasons indicated in this order.

3.  Poag Defendants' Motion for Partial Summary Judgment, ECF No. 279, is DENIED.

DATED this 3rd day of December, 2020.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge