IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 17-cv-02853-RBJ

MCWHINNEY HOLDING COMPANY, LLLP, et al.,

     Plaintiffs,

v.

G. DAN POAG, an individual, et al.,

     Defendants.

---

## ORDER on MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Plaintiffs move for partial summary judgment.  ECF No. 276.  For the reasons set forth, the motion is granted in part and denied in part.

### I.  BACKGROUND.

On December 3, 2020 the Court addressed motions for summary judgment.  ECF No. 312.  However, the Court did not at that time resolve the plaintiffs' motion for partial summary judgment.  Billing the motion as a "trial efficiency motion" that would streamline the presentation of evidence at trial, plaintiffs asked the Court for two things; first, "a ruling that establishes the fiduciary duties owed to Centerra Lifestyle Center, LLC ("CLC") and McWhinney Centerra Lifestyle ("MCLC") by the various defendants;" and, second, "a ruling on the preclusive effect of the findings of fact and conclusions of law entered by Judge Thomas R. French in the Phase I State Court Judgment."  ECF No. 276 at 1.  Depending upon how one interprets the motion, it was not a simple ask.  Indeed, it has generated multiple briefs and, as discussed in this order, proposed findings.

1

At bottom, however, the context in which the ask was made is critical. The McWhinney brothers and the Poag & McEwen group entered into a joint venture in 2004 to develop a high-end "lifestyle" shopping center on the McWhinneys' property in Larimer County, Colorado. The project did not go as planned, and the McWhinneys filed suit in the Larimer County District Court in 2011. After years of discovery and other pretrial matters, the state court, by Judge French, held a trial in two phases. Phase I was a 13-day bench trial in June 2017. The court issued a 79-page order in favor of a McWhinney entity ("MCLS") and against a Poag & McEwen entity ("P&M") on claims of breaches of contract and fiduciary duties imbedded in the contract.[1] Judgment was entered for MCLC in the amount of $42,006,032.50 plus interest. ECF No. 22. [2] The judgment has never been paid and is said to have grown to more than $100 million with accumulated interest.

Phase II marked the beginning of the McWhinneys' collection efforts. Their goal was to hold P&M's parent company, "PMLC," liable for the judgment on an alter ego theory. This time the McWhinneys struck out. Following a five-day bench trial of this phase in November 2018, the court issued a 29-page order on December 28, 2018, finding that PMLC and P&M were not alter egos. ECF No. 132.

Plaintiffs' effort to collect the massive judgment was not, of course, confined to Phase II. In October 2016 plaintiffs moved for leave to join the Poags (Dan and Josh) and Terry McEwen individually, and various related entities, as defendants in the state case. Defendants opposed the motion. In an order issued on January 3, 2017, Judge French denied leave to amend, noting

---

[1] Judge French found that Delaware law holds that traditional duties of loyalty and care are owed by a member of an LLC to the LLC and its other members. *See infra* ¶138. He further found that the Operating Agreement expressly imposed on P&M and MCLC duties of loyalty, good faith, fair dealing, candor, and completeness to the LLC and each other, as well as the duty owed by P&M to manage the LLC in a prudent and businesslike manner. *Id.* ¶¶139-144. I refer to this collection of duties as "fiduciary duties" for short, and the breach of them as breach of fiduciary duties.

[2] The court found in favor of the defendants on several tort claims.

among other things that bringing new parties and claims into the case would delay a case already

five and one-half years old and potentially prejudice the new defendants.  ECF No. 70-2 at 6-9.

The plaintiffs had no choice but to file a second lawsuit, which they did.  Defendants removed

that second case to this Court on November 28, 2017.  In effect, therefore, this case is the third

phase of the McWhinneys v. Poag & McEwen litigation, now in its eleventh year.  Indeed, this

case alone is now in its fourth year, and it has been hotly disputed, to say the least.  After several

settings and resettings, the trial is now set to begin on May 3, 2021.

A principal concern of the plaintiffs that led to the pending "trial efficiency" motion is

their fear that they would have to retry all the issues that had been tried and decided in the state

case.  That, of course, would be incredibly wasteful of time and resources; and I have made it

clear that it will not be required.  However, the Phase I judgment was the subject of a pending

appeal, leaving undetermined whether the state court's findings and conclusions would remain

intact following appellate review.  Plaintiffs did not appeal from the Phase II judgment.

All of this background led to the order I issued on December 3, 2020 addressing other

motions but not this one.  Believing that setting out whichever of the state court's findings and

conclusions that remained once the Colorado Court of Appeals issued its decision would be

largely a ministerial task, I reached out to counsel for drafting assistance.  Specifically, regarding

plaintiffs' motion for partial summary judgment, ECF No. 276, I stated,

> I have reviewed the principal briefs (ECF Nos. 276, 294, 297) but not all the other
> briefs filed by the parties relating to the issue preclusion issues.  On the one hand,
> I agree with the Poags and Mr. McEwen that the issue is not yet ripe, since there
> has not yet been a decision by the Colorado Court of Appeals.  On the other hand,
> I agree in substance that retrying the issues tried and decided in the state court
> litigation, both in Phase I and II, would be an unnecessary waste of time and
> resources.  Although the individuals Dan and Josh Poag and Terry McEwen were
> not parties to the state case as such, their interests were fully and competently
> represented by themselves and their lawyers throughout that case, and I am

inclined to find that the issues that were decided there (if upheld on appeal) will be binding on the parties to this case.

That said, although not yet in a league with Judge French, this Court has devoted a huge amount of time and resources to this case, as is evident not only by my decision on the PSC issue set forth in this order but also by the previous hearings it has held and orders it has issued during the last three years. There is not a great deal of time between now and the scheduled trial, and the Court has many other cases demanding time, particularly because of the backup caused by the pandemic and the upcoming holiday season. In short, I do not have the hours available at this time that would be required to pull together all the facts, citations and authorities that have been presented in your briefs and their exhibits on the preclusion issues. Therefore, the Court requests that counsel prepare and submit proposed findings of fact and conclusions of law. Ideally, counsel could confer and agree as to form on a single submission. Failing that, however, all three interests may submit proposed findings and conclusions. The shorter your submissions are, the sooner after the Colorado Court of Appeals' decision on the pending appeals I will be able to review them. And, please, for the sake of continuity, refer to entities by the acronyms Judge French used, and that I have tried to use, e.g., "P&M," not "PMLC-Centerra."

*Id.* at 18-19.

The Colorado Court of Appeals issued its order affirming the state court completely on the contract and related breach of fiduciary duty issues in Phase I on January 14, 2021. ECF No. 322 at 4-45.[3] Despite that, the parties were unable to agree on proposed findings of fact and conclusions of law, submitting their respective versions. ECF Nos. 323, 324 and 325.

Plaintiffs' proposed Findings of Fact and Conclusions of Law are based on Judge French's orders and judgment on the contract and fiduciary duties issues in Phase I. It is an annotated set of findings and conclusions with specific citations to Judge French's orders and the addition of headers for clarity. That was essentially what I was looking for as far as it went. The main omission is that plaintiffs did not include anything from Phase II.

---

[3] The Court of Appeals reversed the state court's dismissal of plaintiffs' tort claims of fraudulent concealment, intentional interference with contractual obligations, and intentional inducement of breach of contract, holding that Colorado's economic loss rule did not bar those intentional torts. *Id.* at 37-45. The only issue on which the defendants prevailed in the Court of Appeals was affirmance of the state district court's dismissal of plaintiffs' civil conspiracy claim. *Id.*

The Poag defendants submitted 45 pages of proposed findings that frequently are not visibly tied to the state court's findings.  ECF No. 304.  Their proposal does not point out disagreements with plaintiffs' proposal with respect to Phase I.  It does not explain why any single paragraph of plaintiffs' proposal should be rejected or why defendant's proposal should adopted in lieu of, or in addition to, plaintiffs' proposal with respect to Phase I.  It did discuss Phase II but did not track the state court's findings and conclusions as I had hoped.

The McEwen submission begins by informing the Court that none of this is yet ripe because defendants have petitioned the Colorado Court of Appeals for reconsideration, and if that is denied, they might petition for certiorari review.  I take their point, but I am not persuaded that this is a sufficient reason to delay this old case even longer.  The decision of Judge French was detailed and thorough, as was the decision of the Court of Appeals.  In my judgment, it is highly unlikely that defendants will get any part of the case concerning breach of contract and breach of fiduciary duties changed by a petition for reconsideration or certiorari review.  Meanwhile, this Court has to deal with what is, not what possibly could be.  If the defendants manage to beat the odds in the state appellate courts, so be it.

The McEwen brief points out that plaintiffs' intentional tort claims have not been tried yet.  That is true, but it is not relevant to the pending motion.  The brief also insists that Mr. McEwen not be precluded from presenting his case.  He won't be, but that doesn't detract from the Court's finding that the facts and conclusions from the state case, so far as they went, have been decided.  There is no unfairness to the defendants.  The interests of Dan Poag, Josh Poag and Terry McEwen in the claims against their companies P&M and PMLC were fully and aggressively represented in the defense of the state case.  Plaintiffs might or  might not be able to establish the individual liability of the Poags, Mr. McEwen, or the various trusts for the damages

caused by their companies, but they will not be put to task of retrying either Phase I or Phase II of the state case in this trial.

As for the McEwen brief's suggested findings of fact and conclusions of law, I find that it suffers from the same problems as the Poag proposal.  It does not identify any of the plaintiffs' proposed Phase I findings with which McEwen defendants disagree.  It does not propose Phase II findings in a form I can accept.

Accordingly, this order finds that the state court's findings and conclusions in Phases I and II of the state trial are established facts and conclusions.  The Court largely adopts the findings and conclusions in plaintiffs' proposal, which are quite true to Judge French's Phase I findings and conclusions.  I have only made some minor non-substantive grammar, punctuation, and organizational modification.  Because the parties did not do the job I anticipated vis-a-vis Phase II, I have drafted findings and conclusions reflecting the state court's findings and conclusions.  They too are now established facts and conclusions for purposes of this case.  In doing so I have attempted to remain true to Judge French's order and judgment, although I have reorganized the findings somewhat so as better to focus on the specific issue he addressed in Phase II (is P&M the alter ego of PMLC) and the specific findings that supported his conclusions.  I envision that, at a minimum, the jury in this case will be instructed that the findings and conclusions set forth below were decided in the state court case, affirmed on appeal, and need not be retried in this case.

The Court is willing to reconsider any finding or conclusion if it can be shown, after conferral, that it deviates in a substantive and material way from Judge French's findings and conclusions.  I am not addressing "claim preclusion" or "issue preclusion" as such at this time.  Plaintiffs' charts on pages 4-6 of ECF No. 323 were confusing, at best.  Plaintiffs wanted the

Court to determine that what Judge French did need not be retried in this Court.  They have that now, and that is a far as I am willing to go at this time with respect to ECF No. 276.  It is the parties' job to make what they will of it.

## II. FINDINGS OF FACT ADOPTED FROM THE PHASE I JUDGMENT.

### A.  <u>The Beginning of Centerra and the Business Relationship</u>.

1. Chad and Troy McWhinney are brothers who desired to build a shopping center, or "lifestyle center," as part of a master-planned community called Centerra located east of Loveland, Colorado.

2. The McWhinney brothers needed a partner with expertise to help develop, lease, and manage the shopping center, and they began attending conferences hosted by the International Council of Shopping Centers ("ICSC") in Las Vegas, Nevada.

3. At one of these conferences, McWhinney employees met Terry McEwen ("McEwen"), the President and co-founder of Poag & McEwen Lifestyle Centers, LLC ("PMLC").

4. McEwen was the co-founder of PMLC along with Dan Poag, the man who invented the concept of a "lifestyle center."

5. Chad McWhinney and McEwen met in 2001, and on December 5, 2002, they signed a letter of intent to develop, manage, and own the lifestyle center at Centerra.

6. McWhinney and PMLC then formed Centerra Lifestyle Center, LLC ("CLC") in 2004 to build, manage, and own the "Promenade Shops at Centerra" (the "Shops").

7. To hold their ownership interests in CLC, McWhinney and PMLC created two special purpose entities, McWhinney Centerra Lifestyle Center, LLC ("MCLC") and Poag & McEwen Lifestyle Center – Centerra, LLC ("P&M").

8. The Limited Liability Company Agreement of Centerra Lifestyle Center, LLC ("Operating Agreement") was signed by P&M and MCLC on September 29, 2004.

9. P&M's initial contribution to CLC was an advance of $2.38 million in cash which was returned after construction began.

10. MCLC's initial contribution to CLC was the property that the Shops were to be built on—valued at $16.78 million.

11. The Operating Agreement contemplated two phases of financing for the Shops: the first phase was for CLC to enter into a temporary construction loan to fund the construction of the Shops; and the second phase would come after construction was complete, at which time CLC would enter into a permanent loan to refinance the construction loan prior to its maturity date.

12. On October 22, 2004, P&M—acting as Manager of CLC—acquired a $116 million construction loan from a group of banks with JPMorgan Chase ("JPM") as the lead agent (the "Construction Loan").  The Construction Loan was for a term of two years, and the loan's maturity date was October 23, 2006.

13. When the Shops opened in October 2005, they were leased at 66% occupancy. However, the in-line leasing (excluding the anchor tenants) was at 38%, a very low opening occupancy.  Leasing for the Shops continued to be an issue in 2006.

14. The Operating Agreement provided that P&M, as manager, was responsible for finding permanent financing and for sending MCLC the terms of the permanent loan for its approval.

15. Throughout 2005 and 2006, McWhinney made Poag & McEwen aware of its desire to put on permanent financing quickly while the market was good. [4]  However, Poag & McEwen's response to McWhinney was consistent—that it would find a permanent loan at some point in 2007.

16. In late 2006 and continuing through 2008, Chad McWhinney expressed concern to P&M over the physical appearance and upkeep of the Shops and felt that they were not being maintained in the "first class manner" that had been bargained for in the Management Agreement.

   **B. Terry McEwen's Retirement from Poag & McEwen.**

17. In the early 2000s, Dan Poag and McEwen began discussing their respective retirement from PMLC and redemption plans.

18. In 2003, Dan Poag and McEwen came up with a plan that they would begin redeeming their interests in Poag & McEwen in 2008.

19. In June 2006, McEwen decided that it was time to step away from Poag & McEwen. He met privately with Dan Poag and his son Josh Poag who had joined the company in 1998 and informed them of his desire to sell his interest in Poag & McEwen for $40 million.

20. Poag & McEwen, however, had "nowhere near enough" cash flow to pay $40 million to McEwen.

21. Josh and Dan Poag then began planning how to come up with the $40 million to buyout McEwen's interest and how to keep him involved with the company after his buyout.

---

[4] Like Judge French, the Court will use the term "McWhinney" when referring to the family of entities owned and operated by Chad and Troy McWhinney and "Poag & McEwen" when referring to the family of entities owned and operated by Dan Poag, Josh Poag and Terry McEwen.  *See* ECF No. 22 at 4, n.1 and 5, n.2.

22. Josh and Dan Poag never considered purchasing McEwen's interest with their own money—even though they would be receiving the majority of McEwen's interest.

23. So Josh and Dan Poag decided the best place to get the $40 million was from leveraging permanent loans that would soon be put in place at the Shops and at another lifestyle center in Corona, California called Dos Lagos.

24. This plan would allow Josh and Dan Poag to receive the $40 million to buy-out McEwen for free, as P&M would obtain a $40 million loan secured by its ownership interests in the Shops and Dos Lagos, and all of the proceeds from the permanent loans on those two properties would then pay off the $40 million loan used to buyout McEwen's interest in Poag & McEwen.

25. Josh Poag recognized, however, that to pull the money from these properties would "require good cap rates, high leverage, and good leasing."

26. By August 2006, Poag & McEwen was already deep in negotiations with JPMorgan Investment Management ("JPMIM")—an affiliate of JPM—for a $40 million loan to buyout McEwen.

27. Josh and Dan Poag also took steps to keep the $40 million loan and McEwen's retirement secret.  They had McEwen sign a non-disclosure of the retirement plan as well as a seven year non-compete.

**C. The $155 Million Forward Swap.**

28. In July of 2006, Josh Poag and David Selberg, PMLC's Vice President of Finance, went to JP Morgan Investment Management ("JPMIM") to purchase a $155 million forward rate swap.

29. The $155 million forward rate swap was purchased on September 1, 2006, and it was for a period of 18 months with a February 2008 settlement date at 5.4125%.

30. The swap was an "uncovered" or "naked" swap without a permanent loan in place. McWhinney called this a "naked" swap because it was not tied to any loan or loan application. The swap was a gamble that if a loan were sought and obtained in the future, the interest rate would be set.

31. Dan and Josh Poag's plan was to use the $155 million forward rate swap as a tool to obtain the $40 million loan.

32. Specifically, at the same time as it sold P&M the forward swap, JPMIM was looking to fund PMLC's request for a $40 million loan, which would come from individual investors.  To convince the investors to fund the $40 million loan, JPMIM wanted to show some assurance that Poag & McEwen would be able to pay it back.

33. The $155 million swap was that assurance, as it suggested to investors that PMLC would soon be putting a $155 million permanent loan on the Shops, indicating that PMLC would have sufficient cash available in loan proceeds to pay back the $40 million loan.

34. The forward swap essentially locked CLC into needing a $155 million permanent loan for the Shops.

35. P&M, however, was not close to finding a $155 million permanent loan when it purchased the swap in September 2006.

36. McWhinney was only informed one week prior that Poag & McEwen would "possibly" put a swap in place, and McWhinney was never informed of the $155 million amount until after it was already purchased.

37. After the forward swap was entered into, P&M was never interested in a permanent loan under $155 million—even though it only needed $116 million to refinance the Construction Loan.

38. Doug Hill at McWhinney disagreed with P&M's decision to purchase the $155 million swap, telling Chad McWhinney that Josh Poag had just made "the worst decision of his life."

39. In January of 2008, the $155 million swap expired, and CLC ended up paying $7.5 million interest penalty for the failed swap.

**D. The $40 Million "Mezzanine Loan."**

40. On April 23, 2007, JPMIM, acting through a new subsidiary called I&G Promenade Shops Lender, LLC ("I&G"), and PMLC, acting through its own new wholly-owned subsidiary called Centerra & Dos Lagos Venture, LLC ("C&DL"), entered into a $40 million Mezzanine Loan Agreement (the "Mezzanine Loan" or the "$40 Million Loan").  PMLC's subsidiary C&DL was created for the sole purpose of entering into the $40 million Mezzanine Loan.

41. On April 23, 2007, P&M—while retaining its position as Manager of CLC—transferred its 50% ownership interest in CLC to C&DL.

42. On April 23, 2007, C&DL, likewise, pledged the same 50% ownership interest in CLC to I&G—the Mezzanine Loan lender.

43. On April 23, 2007, an "Intercreditor Agreement" was entered between I&G and the group of banks that held the Construction Loan.

44. The only information disclosed to McWhinney before the Mezzanine Loan was entered into, inclusive of the series of April 23, 2007 transactions, was Josh Poag's statement to

Chad McWhinney that Poag & McEwen was going to do a "corporate financing" with JPM, wherein they would be pledging their interest in CLC.

45. On April 23, 2007, MCLC and P&M entered into a First Amendment to the Operating Agreement that included a provision allowing the parties to pledge their membership interest in CLC to financial institutions.  Josh Poag told Chad McWhinney the statement about "corporate financing" to get him to sign the First Amendment to the Operating Agreement.

46. McWhinney was never informed of the amount, purpose, or effect of the Mezzanine Loan.

47. McWhinney was never informed that McEwen was retiring from the business and being bought out of the Poag & McEwen companies.

48. McWhinney was never informed that Poag & McEwen was planning on leveraging the Shops with a higher permanent loan than was necessary in order to pay back the $40 million Mezzanine Loan.

49. Neither Josh Poag, Dan Poag, nor Terry McEwen ever informed McWhinney that— as part of the Mezzanine Loan transactions—JPMIM would own specific rights regarding CLC, including the right to approve any refinancing of the Construction Loan.

50. Poag & McEwen hid all of these facts from its partner McWhinney.

51. Poag & McEwen also intentionally concealed the purpose of the Mezzanine Loan from JPM—the lead agent of the group of banks—telling JPM that the money was going to be used for equity for other projects, repayment of shareholder loans, and shareholder distributions, when in truth the entire $40 million was going to McEwen.

### E. **Permanent Financing Options**.

52. As early as September 2005 and throughout the 2006 calendar year, Poag & McEwen was presented with several permanent loans options for the Shops.

53. In September 2005, David Selberg, spoke with Teachers and MetLife about permanent loans.

54. Initially, Mr. Selberg was looking for permanent loans of $116 million—the amount of the Construction Loan.  However, Josh Poag directed Mr. Selberg to request at least $133 million from a permanent loan in order to pay back McWhinney's preferred return on the land that it contributed to CLC.

55. Then, after entering into the forward swap in September 2006, Poag & McEwen limited its search to loans of at least $155 million.

56. In November 2006, Poag & McEwen received initial bids for five separate commercial mortgage backed securities ("CMBS") loans from five different lenders that would have covered the permanent financing for the Shops as well as the Dos Lagos property.

57. These five CMBS loans would have netted Poag & McEwen between $7.5 million and $27.5 million—below the $40 million that Poag & McEwen needed to repay the Mezzanine Loan.  For this reason, Poag & McEwen did not enter into any serious discussions with any of these CMBS lenders.

58. In early 2007, when Poag & McEwen had originally told McWhinney that a permanent loan would be put in place, the Shops were unable to justify the $155 million loan that Poag & McEwen desired because of poor leasing.

59. In May of 2007, Josh Poag and Chad McWhinney began to discuss selling the Shops to a third party.

60. At the same time, in May of 2007, Josh Poag directed Mr. Selberg to inform JPMIM that Poag & McEwen was no longer pursuing a permanent loan for the Shops.  But Poag & McEwen's decision to abandon its search for a permanent loan was never told to McWhinney.

**F. McWhinney and PMLC Buy/Sell Negotiations.**

61. In August 2007, McWhinney and Poag & McEwen received the initial valuation for the Shops from Eastdil which stated the Shops were worth between $197 and $202 million, a range that was later increased by $5 million due to a calculating error.

62. Josh Poag challenged Eastdil's valuation, and Eastdil thereafter changed its appraisal to reflect Josh Poag's opinions.  A final valuation of the Shops was sent on September 7, 2007 showing a value of between $206 and $212 million---still short of the $250 million valuation that Josh Poag needed in order to pay off the Mezzanine Loan.

63. In October 2007, McWhinney offered to purchase P&M's 50% interest in CLC for $47.125 million.

64. Josh Poag responded to the offer by stating that Poag & McEwen wanted McWhinney to forgo any due diligence period.

65. Following this exchange, Poag & McEwen representatives attended a Loveland City Council meeting and publicly disclosed that the Shops were performing poorly and were three to five years from stabilization, which was contrary to McWhinney's impression that the Shops were performing quite well and Josh Poag's belief that the Shops would be worth $250 million in the open market.

66. Due to the comments made at the Loveland City Council meeting, on November 16, 2007, McWhinney sent a new offer to Poag & McEwen to purchase the Shops for $45 million—approximately a 5% discount from its previous offer.

67. An hour after receiving McWhinney's new offer, Josh Poag rejected it stating, "We said $47,125,000 and not a penny less." Shortly after, Dan Poag—in a private email to Josh Poag—stated that Poag & McEwen needed to "test Chad's desire to get rid of us," clearly indicating that Poag & McEwen needed to maximize the cash proceeds from the sale to pay off the Mezzanine Loan.

68. Josh Poag's rejection of McWhinney's offer ended all discussions of McWhinney purchasing P&M's interest in CLC.

69. Throughout their buy/sell negotiations, Poag & McEwen hid pertinent information from McWhinney to use as leverage in their negotiation and told McWhinney that it would not disclose this information until after a letter of intent had been signed.

**G. Further Attempt to Refinance the Construction Loan and the Great Recession.**

70. The final extension of CLC's Construction Loan was set to mature in October 2008, and the Shops needed a permanent loan; however, Poag & McEwen had no plan to put on permanent financing for the Shops as it had ceased looking for permanent financing in May 2007.

71. After the buy/sell negotiations ended, Poag & McEwen did not renew its search for permanent financing but instead focused its attention on attaining an extension or short-term bridge loan for the Shops.

72. Mr. Selberg testified that P&M stopped trying to find permanent financing after mid-2007. Specifically, he testified that in mid-2007 "we were not looking for permanent loan at that

time." Mr. Selberg had no memory of telling McWhinney that P&M was no longer attempting to secure permanent financing for the Shops at that time.

73. On August 14, 2008, Mr. Selberg sent a loan proposal from Capmark to McWhinney's CFO, Josh Kane (the "Capmark Proposal"). According to Mr. Selberg, it was a proposal of terms that Capmark—as a broker—would try to source. The specific terms of the Capmark Proposal were $115 million for a 3- year loan with a 12-month extension.

74. When Poag & McEwen sent this Capmark Proposal to McWhinney, it informed McWhinney that it was "pretty pricey," and that it hoped they could "work something out with JPM." McWhinney agreed. No contract with Capmark was ever signed.

75. Due to the continued poor performance of the Shops and the ever worsening financial market, Poag & McEwen did not receive any other loan offers before October 2008, even though McWhinney was consistently urging it to obtain permanent financing.

**H. Tax Appeals.**

76. The Operating Agreement included a provision that P&M would not independently contest or seek to lower the assessed value of the improved property of CLC to less than $190 per square foot without MCLC's prior consent.

77. After receiving the property taxes for the Shops in January 2008, Poag & McEwen looked into challenging the increased assessed value.

78. The next month, Poag & McEwen informed McWhinney that it was "looking into the property taxes" and asked if McWhinney had anyone who could help it review the process for challenging the tax assessment. McWhinney suggested Phil Hodgkinson, its Vice President of Property Management.

79. Poag & McEwen then called Mr. Hodgkinson, and he began assisting it with the tax appeal process.

80. Mr. Hodgkinson put Poag & McEwen in contact with the county assessor after it had missed the deadline to file a formal appeal, and he was involved in numerous discussions with P&M regarding the tax appeal.  However, while Mr. Hodgkinson was aware that Poag & McEwen was seeking to lower the taxes from an assessed value of $81 million to a value of $45 million, he was never told that this assessed value would equate to less than $190 per square foot—the amount that required McWhinney's consent.

81. In July 2008, Poag & McEwen became aware that the tax assessor was not going to decrease the tax valuation for 2007.  However, Poag & McEwen filed an appeal for the 2008 property taxes near that same time to lower the assessed value from $81 million to $45 million.  Mr. Hodgkinson was again involved in this tax appeal with Poag & McEwen.

82. It was not until the fall of 2009 that Poag & McEwen received the final appraisal for the 2007 and 2008 taxes, where it learned that the assessed value for the 2007 taxes was lowered to $56 million, and the assessed value for the 2008 taxes was lowered to $60 million.

83. After receiving the final appraisal from the tax appeals, Poag & McEwen finally sought McWhinney's consent to file the 2007 tax appeal.  Poag & McEwen had never told McWhinney that it had filed an appeal for 2008 as well.  McWhinney refused.

84. Josh Poag then told Chad McWhinney that he knew that Poag & McEwen did not have McWhinney's consent to pursue the tax appeal, and that it would dismiss the appeal.

85. However, Josh Poag had no intention of dismissing the tax appeals, did not dismiss them after McWhinney requested a second time, and only dismissed them after McWhinney sought legal recourse.

**I. CLC Distributions and Modification of the Construction Loan.**

86. During the summer of 2008, Poag & McEwen needed cash to cover the monthly interest payments that were due on its Mezzanine Loan, so it started issuing distributions from CLC as often as possible to cover these payment obligations.

87. For five straight months in the middle of 2008, Poag & McEwen made $500,000 distributions from CLC to pay the interest on its Mezzanine Loan.

88. During this time period, instead of waiting to see how much money the company had left after paying its debts, Poag & McEwen would make the distribution to themselves first and then pay off the most important debts, leaving the less important ones unpaid.

89. Poag & McEwen was also not reserving taxes for the Shops because it needed the full distribution from CLC for its Mezzanine Loan interest payments.

90. Poag & McEwen then amended the Construction Loan to an interest only loan, so that the money that had been going to pay off the principal could be used by Poag & McEwen to pay the interest on its Mezzanine Loan.

**J. 2008 Buy/Sell Negotiations.**

91. In August 2008 McWhinney and Poag & McEwen began discussing another buyout of Poag & McEwen's interest in CLC.

92. On August 28, 2008, Josh Poag sent Chad McWhinney an email stating that Poag & McEwen's interest would be valued at approximately $38 million (based on a total valuation of $190 million).

93. Poag & McEwen was "desperate" to sell its interest to McWhinney.  It did not want to appear so, and again it withheld and altered pertinent financial information from McWhinney in order to manipulate negotiations and maximize its own proceeds.

94. In fact, Josh Poag even "scrubbed" financial information before sending it to McWhinney in order to give Poag & McEwen an upper hand in negotiations.

95. These negotiations did not lead to McWhinney's purchase of Poag & McEwan's interest in CLC because McWhinney felt that its capital could be better spent elsewhere.

**K. Default of the Construction Loan.**

96. The Construction Loan was scheduled to mature on October 23, 2008.  However, at McWhinney's insistence, Poag & McEwen was able to work out a three-month extension with the Bank Group, so that the final maturity date was January 23, 2009.

97. JPM sent a notice of default to CLC on January 26, 2009 as the January 23, 2009 deadline had passed.  While the Construction Loan was in default, the Bank Group continued to attempt a workout of the loan.

98. The Bank Group first sent a term sheet to Poag & McEwen on January 28, 2009 for an extension of the Construction Loan.

99. During the discussions between McWhinney and Poag & McEwen about this proposal, McWhinney first learned that JPMIM held a veto power to any extensions or refinancing of the Construction Loan via its Intercreditor agreement with the Bank Group that was entered into in April 2007.

100. In light of this development, McWhinney was hesitant to enter into an extension until it fully understood the Mezzanine Loan documents; thus, McWhinney sought all of the loan documents from Poag & McEwen.

101. Poag & McEwen only sent the Intercreditor Agreement, stating that all of the other documents were "proprietary."

102. Nothing ever came of this January 28, 2009 term sheet from JPM.

L. **Post-Default Workout Negotiations.**

103. On February 9, 2009, Poag & McEwen sent a "Permanent Loan Notice" to McWhinney pursuant to Section 7.3 of the Operating Agreement.  This permanent loan notice was for a three-year extension of the Construction Loan, requiring a $10 million buy-down of the principal.

104. Additionally, the term sheet that was sent to McWhinney had numerous redlines, purportedly made by Poag & McEwen, and not accepted by the Bank Group.

105. McWhinney responded to this notice on February 20, 2009.  In its response, McWhinney told Poag & McEwen that it did not deem the notice a proper "Permanent Loan Notice" under Section 7.3 of the Operating Agreement; however, the parties continued to negotiate the extension with the Bank Group.

106. On March 13, 2009, Poag & McEwen sent a second "Permanent Loan Notice" to McWhinney.  This notice was for a one-year extension of the Construction Loan, which also required a $10 million buy-down of the principal.

107. McWhinney responded on March 25, 2009 by again informing Poag & McEwen that the notice was not a Permanent Loan Notice under Section 7.3 of the Operating Agreement.

108. McWhinney also rejected the proposal based on the principal buy-down terms; and that a conflict of interest existed between Poag & McEwen and JPM based on the Mezzanine Loan; and that Poag & McEwen had an inability to negotiate a loan with JPM in the sole interest of CLC.  Finally, McWhinney gave three options to Poag & McEwen of terms for loan extensions that it would agree to.

109. In early April, representatives from McWhinney and Poag & McEwen met with JPM in Chicago to discuss the defaulted Construction Loan.  At this meeting, McWhinney

brought up the conflict of interest that it believed existed between Poag & McEwen and JPM due to the Mezzanine Loan.  As a result, JPM resigned as the lead agent for the Bank Group— without citing a reason—and KeyBank N.A. ("Key Bank") took over as lead agent for the Bank Group.

110. Prior to the meeting, McWhinney and Poag & McEwen had agreed to the terms that it would jointly propose to JPM; however, after McWhinney proposed the agreed-upon terms to JPM, Poag & McEwen told JPM that it was willing to agree to JPM's less-favorable terms as well—undermining its partners.

111. At the early April meeting, McWhinney brought up the conflict of interest that it believed existed between Poag & McEwen and JPM due to the Mezzanine Loan.

112. As a result, JPM resigned as the lead agent for the Bank Group—without citing a reason—and Key Bank took over as lead agent for the Bank Group.

113. On June 23, 2009, Key Bank sent a new term sheet to Poag & McEwen for a three-year extension of the Construction Loan.

114. On September 16, 2009, representatives from McWhinney and Poag & McEwen met with Key Bank in Denver to discuss the extension.  During this meeting, Chad McWhinney gave Mark Wright from Key Bank a number of documents showing what the project was actually worth and why the Bank Group should give it a better offer.

115. Because Key Bank was not willing to give a better offer; and because McWhinney was upset with how Poag & McEwen had been handling negotiations, McWhinney informed Poag & McEwen that it was only willing to agree to the extension if Poag & McEwen paid the full $9 million buy-down, and Poag & McEwen decreased its management fee from 5% to 3.5%, and Poag & McEwen attempted to extend the term of the extension from 3 years to 5 years.

116. Due to McWhinney's issues with Poag & McEwen's ability to negotiate a loan, McWhinney served a demand for arbitration on Poag & McEwen on September 23, 2009.

117. On September 28, 2009, representatives from McWhinney, Poag & McEwen, and Key Bank had a teleconference, wherein Key Bank informed the parties that it would only forward proposals to the other members of the Bank Group if it was assured that there were no outstanding partnership issues.

**M. Foreclosure & Sale.**

118. After learning of the myriad of issues between the parties, Key Bank sent a second notice of default on October 13, 2009.  Key Bank gave the parties three days to remedy their default.  The parties did not remedy their default, so Key Bank foreclosed on the Construction Loan.  A receiver was appointed to manage the Shops in December 2009.

119. Despite the foreclosure, the partners continued to try and come up with a solution to prevent losing all of their equity in the project.

120. On December 2, 2009, McWhinney sent a letter to Poag & McEwen seeking its approval for McWhinney to purchase the Construction Loan note directly from the Bank Group.  Around this same time in November 2009, Poag & McEwen bought the Mezzanine Loan note from JPMIM for approximately $420,000—a discount of over $35 million.  Even though they failed in their plan to pay off the Mezzanine Loan from permanent loan proceeds or the sale of their ownership interest in CLC, Josh & Dan Poag were able to buy McEwen's $40 million interest in Poag & McEwen without using their money to do so.

121. Poag & McEwen replied promptly to this letter on December 7, 2009, stating that any attempt by McWhinney to purchase the note would constitute a breach of its duty of loyalty.

122. An extension proposal that was agreed upon by both McWhinney and Poag & McEwen was sent to Key Bank on December 16, 2009.  However, the Bank Group rejected that proposal in January 2010.

123. The Shops were sold at foreclosure to the Bank Group for $85 million on June 30, 2010.

124. The Bank Group then put the Shops up for sale.  McWhinney made an offer of approximately $70 million to purchase the Shops from the Bank Group.  However, McWhinney was outbid by G&I VI Promenade, LLC ("G&I") which purchased the Shops in December 2010. G&I then contracted with Poag & McEwen—under the new entity Poag Lifestyle Centers, LLC ("PLC")—to be the manager at the Shops.  PLC remains the manager of the Shops to this day.

125. On November 3, 2010—after the Shops had been sold at foreclosure—the parties entered into a stipulated dismissal of their arbitration action.

126. As a part of this stipulation, the parties agreed that the statute of limitations for all of the claims and counter-claims raised in the proceeding was to be deemed tolled for the duration of the arbitration action.

127. After its failure to purchase the Shops in December 2010, McWhinney initiated an action against Poag & McEwen on May 27, 2011.

128. McWhinney's breach of contract claim was timely brought before the state court.

**III. CONCLUSIONS OF LAW ADOPTED FROM THE PHASE 1 JUDGMENT.**

**A. Summary of Findings Against P&M.**

129. The court finds, by a preponderance of the evidence, that P&M's breaches of the Operating Agreement which surrounded the receipt of the Mezzanine Loan and use of those proceeds to buy out McEwen were accompanied by gross negligence or willful misconduct and

were actions from which P&M derived improper personal benefit.  The following is a summary of the evidence that supports that finding:

(1) Josh Poag and Dan Poag, through P&M, used CLC and the Shops to secretly secure a $40 million loan from JPMIM and used the proceeds of that loan to buy out McEwen's interest in P&M;

(2) The Poags, through P&M, intentionally kept important details and the purpose of the $40 million loan from McWhinney for more than two years;

(3) The $40 million loan agreement secretly gave JPMIM significant authority to make management decisions for CLC.  This change in decision making amounted to *de facto* changes in the Operating Agreement.  McWhinney did not consent or know of these changes when the changes were agreed to by P&M;

(4) The proceeds from the $40 million loan were used solely for the benefit of P&M and the Poags, and did not benefit the Shops, CLC, or McWhinney;

(5) As part of the $40 million loan, P&M required MCLC to sign an amendment to the Operating Agreement.  However, P&M obtained the consent of MCLC without disclosing material facts concerning the $40 million loan;

(6) P&M failed to disclose to McWhinney that in order to get the loan, P&M had to approve agreements giving JPMIM veto power over the future refinancing of the construction loan;

(7) P&M obtained the $40 million loan proceeds and immediately used those proceeds to acquire McEwen's ownership interest in P&M;

(8) Days after P&M received and paid the $40 million to McEwen in 2007, P&M secretly informed JPM that P&M was no longer interested in obtaining a permanent loan for the Shops and CLC, and then it demanded that McWhinney purchase P&M's interest in CLC;

(9) After that time, P&M did not make good faith efforts to obtain permanent financing for CLC before CLC defaulted on the Construction Loan;

(10) For example, Josh Poag, on behalf of P&M, told the CFO for P&M that he "let the [construction] loan go into default" and that he "had the ability to get a permanent loan" before the default on the Construction Loan;

(11) P&M's inability to secure permanent financing before April 2007 was the result of its attempts to secure a loan which would pay off the $116 million construction loan and pay $40 million to P&M so that it could buy out McEwen's interest in P&M;

(12) P&M brought a tax appeal concerning CLC, which was contrary to the interests of McWhinney, when Josh Poag knew that he did not have the right to pursue that appeal under the Operating Agreement.

(13) The above summarized conduct involved numerous breaches of the Operating Agreement by P&M.

**B. <u>Governing Law & Burden of Proof</u>.**

130. The Operating Agreement contains a choice of law provision which states that both the Operating Agreement and the company (CLC) "shall be governed by and construed in accordance with the laws of the State of Delaware." Operating Agreement, § 10.1.

131. Choice of law provisions are enforceable in Colorado. *See Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 113 (Colo. App. 1994). To interpret choice of law provisions, Colorado applies the Restatement (Second) of Conflict of Laws § 187 (1971), and the law chosen

by the parties will apply "unless there is no reasonable basis for their choice or unless applying the chosen state's law would be contrary to the fundamental policy of the state whose law would otherwise govern." *Target Corp. v. Prestige Maintenance USA, Ltd.*, 351 P.3d 493, 497 (Colo. App. 2013).

132. There is a reasonable basis for the parties' choice of Delaware law because all of the Poag & McEwen entities were formed in Delaware, and there have been no allegations that applying Delaware law would be contrary to Colorado law. Therefore, the law of Delaware applies except as discussed below.

133. The choice of law provision in the Operating Agreement is drafted narrowly and only applies to contract claims—not tort claims; therefore, Delaware law applies to McWhinney's breach of contract and indemnity claims, and to Poag & McEwen's breach of contract and breach of good faith and fair dealing claims. Colorado law applies for all other claims.

134. Under both Colorado and Delaware law, the burden of proof for a civil claim or affirmative defense is generally on the party bringing the claim or defense. *See Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1057 (Colo. 1992); *Williams v. Vertical Blind Factory*, 2009 WL 5604428,*1,*3 (Del. Com. Pl. Nov. 17, 2009). Except as discussed below, parties in a civil action must meet their burden of proof by establishing each element of a claim or affirmative defense by a preponderance of the evidence. C.R.S. § 13-25-127(1); *Meyer & Meyer, Inc. v. Brooks*, 2009 WL 2778426, *1, *3 (Del. Com. Pl. May 19, 2009). Black's Law Dictionary (10th ed. 2014), defines preponderance of the evidence as "the greater weight of evidence."

135. Under both Colorado and Delaware law, fraud must be proved by clear and convincing evidence, a higher degree of proof than preponderance of the evidence. *See Cox v. Johnston*, 484 P.2d 116, 118 (Colo. App. 1971); *Byrd v. Westaff USA, Inc.*, 2011 WL 3275156, *2 (Del. Super. Ct. July 29, 2011).

136. Waiver must also be proved by clear and convincing evidence. *Williams v. Gulick*, 461 P.2d 211, 214 (Colo. 1969); *Eureka VIII, LLC v. Niagara Falls Holdings, LLC*, 899 A.2d 95, 109–10 fn. 27 (Del. Ch. 2006).

### C. McWhinney's Breach of Contract Claim.

137. Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendants; and (3) resulting damages to the plaintiff. *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

### 1. P&M's Duties Under the Operating Agreement.

138. Under Delaware law, managers of an LLC owe the traditional fiduciary duties of loyalty and care to the LLC and its members. *Feeley v. NHAOCG LLC*, 62 A.3d 649, 660, fn. 1 (Del. Ch. 2012). However, 6 Del. C. § 18-1101(c) permits the members of an LLC to modify or eliminate those fiduciary duties, and Delaware courts have interpreted this section to mean that managers owe these fiduciary duties unless explicit contrary provisions exist within the LLC agreement. *See Feeley*, 62 A.3d at 660, fn. 1.

139. The Operating Agreement explicitly provides for the duties of loyalty and care, as well as the duties of good faith and fair dealing. Section 6.1 of the Operating Agreement provides that P&M—as the manager of CLC—owes duties of good faith, loyalty, and fair dealing to CLC.

140. The duty of loyalty mandates that the best interest of the company and its members take precedence over any individual interest possessed by the manager. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). A manager should not only affirmatively protect the interests of the company but should also "refrain from doing anything that would work injury to the corporation" (citing *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939)). The duty of loyalty "requires an undivided and unselfish loyalty to the company and demands that there be no conflict between duty and self-interest." The duty of loyalty includes a duty that the manager act in good faith, which is "a subsidiary element" of the duty of loyalty. *In re Rural/Metro Corp. Stockholders Lit.*, 102 A.3d 205, 252-53 (Del. Ch. 2014). A breach of this duty to act in good faith—acting in bad faith—can be shown when the manager's actions are committed for a purpose other than the best interests of the company. *See id.* at 253, fn. 26.

141. The duty of fair dealing imposes a duty of candor. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). In order to satisfy this duty of candor, completeness is required, and the manager must disclose all information which a reasonable member would consider important in deciding on a transaction. *Wacht v. Continental Hosts, Ltd.*, 1986 WL 4492, *2 (Del. Ch. April 11, 1986).

142. While the Operating Agreement does not provide that these duties are also owed to the members of CLC, there is no explicit language that these duties do not extend to the members. Based on the absence of explicit contrary language, P&M also owed the duty of loyalty found in Section 6.1 to MCLC.

143. Section 6.4 of the Operating Agreement provides that P&M—as the manager of CLC—shall manage CLC "in a prudent and businesslike manner." This language encapsulates and extends the traditional fiduciary duty of care and that P&M owed this duty to both CLC and

MCLC.  The duty of good faith requires that a manager act on an informed basis.  *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 367 (Del. 1993).  However, Section 6.4 of the Operating Agreement not only requires that manager be informed (businesslike), but also that the manager act prudently.  Merriam-Webster defines "prudent" as "having or showing careful good judgment."  So not only was P&M required to be informed, but it was also required to show good judgment.

144. Section 6.6 of the Operating Agreement further provides that each member (MCLC and P&M) owes duties of good faith and fair dealing to CLC and to the other member.  So, while Section 6.1 only imposed duties of good faith and fair dealing as to CLC, Section 6.6 extends those duties to the members.  Therefore, P&M owed the duties of good faith and fair dealing to both CLC and MCLC.

145. The only limitations to any of these duties are found in Section 6.4(a) of the Operating Agreement, which provides that P&M shall not be restricted from participating in "other business activities," even if those activities are competitive with the Shops.  This clause slightly limits the duty of loyalty by allowing P&M to participate in business deals that are completely separate from the Shops, yet have an adverse effect on the Shops.

146. Therefore, other than the slight limitation, the Operating Agreement provides that P&M owed the duties of care, loyalty, good faith, and fair dealing to both CLC and MCLC.

147. Section 6.6(a) of the Operating Agreement provides that P&M shall not be liable to CLC or MCLC for any actions, omissions, or errors of judgment performed "in good faith and reasonably believed to be in the best interest" of CLC.  However, Section 6.6(a) of the Operating Agreement provides that P&M shall be liable to CLC and MCLC for actions or omissions

involving "actual fraud, gross negligence, or willful misconduct or from which [P&M] derived improper personal benefit."

    2. <u>Breach of Contract: Purchase of the $155 Million Forward Swap</u>.

148. The forward swap was a business decision, and in Delaware there is a presumption that in making a business decision, the manager of the company "acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *In re Walt Disney Co. Derivative Litigation*, 906 A.2d 27, 52 (Del. 2006). This presumption is known as the business judgment rule. However, this presumption can be rebutted if the plaintiff shows that the manager breached its fiduciary duties of care or loyalty or acted in bad faith.

149. McWhinney rebutted this presumption by establishing that this decision was a breach of P&M's fiduciary duties.

150. Here, the duty of care was to act in a "prudent and businesslike manner." *See* Operating Agreement at § 6.4(a). However, P&M's decision to enter into a forward swap was not an act of good judgment or prudence. Brian Kelly, an expert in banking and financing, testified at the state court trial that P&M's decision was "tantamount to, you know, somebody going out and buying a ten year extended warranty on a car that they haven't purchased nor have they any expectation that they can purchase it. It is just strictly, in my mind, a cart before the horse kind of—kind of decision." Mr. Kelly further testified that such a decision was unprecedented in his lifetime of working in the finance and banking industry. Mr. Kelly testified that in 30 years in the banking and finance industry he had never seen anyone purchase a forward swap without either having a loan already in place or close to closing.

151. When P&M purchased this swap, P&M had never received any indication from a bank that it could enter a permanent loan of that magnitude, and P&M simply gambled that the Shops would reach a point where a bank would be willing to loan $155 million in the near future. Mr. Kelly further testified that this forward swap was "very risky," and that it "made no sense." Even Josh Poag, the person who obtained the forward swap, described swaps as "aggressive" and "unnecessarily risky."  P&M's banking expert, Gary Schwartz, offered no opinion on the propriety of the $155,000,000 forward swap.

152. No loan was ever obtained within the 18-month timeframe of the forward swap. CLC had to pay $7.5 million to settle the swap without ever receiving the benefits of permanent financing for the Shops.  Therefore, the forward swap ended up costing CLC $7.5 million with no benefits received.

153. This purchase of the $155 million forward swap was also a breach of P&M's duty of loyalty.  Josh Poag apparently believed that by entering into the swap, he could convince investors that their $40 million loan would be repaid quickly from the proceeds of a permanent loan.

154. The forward swap purchase was for the individual benefit of P&M, Dan Poag, and Josh Poag, as well as for PMLC.  Because the purpose of this swap was in large part for the personal benefit of the Poags and P&M—not CLC or the Shops—they breached their duties of good faith and loyalty in purchasing the forward swap.

155. P&M breached its duty of candor because it failed to disclose the purpose of the swap or that the essential benefit of the swap was not for the Shops or CLC.

156. The breach was also accompanied by both gross negligence and willful misconduct. It was gross negligence to enter into a commitment which risked $7.5 million when P&M had

never received any indication from a bank that it could obtain a permanent loan of $155 million, and P&M simply gambled that the Shops would reach a point where a bank would be willing to loan $155 million in the near future.  Moreover, this was an unprecedented step and "made no sense" according to banking expert Brian Kelly, and it was risky according to Josh Poag.

157. Further, it was willful misconduct to enter into this forward swap.  The forward swap was an effort by Josh Poag to convince private investors that he had or was close to obtaining permanent financing for $155 million so that he could obtain $40 million to purchase McEwen's share of the Poag and McEwen businesses.  However, Josh Poag was not close to obtaining that financing, never obtained that financing, and set the amount at $155 million so that he would receive enough proceeds to pay back the $40 million to the investors.  The forward swap was part of the effort to obtain the money to pay for McEwen's share of the businesses from the financing for the Shops, and this effort was willful misconduct.

158. P&M is liable to MCLC under Section 6.6(a) of the Operating Agreement for damages.

3. <u>Breach of Contract: The $40 Million Loan to Pay Off Terry McEwen</u>.

159. P&M owed fiduciary duties to MCLC and CLC with respect to the Mezzanine Loan transaction.  P&M's entry into, and concealment of, the Mezzanine Loan constituted material breaches of its fiduciary duties to MCLC and CLC.

160. The first issue with the Mezzanine Loan was the authority P&M gave in this agreement for JPMIM to make management decisions for CLC.  While Poag & McEwen only pledged its ownership interest in CLC as collateral—as opposed to putting up the Shops themselves as collateral—the Mezzanine Loan Agreement gave JPMIM a significant authority over the management of CLC and the Shops.  Specifically, in the Mezzanine Loan Agreement,

Poag & McEwen agreed that JPMIM's consent was necessary in order to: (1) make material alterations at the Shops, § 5.4.2; (2) assign leases at the Shops, § 5.10.1; (3) modify the Management Agreement between McWhinney and Poag & McEwen in any way, § 5.12.1; (4) change the business of the Shops, § 5.14; (5) seek any zoning change for the Shops, § 5.17; and (6) refinance or modify the Construction Loan, § 9.1- 9.4.  Further, in the Intercreditor Agreement between JPM and JPMIM, JPM agreed that JPMIM's consent was necessary for any modification to the Construction Loan.

161. All of these rights given to JPMIM had a major impact on the management structure of the Shops.  McWhinney and Poag & McEwen spent years negotiating the Operating Agreement and how decisions would be made for CLC.  P&M changed the essence of the Operating Agreement dramatically without the consent of its co-owners, and this was a direct violation of its contractual-fiduciary duties to McWhinney under the Operating Agreement.  P&M breached its duties of loyalty and good faith in doing so because the only reason P&M entered into this agreement and gave JPMIM this authority was so that the Poags could buy-out McEwen with the $40 million from the loan.  P&M's decision was solely for the benefit of Poag & McEwen and was not in the best interest of CLC.

162. The second issue with the Mezzanine Loan was P&M's concealment of the purpose of the loan.  McWhinney repeatedly asked for the details and documentation concerning the loan.  However, it was only ever informed that it was a "corporate financing" and was never given an amount.  It was never told that the money was to buyout McEwen's interest.  The testimony was unequivocal that Dan and Josh Poag actively sought to keep these details secret from McWhinney.  Dan Poag admitted as much in an email to Josh Poag where he stated that they would require a nondisclosure of McEwen's buyout "to anyone."

163. Even after McWhinney knew more of the details surrounding the loan, Josh Poag refused to give it the loan documents because they were "proprietary", and McWhinney was never able to obtain the actual buyout agreement between the Poags and McEwen.  Josh and Dan Poag did not disclose the details surrounding the Mezzanine Loan for fear of harm to their reputation and business.  The Poags were worried that if news of the buyout got out, people would lose their faith in Poag & McEwen and stop doing business with them.  Therefore, they hid this information from everyone, including their partners to whom they owed fiduciary duties.

164. By not telling McWhinney that the "McEwen" of Poag & McEwen was leaving, and by their failures to disclose the details of the loan, the Poags breached the duties of fair dealing and candor.  Ultimately the misrepresentations and active concealment may even have amounted to fraud.  *See Vichi v. Koninklijke Philips Electronics*, N.V., 85 A.3d 725, 774 (Del. Ch. 2014) (holding that active concealment of facts that prevents their discovery is a "false representation" for purposes of fraud).  The misrepresentations and active concealment were, however, at least willful misconduct.

165. The third issue with the Mezzanine Loan was that P&M required MCLC to agree to an amendment of the Operating Agreement in order for Poag & McEwen to acquire the Mezzanine Loan.  However, Poag & McEwen did not disclose significant details surrounding the reason for the amendment and made misrepresentations to McWhinney in order to induce it to sign the amendment.  At no point did Josh Poag or any P&M representative make the requisite "full disclosure of all material facts": i.e., P&M admittedly sought and obtained McWhinney's consent without disclosing:

(1) JP Morgan had originally asked Poag & McEwen to obtain McWhinney's consent to the actual $40 million Mezzanine Loan;

(2) Josh Poag refused to seek McWhinney's consent for fear of McWhinney asking "more questions and then their hands out;"

(3) afterwards, JPM convinced JPMIM to accept McWhinney's consent to the amendment as an alternative;

(4) the size, structure and intended use of the Mezzanine Loan;

(5) the fact that, per Dan Poag, a mezzanine loan amounted to a "second mortgage" on the Shops;

(6) the fact that, per KeyBank, the Mezzanine Loan put JPMIM within the Shops' "capital stack" or "ownership structure;"

(7) the fact that, to get the $40 million, Poag & McEwen had to sign and/or approve agreements giving JPMIM control over various aspects of the joint venture's operations and veto power over the future refinancing of the Construction Loan;

(8) the fact that Poag & McEwen transferred its ownership in the joint venture to a newly formed entity without consideration;

(9) the fact that McEwen's (never produced) buyout agreement did not require him to do anything to receive his salary after he got his $40 million; and

(10) the fact that Poag & McEwen's secret plan prevented it from pursuing or accepting multiple permanent loan "bids" because none would have netted Josh and Dan Poag the $40 million needed to pay McEwen.

166. P&M's conduct violated duties of fair dealing and candor and was at least willful misconduct.

167. The fourth issue with the Mezzanine Loan was P&M's concealment of the effect of the loan on CLC.  P&M made false representations to McWhinney on multiple occasions by

telling it that the Mezzanine Loan had no effect on the partnership or on P&M's ability to obtain financing.  It was not until January 2009—almost two full years after the Mezzanine Loan was entered into—that McWhinney learned of JPMIM's rights over the management of CLC.  Poag & McEwen's consistent concealment of the effect of the Mezzanine Loan left McWhinney in a situation where—when it finally knew everything—it was too late to cure Poag & McEwen's breach or protect themselves from the loss of the Shops.  By intentionally hiding and making false representations about the details of the Mezzanine Loan from McWhinney, Poag & McEwen committed fraud and willful misconduct and breached its duties of fair dealing and candor.

168. The final issue with the Mezzanine Loan was the effect it had on P&M's ability to find a permanent loan for CLC.  Poag & McEwen entered into the Mezzanine Loan because it was confident it would receive $40 million in proceeds from the permanent loans on the Shops and on Dos Lagos.  After coming up with this plan, P&M never pursued a permanent loan that would not give it the necessary proceeds to pay off the Mezzanine Loan and the $116 million Construction Loan.  It received numerous proposals for permanent loans from banks.  However, it turned all of these proposals down without informing McWhinney of their existence because the proceeds were not high enough for it to pay off its Mezzanine Loan and the Construction Loan.

169. For example, on November 10, 2006, a representative of JPM, Patrick Gillan, presented P&M with five different permanent loan bank bids.  At the state court trial, Gillan testified the bids were made after "substantial conversations and review of materials" by the individual banks.  The bid terms were generous (i.e., allowed for the full payoff of the existing construction loans plus millions of additional dollars in "net proceeds") as a result of what Gillan

and several others testified were very "favorable" and "aggressive" market conditions then favoring borrowers.  Indeed, per Gillan, this is when banks were "aggressive in terms of people's valuations and what they were willing to do" and even willing to lend "90 percent loan-to-value."

170. Given such "aggressive," "favorable," and "borrower friendly" conditions, Selberg admitted that in 2006-07 it would have been easier to close a permanent loan than the Mezzanine Loan Poag & McEwen ultimately obtained, because "lenders were wanting to do loans like that." Selberg further admitted each of the five bank bids were time sensitive and "functionally worthless" if not acted upon immediately.

171. Yet, in breach of its contractual and fiduciary duties, P&M and its principals admittedly did not pursue these refinancing opportunities.  P&M squandered opportunities to obtain a permanent loan in 2006 and 2007 to instead pursue its secret plan to get the $40 million to buy out McEwen.  It did so even though: (1) all five bids proposed permanent loans based on the Shops "current condition" as  opposed to their "fully stabilized condition"; (2) any one of the proposed loans would have fully paid off the joint venture's Construction Loan, McWhinney's land preference, and provided Poag & McEwen another $7,500,000-$27,500,000 in net proceeds; and (3) Bank of America's proposal would have provided another $20,000,000 "earnout" after stabilization of the Shops and Dos Lagos.

172. Josh Poag testified he did not remember why P&M failed to follow-up on any of these five bids.  He and Selberg contrarily testified they intentionally failed to follow-up because, in their opinion, the Shops were not yet "ready" for a permanent loan.  Instead, Josh Poag instructed Selberg to inform JPM that P&M was no longer seeking a permanent loan.

173. In addition to these bids, there were other loan proposals that Poag & McEwen turned down without informing McWhinney of their existence because the proceeds were not high enough.  This conduct was a breach of P&M's duties of good faith and loyalty as it was in CLC's best interest to close on any of these proposed permanent loans.  But it was in Poag & McEwen's interest to put on a permanent loan of at least $155 million.

174. These interrelated breaches of P&M's duties of loyalty, good faith, and fair dealing were material.  The breaches went to the essence of the parties' agreement.  P&M had clearly negotiated what the rights of each partner was, and for one partner to give away rights to a third party without the other partner's consent, and then hide it for two years.  This was material.

175. McWhinney lost the benefit of the contract because it now had a partner who could not find a loan that was in the company's best interest due to its personal, conflicting interest, and Poag & McEwen could not remedy this breach.  Therefore, as of the date that the Mezzanine Loan was entered into, April 23, 2007, MCLC was no longer obligated to perform under the contract because of P&M's material breaches of the Operating Agreement.

4. Breach of Contract: P&M's Conduct During Sales Negotiations.

176. Another series of breaches of the Operating Agreement occurred between the spring and fall of 2007 when the parties were negotiating McWhinney's buyout of Poag & McEwen's interest in CLC.

177. The parties began negotiating the sale of P&M's interest in CLC to MCLC in May 2007.  At this time, Poag & McEwen changed its strategy on how to pay off the $40 million Mezzanine Loan.  Instead of trying to get the capital to pay off the Mezzanine Loan from permanent loan proceeds, it decided that it would pay the loan off with proceeds from the sale of its interest in CLC to McWhinney. Poag & McEwen informed JPMIM that this was their "exit

strategy."  It also informed JPM, at this same time, that it was no longer interested in procuring a permanent loan for the Shops.  However, McWhinney was never told about this de facto repudiation of P&M's contractual duty even when, on July 10, 2007, McWhinney's then-CFO, Ken Howell, inquired "Are you guys moving forward on increasing the financing on the [Shops]?  Where do you stand with JP Morgan?"

178. Poag & McEwen's decision to stop looking for financing—and failure to disclose to McWhinney that it was no longer looking for financing—constituted a breach of its duties to McWhinney.  This was a further material breach because finding a permanent loan was essential to the Operating Agreement.

179. Further, during the course of the sales negotiations, Poag & McEwen intentionally withheld important financial information from McWhinney to use as a "tool in their negotiations."  Josh Poag described this as a "scrub" of the documents before they were provided to McWhinney.  This improper withholding of information was a breach of the duties of good faith and fair dealing.

180. The Operating Agreement allowed for one partner to purchase the ownership interest of the other.  However, the members owed duties of good faith and fair dealing to each other in this process. P&M's deliberate concealment and withholding of relevant financial information and other conduct directly breached its duties of candor and fair dealing.

181. Also, the fact that the only purpose for withholding this information was in order to maximize P&M's profits at the direct expense of McWhinney demonstrates that P&M breached its duty of good faith.  Nothing about P&M's withholding of information was in CLC's best interest.

182. P&M also used the Loveland City Council meeting as another tool in its negotiations by threatening McWhinney if it did not waive its right to conduct due diligence and sign the letter of intent immediately.  When McWhinney refused to do so, Poag & McEwen made a public statement at the city council meeting that the Shops were overbuilt and in a precarious financial state.  These statements were made even though Poag & McEwen had continued to inform McWhinney— and third-party financial institutions—that the Shops had been doing well financially (in order to maximize the value of their interest).

183. All of these tactics were in bad faith and breached the duty of fair dealing.  Further, the change in Poag & McEwen's story about the Shops' performance demonstrates its interest in tailoring facts to advance its own personal interests.

184. Throughout these negotiations, Poag & McEwen's actions were based on its financial best interest, which was in direct conflict to the duties that it owed McWhinney and CLC as manager of the company.

### 5. Breach of Contract: P&M's Tax Appeals.

185. Section 6.2(m) of the Operating Agreement states that P&M will not contest the property taxes at the Shops below a valuation of $190 per square foot without McWhinney's prior approval.  However, it is undisputed for the years 2007 and 2008, P&M did contest the property taxes of the Shops at a valuation below $190 per square foot. Josh Poag also admitted that P&M never had McWhinney's approval to do so.

186. McWhinney referred P&M to Phil Hodgkinson, McWhinney's VP of Property Management, to assist in looking into tax appeals for 2007 and 2008.  While it is true that Mr. Hodgkinson was involved in P&M's filing of the tax appeals, his involvement cannot be considered approval by McWhinney.

187. First, Mr. Hodgkinson was only involved to the extent that he gave local knowledge and facilitated introductions.  Mr. Hodgkinson did not know that the appeals were going to be seeking valuations lower than $190 per square foot.

188. Further, McWhinney referred Poag & McEwen to Mr. Hodgkinson when Poag & McEwen was asking who at McWhinney had local knowledge about the process for filing a tax appeal.  McWhinney could not have considered this referral to constitute its approval of P&M's filing two tax appeals below the $190 per square foot threshold.  Additionally, Mr. Hodgkinson did not have the authority to speak on behalf of McWhinney.  Finally, just because he stayed involved with the tax appeals for a significant period of time did not mean that Doug Hill or Chad McWhinney—individuals who did have the authority to speak on behalf of McWhinney— had any idea that Poag & McEwen were appealing the taxes at a valuation below $190 per square foot.

189. Therefore, McWhinney's silence could not be considered acquiescence to, or ratification of, the tax appeals.  Because Poag & McEwen challenged the property taxes in 2007 and 2008 below a valuation of $190 per square foot without McWhinney's approval, P&M breached Section 6.2(m) of the Operating Agreement.

190. Significantly, after McWhinney learned of these improperly filed tax appeals, Chad McWhinney and Josh Poag had a conversation wherein Josh Poag promised to dismiss them. However, Josh Poag testified at the state court trial that he had no intention to dismiss the tax appeals when he made that promise to McWhinney, and P&M did not dismiss the tax appeals after further requests by McWhinney.  It was not until McWhinney sought legal recourse that the tax appeals were finally dismissed.

191. P&M's fraudulent misrepresentations and failure to remedy its breach constituted further breaches of its duties of good faith and fair dealing. Josh Poag specifically told Selberg in an email that Josh Poag told Chad McWhinney that Poag knew that McWhinney did not approve the tax appeals.

6. Breach of Contract: Improper Distributions from CLC.

192. In the summer of 2008, at a time when the markets were suffering and the Shops were still not fully leased, P&M made significant cash distributions from CLC on a monthly basis. Poag & McEwen needed cash to make interest payments on its Mezzanine Loan and all of the money that it distributed during this time period went to the Mezzanine Loan. There was also evidence—including the state court testimony of David McGowan, a forensic accountant— that CLC did not have enough cash to make these distributions and that vendors were not being paid. Poag & McEwen's theory appeared to be "pay ourselves first and then pay the debts of the company second."

193. Section 5.1 the Operating Agreement provides that P&M—as the manager of CLC—had the sole discretion to determine when distributions should be made and the total amount to be distributed. These distributions were a breach of P&M's fiduciary duty of loyalty.

194. P&M's purpose for these distributions was for its own personal gain (making interest payments on its Mezzanine Loan), and these distributions were not in the best interest of CLC.

195. CLC did not have enough capital to make all of these distributions, but P&M made them to pay its individual debts.

196. P&M's improper CLC distributions constituted a breach of P&M's duties and amounted to willful misconduct.

7. Breach of Contract: Failure to Give Permanent Loan Notice before the Maturity Date.

197. Section 7.3(a) of the Operating Agreement provides: "Prior to the maturity date of the Construction Loan, [P&M] shall submit to [MCLC] in writing the terms proposed for the Permanent Loan, including the maximum loan amount, maturity date, interest rate, fees to the lender, repayment terms and other material terms (the Permanent Loan Notice)." Section 7.3(a) required that P&M send the written terms of the permanent loan to MCLC and send them before the maturity date of the Construction Loan.

198. Prior to January 23, 2009, the final maturity date of the Construction Loan, the only terms for a loan McWhinney had seen were from the Capmark Proposal. The Capmark Proposal was not a proper Permanent Loan Notice under Section 7.3(a).

199. First, the Capmark Proposal was not a commitment by Capmark—as financier— to give CLC a loan based on the terms. Rather, Capmark was acting as a broker, and the terms it sent to P&M were terms that it hoped it could acquire from a financial institution. These were not terms that could be immediately closed on, as no financial institution had agreed to those terms. However, to be a Permanent Loan Notice under Section 7.2(a), the terms had to be such where P&M could close on them after acquiring MCLC's approval (i.e. a term sheet). This Capmark Proposal was not a term sheet.

200. Second, the Permanent Loan Notice—as contemplated in Section 7.3(a)— required that P&M was willing to close on the terms after acquiring MCLC's approval. But when P&M sent the Capmark Proposal to MCLC, P&M stated that the terms were "pretty pricey" and that it was hoping to work out a deal with JPM. Therefore, even if MCLC had approved of the terms, it was clear that P&M was not interested in Capmark's deal at the time it was sent to MCLC. The

Capmark Proposal was not a Permanent Loan Notice when Poag & McEwen had no interest in entering into those terms at the time it sent it to McWhinney.

201. Third, P&M emailed the Capmark Proposal to MCLC.  However, Section 10.6 required that all notices be personally delivered or mailed to McWhinney's corporate headquarters.  If the Capmark Proposal was intended to be a Permanent Loan Notice, then it would have had to be sent according to the notice requirements in the Operating Agreement.

202. Waiver requires intent to waive and must be shown by clear and convincing evidence.  *See AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005); *Weyerhaeuser Co. v. Domtar Corp.*, 204 F. Supp. 3d 731, 740 (D. Del. 2016). McWhinney did not intend to waive the notice requirement in Section 10.6 of the Operating Agreement.

203. Finally, the terms of the loan in the Capmark Proposal did not constitute a "permanent loan."  Therefore, sending the proposal to McWhinney could not constitute a Permanent Loan Notice.  "Permanent Loan" is defined in Section 1 of the Operating Agreement as "the refinancing of the Construction Loan at or prior to the maturity date of the Construction Loan or any subsequent refinancing of the Permanent Loan."  Of note, this definition does not give any length of term for a loan to be a "permanent loan."

204. The definition of the term "Permanent Loan," as used in the Operating Agreement, contains a duration component and the parties intended that definition to be based on the standard industry definition of permanent loan.

205. A construction loan is a short-term, high-interest loan.  And a bridge loan is a 2-5 year loan that is used when a construction loan is about to mature but the owner is not ready to

put on a permanent loan—it therefore "bridges" the time period between a construction loan and a permanent loan.

206. The loan in the Capmark Proposal was not for a permanent loan because it was not a long-term, low-interest loan.  Rather, it was for a bridge loan.  Because bridge loans and permanent loans are two separate types of loans, this bridge loan cannot be considered a "Permanent Loan" under the Operating Agreement.  Therefore, the Capmark Proposal was not a Permanent Loan Notice.

207. No other loan proposals were sent by P&M to MCLC prior to the maturity date of the Construction Loan.  Therefore, P&M breached Section 7.3(a) by failing to submit to McWhinney a Permanent Loan Notice.

208. This failure was not due to the impossibility of obtaining a permanent loan on account of the financial crisis.  While it may have been impossible for Poag & McEwen to obtain a $155 million permanent loan, it could have obtained a permanent loan for the entire amount of the Construction Loan.

209. Specifically, Poag & McEwen received numerous permanent loan offers in 2006 and 2007 that would have fully paid off the Construction Loan and McWhinney's preferred return.  Further, Poag & McEwen were able to secure a permanent loan for Dos Lagos during the same period—a similar property with similar occupancy.  Also, there were loans available in 2008 and 2009, although those loans probably would not have covered the $116 million Construction Loan and would not have favorable terms.  Poag & McEwen was unable to find a permanent loan because it waited too long and sought to leverage the property too high, and Poag & McEwen was responsible for that waiting and leveraging.  *See Martin v. Star Pub. Co.*, 126 A.2d 238, 242-43 (Del. 1956) ("In all the cases holding that the promisor was discharged from duty by

impossibility of performance or frustration of purpose, it has been assumed that the promisor was not himself the responsible cause of the impossibility or frustration.") (internal quotations omitted).

210. P&M's breach was material.  Section 2.3 of the Operating Agreement lists two main purposes of CLC.  The second purpose of the company was to find a construction loan and refinance it with a permanent loan.  Not finding refinancing before the Construction Loan matured directly breached the purpose of the Operating Agreement and the purpose of the parties' joint venture.  While P&M materially breached the Operating Agreement in April 2007, this second material breach further insured that CLC would eventually lose its only asset.

211. Even though P&M sent two documents titled "Permanent Loan Notices" to MCLC shortly after the maturity date in February and March of 2009, the breach was still material as neither complied with the bargained-for requirements of Section 7.3(a).  First, they were untimely, as Section 7.3(a) required P&M to "send a written notice to MCLC of the proposed terms for the Permanent Loan . . . prior to the maturity date of the Construction Loan." (emphasis added).  Both of these alleged permanent loan notices were sent after the maturity date of the Construction Loan. Second, they did not set forth terms for a new loan to replace or "take out" the existing $116 million Construction Loan.  Rather, they suggested a high-cost ($10 million) additional extension of the existing loan already in default.  Third, neither set forth "all material terms" for the extension, much less evidenced the Bank Group's "commitment" to approve the extension because Poag & McEwen later rejected the extension after the Bank Group demanded a 75% LTV performance covenant.

8. <u>Breach of Contract: Failure to Give Permanent Loan Impasse Notice</u>.

212. In conjunction with P&M's failure to give MCLC a Permanent Loan Notice before the maturity date of the Construction Loan, P&M also failed to send McWhinney a Permanent Loan Impasse Notice.  Once the maturity date for the Construction Loan had passed, P&M had a duty under Section 7.3(a) to send a Permanent Loan Impasse Notice to McWhinney.  This was never done, and therefore, P&M breached this duty.

213. Had P&M sent this notice to McWhinney, the buy-sell provision of Section 7.4 would have been triggered and MCLC would have had the opportunity to buyout P&M's interest in CLC.  If MCLC had elected to forgo its right to buyout P&M, P&M could have entered into a loan agreement without McWhinney's consent.

214. P&M's breach, in conjunction with the failure to send McWhinney a Permanent Loan Notice, constituted a material breach.

**IV. FINDINGS AND CONCLUSIONS ADOPTED CONCERNING PHASE I DAMAGES.**

215. P&M had contractual obligations to MCLC, and that P&M breached contractual obligations to MCLC.  P&M's breaches of contract resulted in, led to, and caused McWhinney damages.

216. There were three areas of damages suffered by MCLC that were the result of, or caused by, P&M's breaches.  The first area of these damages suffered by MCLC is the costs related to the filing of the tax appeals.  P&M did not have any right to instigate these tax appeals without MCLC's consent—and Josh Poag admitted that P&M did not have MCLC's consent.  Filing these tax appeals with knowledge that they were filed without authority constituted willful

misconduct, and cost CLC $12,065.  As 50% owners of CLC, P&M is liable to MCLC for damages of one half of that sum, or $6,032.50 for costs associated with the tax appeals.

217. The second area of damages suffered by MCLC involves the $7.5 million paid by CLC to sell the $155 million forward swap.  P&M's decision to enter into the forward swap on behalf of CLC was an imprudent gamble that rose to the level of gross negligence, and that P&M used the swap as a tool to obtain the $40 million loan.  In addition, P&M derived an improper personal benefit from entering into this swap.  As 50% owners of CLC, P&M is liable to MCLC for half of the cost of the forward swap, or $3.75 million.

218. The final area of damages suffered by MCLC is its loss of equity in the Shops. P&M's breach of its contractual duties to MCLC prevented a permanent loan from being put in place and cost MCLC its 50% interest in the Shops.  Poag & McEwen's Mezzanine Loan—and its attempts to pay it off—resulted in the foreclosure of the Shops.

219. Because the loss of the Shops resulted in a loss in the value of MCLC's equity in CLC, MCLC is entitled to damages in the amount that its equity in CLC was worth on the date of the first material breach, April 23, 2007.  As CLC's only asset was the Shops, MCLC's equity in CLC at that time was the value of the Shops, minus the Construction Loan, divided by two. However, the value of the Shops was fluctuating at this time due to the fact that it was not fully leased and stabilized.  Therefore, to determine the value of the Shops in April 2007, it is reasonable to determine the average value of the Shops over the period of a year.

220. From the period starting six months before the breach and ending six months after the breach, four valuations of the Shops were performed. In October 2006, NVC valued the Shops at $182.8 million.  Then, NVC decreased the value of the Shops in March 2007 to $178.2 million.  In August 2007, Eastdil valued the Shops between $196.81 million and $202.62 million

(for a combined average of $199.75 million). Finally, after adjusting some numbers, Eastdil valued the Shops in September 2007 between $206.14 million and $212.4 million (for a combined average of $209.3 million).

221. Taking the average of all of these valuations, the Shops were worth approximately $192.5 million on April 23, 2007, and that this is a fair and reasonable estimate. Subtracting the $116 million Construction Loan and dividing by two yields an equity for each partner of $38.25 million. Therefore, P&M is liable to MCLC in the amount of $38.25 million for its breaches related to the Mezzanine Loan.

222. This amount of damages is not speculative as it is based on the average of numerous professional evaluations that were made of the value of the Shops within a reasonable period of time surrounding the time of the first material breach.

223. Adding up these three areas of damages, P&M is liable to MCLC for a total of $42,006,032.50 ($6032.50 + $3,750,000 + $38,250,000 = $42,006,032.50).

**VI. FINDINGS AND CONCLUSIONS ADOPTED REGARDING AFFIRMATIVE DEFENSES.**

224. The court rejects Josh Poag's testimony that he did not pursue permanent financing from 2006 through 2007 because he could not obtain permanent financing until the Shops were stabilized. P&M obtained a permanent loan for Dos Lagos, a similar shopping center to the Shops, in April 2007 when Dos Lagos had a lower percentage of its retail space rented than the Shops at the time. Loan offers were made to P&M in 2006 which were based on current tenancies, not on tenancies in the future.

225. The sole reason that P&M did not obtain financing between June 2006 and April 2007 was because P&M wanted an unnecessarily large permanent loan so that it could pay off its Mezzanine Loan in addition to the existing Construction Loan on the Shops. The testimony was

unequivocal that the lending market from 2005 through 2007 was exceptional and that P&M could have easily found a permanent loan to pay off the Construction Loan during that time.

226. At the end of April 2007, P&M stopped trying to find permanent financing because it was planning on selling the Shops (or at least its interest in the Shops) and that the buyer would want to find its own permanent financing.  However, P&M never informed MCLC that it was abandoning the search for a permanent loan.  The abandonment of the efforts to secure permanent financing and the failure to disclose this to McWhinney was a clear breach of the Operating Agreement, willful misconduct, and working for the benefit of P&M and not McWhinney.  P&M knew that it might not be able to sell its interest and that it needed to have a plan if that occurred.  However, from the end of April 2007 until the time that the Shops were foreclosed on in 2010, P&M did not use good faith efforts to search for or obtain permanent financing.  After the sales negotiations fell through at the end of 2007, P&M did not obtain a single permanent loan proposal from a lender.

227. When the Construction Loan defaulted in January 2009, P&M did not send McWhinney a Permanent Loan Impasse Notice as required by Section 7.3(a) of the Operating Agreement.  P&M's breach further prevented McWhinney from putting a permanent loan on the Shops.  Not only did it fail to send the Permanent Loan Impasse Notice, but P&M consciously chose to let the Construction Loan default—hoping to get a favorable workout from the Bank Group.  This was evidenced by the statements of Josh Poag that he chose to let the construction loan enter into default and that he could have obtained a permanent loan at this time but chose not to do so.  This was another breach of P&M's fiduciary duties as it had an obligation to obtain permanent financing and could have obtained a permanent loan but chose not to do so.

228. P&M's failure to make efforts to find permanent financing and its efforts to work for its own interest after April 2007—coupled with its refusal to put on a permanent loan in 2006 and early 2007—resulted in, led to or caused default of the Construction Loan, foreclosure of the Shops, and damages to McWhinney based on the loss of its equity in the Shops.

229. The foreclosure of the Shops did not result from the recession in 2008-10 and McWhinney's refusal to agree to a post-foreclosure workout agreement.  Had P&M not obtained the Mezzanine Loan it would have been able to obtain a permanent loan before the financial crisis and a workout would not have been necessary.  That is, there were no impediments to obtaining financing from 2006 through the end of 2007 except those caused by P&M's desire to obtain a permanent loan that would pay off the Construction Loan and give it an additional $40 million to pay-off McEwen.  Simply put, the Poags' gamble to leverage the Shops in order to buyout McEwen kept a permanent loan from being put on the Shops, which led directly to the default of the Construction Loan and the foreclosure and sale of the Shops.

230. This series of breaches between 2006 and 2010 also resulted in, led to, and caused losses because if P&M had not actively concealed its breaches from McWhinney, McWhinney would have fired P&M as the manager pursuant to Section 6.5 of the Operating Agreement. McWhinney would have obtained permanent financing for the Shops in 2006 or 2007, which would have avoided foreclosure of the Shops.  Section 6.5 of the Operating Agreement provides that P&M may be removed as manager for cause if it commits willful malfeasance, is grossly negligent, engages in materially damaging conduct, or commits an act of fraud or embezzlement. McWhinney would have removed P&M as manager had it known of the breaches of the Operating Agreement by P&M and obtained permanent financing for themselves.  McWhinney did not know any details about the $40 million loan until March 13, 2009.  At that time, deep in

the recession, the Construction Loan was already in default, and it would have been "too little too late" to try and replace P&M and obtain a permanent loan at that time.

231. While MCLC had a duty to mitigate its damages where feasible, it met its duty. Specifically, MCLC attempted to purchase P&M's interest in the company numerous times.  It also diligently worked with P&M and the Bank Group to try and obtain an extension to the Construction Loan.  Finally, it attempted to purchase the Shops post-foreclosure.  All of these actions were taken to mitigate its damages.  Because MCLC was the non-managing member of CLC, it did not have the ability to find its own financing for the Shops.  It relied on P&M to do its job as the manager in obtaining financing, and it attempted to mitigate its damages in other ways.  It would not have been reasonable for MCLC to overstep its place as the non-managing member in attempting to mitigate its damages by putting its own financing on the Shops, and it did not do so.  Therefore, P&M is liable for the full amount stated above.

## VII. FINDINGS AND CONCLUSIONS ADOPTED CONCERNING PHASE II.

232. In Phase II of the state court trial the sole issue was whether PMLC and P&M are alter egos, rendering PMLC liable for the damages awarded in Phase I against P&M.  Delaware law is the applicable law to be used in deciding this issue.

233. To prove that PMLC and P&M were alter egos, plaintiffs must prove that (1) P&M was a mere instrumentality of PMLC, and (2) P&M was formed or pervasively used by PMLC to commit fraud or something like fraud.

234. Factors in determining the first prong, i.e., whether P&M was a mere instrumentality of PMLC, are whether (1) the subsidiary is adequately capitalized; (2) it is solvent; (3) corporate formalities were observed; (4) a controlling shareholder siphoned company

funds; and (5) in general, the subsidiary simply functioned as a facade.  A combination of multiple factors is required; no single factor is sufficient.

235.    The second prong requires proof of fraud or fraud-like conduct, not merely injustice or unfairness.  There must also be a nexus between the alleged fraud and the abuse of the entity form.

236.    In the December 2002 letter of intent, the parties agreed to structure the Centerra venture as a "single purpose limited liability company (LLC) to develop, own and manage the center."

237.    In 2003, Josh Poag discussed with Chad McWhinney, on multiple occasions, the structure and ownership of their respective organizations, and how they would form LLCs to hold their holding companies' interests.  Their respective holding companies were McWhinney Holding Company, LLLP  or "MHC" and Poag &McEwen Lifestyle Centers, LLC or "PMLC."

238.    The holding companies had no employees and operated through operating companies, McWhinney Real Estate Services, Inc. or "MRES," and PM Lifestyle Shopping Centers, LLC or "PMLSC."

239.    PMLC and MHC also agreed to form special purpose entities to become the two members of CLC.  PMCL formed P&M for that purpose in March 2004.  MHC formed MCLC in April 2004.

240.    When the Operating Agreement was signed by P&M and MCLC on September 29, 2004, 91.5% of P&M , and 96% of PMLC, were owned and controlled by Terry McEwen, Dan Poag, Josh Poag, their family members, entities, and trusts.  PMLSC was wholly owned by PMLC.  MHC initially owned 100%, later reduced to 94.5%, of MCLC, and the McWhinneys, their family entities and trusts, owned and controlled MHC and MRES.

241.     Plaintiffs contend that P&M and PMLC were, *de facto,* a single entity and alter egos of each other for several reasons: (1) P&M was not sufficiently capitalized; (2) P&M was not solvent; (3) business records for P&M were not sufficiently kept; (4) corporate formalities were not sufficiently observed; (5) P&M siphoned stockholder funds; (6) P&M officers did not function properly; and (7) P&M was a facade for PMLC.

242.     Plaintiffs did not prove by a preponderance of the evidence any of the seven above detailed factors.

243.     There was no proof that either P&M or PMLC was not adequately capitalized or solvent.  P&M's initial capitalization was the incurred pre-construction expenses of $2,387,315.93, which was repaid as a preferred return in November 2004.  P&M's capitalization was also its equity in CLC, which plaintiffs' expert conceded was a proper capitalization.  PMLC had business operations for a decade prior to the Centerra venture.  It had numerous other projects.  It was properly structured as a holding company.

244.     P&M maintained separate business records and filed tax returns during all relevant years except 2004 and 2008.  P&M's accounting and business records were sufficient, given the purposes for which it was formed, including to secure the $115,000,000 construction loan; to oversee its affiliate's pre-construction planning and completion of the Shops; to oversee PMLSC's management, budgeting, and financial work for CLC; and to oversee PMLSC's leasing of the Shops.

245.     PMLC and P&M appropriately observed corporate formalities.

246.     There was no siphoning of funds from P&M to PMLC.  P&M was not formed to defraud creditors, and it did not hide and/or transfer assets to defraud creditors.

247.    While P&M had manager duties, most manager duties were performed by PMLSC for CLC, including preparing budgets, maintaining bank accounts and books, preparing tax returns, and providing monthly and annual financial reports.  CLC paid PMLSC fees for these functions.  P&M's efforts created value.  As of April 23, 2007, MCLC's 50% interest in CLC was valued at $38,250,000.

248.    P&M was not a facade for PMLC.  P&M and PMLC were separate entities.  P&M and PMLC were not alter egos of each other.

**ORDER**

Plaintiffs' motion for partial summary judgment, ECF No. 276, is GRANTED in PART and DENIED in PART, as set forth in this order.

DATED this 19th day of March, 2020.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge